LESLIE J. HUGHES (CO Bar No. 15043)
hugheslj@sec.gov
LEE C. ROBINSON (CO Bar No. 32734)
robinsonlc@sec.gov
Attorneys for Plaintiff
U.S. Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, Colorado 80202-2656
Telephone:  (303) 844-1000
Fax: (303) 844-1068

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

---

SECURITIES AND EXCHANGE
COMMISSION,

              Plaintiff,

    v.

ROMULUS S. PEREIRA,

ROBERT B. STANTON,

L. JOHN KERN,

ANDREW D. FELDMAN,

WILLIAM F. McFARLAND,

LORI H. CORNMESSER,

              Defendants.

Case No. C 06-6384 MHP

**COMPLAINT**

---

Plaintiff, Securities and Exchange Commission ("SEC") alleges:

### I. SUMMARY

1.      From June 2001 through June 2002 (the "relevant period"), **Romulus S. Pereira**, chief executive officer, **Robert B. Stanton**, chief financial officer, **L. John Kern**, executive vice president of worldwide sales, **Andrew D. Feldman**, vice president of marketing, and **William F. McFarland**, vice president of finance, engaged in a scheme that defrauded investors by making

COMPLAINT

materially false and misleading statements regarding the net revenues of Riverstone Networks, Inc. ("Riverstone"), a public company whose securities were traded on the NASDAQ national market.

2.    During the relevant period, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** negotiated, reviewed, approved, or were otherwise aware of sales transactions that involved side agreements with purchasers, under which the customer's payment for Riverstone product was contingent upon resale or the purchaser was granted full return, exchange, or cancellation rights and for which Riverstone improperly recognized revenues under Generally Accepted Accounting Principles ("GAAP").

3.    As a direct result of these Defendants' actions, Riverstone falsely reported at least $29,613,000 of revenues in its financial statements as a result of the contingent sales, causing revenue overstatements for each of the four quarters in the relevant period ranging between 14.31 % and 23.14 %.

4.    **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** knew, or were reckless in not knowing, that it was improper for Riverstone to recognize revenues on these contingent sales under GAAP and that Riverstone's periodic filings with the SEC during the relevant period contained materially false and misleading information regarding its reported revenues.

5.    **Pereira**, **Stanton**, and **McFarland**, who were responsible for Riverstone's accounting department and policies, also failed to devise, implement, and maintain an adequate system of internal accounting controls at Riverstone.

6.    **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland**, aided and abetted by Riverstone's director of sales operations, **Lori H. Cornmesser**, made or caused misstatements and omissions to Riverstone's accountants concerning the true nature of certain sales transactions.

7.    During the relevant period, each of the Defendants circumvented the internal accounting controls that Riverstone had in place and falsified Riverstone's books, records, and accounts.

8.    While Riverstone's stock price was artificially inflated due to its material

2

overstatement of revenues, each of the Defendants except **McFarland** realized substantial profits from stock sales, bonuses, and other forms of compensation.

9.     Riverstone was a majority-owned subsidiary of Enterasys Networks, Inc., formerly known as Cabletron Systems Inc., (referred to jointly as "Enterasys"), until it was spun off as an independent public company on August 6, 2001.  Riverstone's financial statements prior to August 6, 2001, were included in Enterasys's consolidated financial reports.

10.     On February 1, 2002, Enterasys announced that it was the subject of a formal SEC investigation and that it was reviewing its sales and revenue recognition practices for its Asia Pacific region and would therefore be delaying the release of its fourth quarter financial results.

11.     Just before the announcement on February 1, 2002, Riverstone's stock had a closing price of $15.72 per share.   Within two weeks after Enterasys's announcement, Riverstone's stock was trading at $7.70 per share, a decline of over 50 percent.  This represents a change in the value of the shareholders' stock of approximately $984 million.

12.     On August 27, 2003, Riverstone filed an amended current report with the SEC on Form 8-K, which **Stanton** signed, announcing the company had overstated its revenues for fiscal year 2002 by as much as $85.5 million and for the nine months ended November 30, 2002, by as much as $12.7 million.

## II.     JURISDICTION AND VENUE

13.     The SEC brings this action to enforce the federal securities law pursuant to Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d) and 78u(e)].

14.     This Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

15.     The Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce, or of the mails in connection with the transactions, acts, practices, and courses of business described in this Complaint.

16.     This district is appropriate for venue under Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the transactions, acts, practices, and courses of business constituting

COMPLAINT

the violations of law alleged in this Complaint occurred within the Northern District of California. The Defendants worked in Riverstone's principle office in Santa Clara, California. The Defendants also reside within this district in Santa Clara or San Mateo counties.

### III.    INTRA-DISTRICT ASSIGNMENT

17.    Assignment to the San Jose Division is appropriate pursuant to Civil Local Rule 3-2(e) because a substantial part of the events that give rise to the Commission's claims occurred in Santa Clara County.

### IV.    DEFENDANTS

18.    **Romulus S. Pereira**, age 55, a resident of Saratoga, California, served as chief executive officer, president, and as a director of Riverstone from March 2000 until December 2003. During the period March 4, 2001 to October 31, 2001, **Pereira** was also the executive at Riverstone in charge of worldwide sales.

19.    **Robert B. Stanton**, age 54, a resident of Palo Alto, California, served as Riverstone's chief financial officer and executive vice president of finance from August 2000 until October 2003.

20.    **L. John Kern**, age 39, a resident of Hillsborough, California, served as Riverstone's executive vice president of worldwide sales from November 2001 until October 2002. **Kern** was Riverstone's vice president of sales from January 2001 to November 2001 and its vice president of worldwide sales operations from April 2000 to January 2001.

21.    **Andrew D. Feldman**, age 36, a resident of Portola Valley, California, served as Riverstone's vice president of marketing from March 2000 until July 2003.

22.    **William F. McFarland**, age 54, a resident of Campbell, California, served as Riverstone's vice president of finance from August 2001 until June 2003. **McFarland** was in charge of Riverstone's accounting function, including its financial reporting.

23.    **Lori H. Cornmesser**, age 35, a resident of San Jose, California, served as Riverstone's director of sales operations from November 2001 to October 2002, and as senior manager of sales operations from December 2000 to October 2001.

COMPLAINT

4

## V.      RELATED ENTITY

24.     Riverstone Networks, Inc. is a Delaware corporation with its principal office in Santa Clara, California.  During the relevant period, Riverstone's stock was registered with the SEC pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78*l*(g)].

25.     Riverstone designed and sold routers, which are devices for making or transferring connections between communication circuits carrying voice or data transmissions.

## VI.     PEREIRA, STANTON, KERN, FELDMAN, AND MCFARLAND CAUSED RIVERSTONE TO REPORT IMPROPER REVENUES FROM CONTINGENT SALES

26.     Riverstone and its directors, officers, and employees were required to comply with the federal securities laws and regulations.  Those laws and regulations were designed to ensure that the financial information of publicly traded companies, such as Riverstone, is accurately recorded and disclosed to the investing public.

27.     Under the federal securities laws and regulations, Riverstone was required, among other things: a) to make and keep books, records, and accounts that accurately and fairly reflected the company's business transactions; (b) to devise and maintain a system of internal accounting controls that provided reasonable assurances that the company's financial transactions were recorded in a manner that would permit the preparation of financial statements in conformity with GAAP; and (c) to file with the SEC quarterly reports (known as Forms 10-Q) and annual reports (known as Forms 10-K) that included accurate and reliable financial statements prepared in accordance with GAAP.

28.     As a public company, Riverstone was also required to retain accountants to review and audit its financial statements for compliance with GAAP.  Officers and directors of public companies are required to provide accountants with information that is not false or misleading.

29.     Between June 1, 2001, and June 2, 2002, Defendants **Pereira, Stanton, Kern, Feldman**, and **McFarland** caused Riverstone to improperly recognize at least $29,613,000 in revenues from sales transactions involving rights of return, exchange, and cancellation, and other material contingencies such as extended payment terms, which were not accounted for at the

COMPLAINT

time the transactions were originally recorded.  As a result, revenues related to these sales either should not have been recognized or should have been recognized in a different period.

30.     Instead of including the foregoing contingencies in its sales contracts or the customers' purchase orders, Riverstone agreed to these contingencies in side agreements that, due to the acts or omissions of the Defendants, were not recorded in Riverstone's books, records, and accounts, or disclosed to the company's outside accountants.

31.     The contingent sales were often consummated within the last two weeks of a reporting period when Riverstone was struggling to meet its revenues target.

32.     **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** knowingly, or recklessly, participated in Riverstone's material misstatements of revenues by negotiating, reviewing, or recording revenues on contingent sales and concealing the sales contingencies from Riverstone's outside accountants.

33.     **Pereira**, **Stanton**, and **McFarland** also knowingly, or recklessly, participated in Riverstone's material misstatements of revenues by failing to implement procedures to identify and properly account for contingent sales after gaining knowledge that millions of dollars of contingent sales had occurred at Riverstone.

34.     As a direct result of these Defendants' actions and omissions, Riverstone materially overstated its revenues for each quarter during the relevant period by at least: $10,382,000 or 23.1% for the quarter ended September 1, 2001; $7,519,000 or 14.3% for the quarter ended December 1, 2001; $7,658,000 or 17.55% for the quarter ended March 2, 2002; and $4,054,000 or 15.56% for the quarter ended June 1, 2002.

35.     **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** caused Riverstone to file three quarterly reports and one annual report with the SEC that contained false and misleading financial statements, which were not prepared in accordance with GAAP.

36.     These Defendants' violations resulted in various materially false statements contained in SEC filings and other documents, including: Riverstone's annual report on Form 10-K for the fiscal year from March 4, 2001 to March 2, 2002; Riverstone's quarterly reports on Forms 10-Q for the quarters from June 3, 2001 to September 1, 2001; September 2, 2001 to

COMPLAINT

December 1, 2001; and March 3, 2002 to June 1, 2002; all press releases and other statements incorporating the above documents; and the representation letters sent to Riverstone's outside accountants on September 20, 2001, May 28, 2002, and May 30, 2002.

37. **Pereira** and **Stanton** signed each of the Forms 10-Q and 10-K listed above despite their knowledge that, or reckless indifference as to whether, the amount of revenues listed in each report was false and materially overstated.

A. **The World Wide Technology Side Agreement**

38. In August 2001, **Feldman** approached World Wide Technology, Inc. ("WWT"), a Missouri-based reseller, about placing a $2.8 million purchase order with Riverstone.

39. To induce the sale, **Feldman** agreed via e-mail that WWT would not have to pay for the Riverstone product until it was resold ("sell-through payment term") and that WWT would have full exchange rights on the order.

40. **Feldman** informed both **Pereira** and **Stanton** about the sell-through payment term prior to agreeing to it and **Pereira** specifically approved the term and instructed **Feldman** to close the WWT transaction.

41. On August 28, 2001, four days before the close of Riverstone's second quarter, WWT submitted a $2.8 million purchase order to Riverstone that made reference to the sale contingencies contained in **Feldman's** e-mail. **Feldman** told WWT that he could provide a side agreement with the contingencies, but instructed WWT to remove the note referencing them from the purchase order.

42. At the time **Feldman** entered into the side agreement with WWT, he was aware that Riverstone intended to recognize revenues on the WWT transaction, that the sale contingencies would prevent revenue recognition under GAAP, and that WWT's purchase order needed to omit any references to the contingencies if revenue was to be recognized.

43. In response to **Feldman's** request, WWT sent a revised purchase order to Riverstone deleting the note.

44. Despite the known contingencies, **Pereira**, **Stanton**, and **Feldman** caused

COMPLAINT

Riverstone to recognize $2.8 million of revenues for the quarter that ended September 1, 2001, from the WWT sale.

45. A month after the WWT sale, Riverstone's director of credit and collections, Kathy Alvendia, learned of the sell-through payment term as a result of a collection call to WWT. Alvendia informed **Stanton**, **Feldman**, and **McFarland** on October 2, 2001, that the inability to collect the amount owed by WWT at the time would have a major impact on the aging of Riverstone's receivables.

46. On October 11, 2001, Alvendia met with **Feldman** and **McFarland**, at which time **Feldman** confirmed the existence of the sell-through payment term.

47. The next day, Alvendia sent an e-mail to **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** stating that Riverstone gave WWT a sell-through payment term "as part of shipping $3M in revenue for the qtr."

48. Soon after **Pereira** and **Stanton** were told by Alvendia of the sell-through payment term given to WWT, they both had conversations with her in which they acknowledged that the WWT transaction was a problem.

49. Three days later, on October 15, 2001, **Pereira** and **Stanton** signed Riverstone's Form 10-Q for the quarter ending September 1, 2001, which included all the revenues recorded from the WWT transaction.

50. **Pereira**, **Stanton**, and **McFarland** took no action to reverse the improper revenues from the WWT transaction, which alone comprised 5.1% of Riverstone's reported revenues for the quarter.

51. Absent the WWT sale, Riverstone would not have met its Wall Street revenues expectations for the second quarter of fiscal year 2002, nor would it have posted a profit.

52. On September 20, 2001, in connection with the quarterly review by Riverstone's outside accountant, KPMG LLP, **Pereira**, **Stanton**, and **McFarland** signed a representation letter indicating that, among other things, all of Riverstone's sales transactions were final, there existed no side agreements involving return rights, and that revenues were reserved to the extent significant future obligations exist.

8

COMPLAINT

53.     On May 28, 2002, **Pereira**, **Stanton**, and **McFarland** also signed a representation letter to Riverstone's outside accountant, Ernst & Young LLP ("E&Y"), in connection with the year-end audit for the fiscal year ending March 2, 2002, stating that none of Riverstone's resellers had sell-through payment terms.

54.     On May 30, 2002, **Pereira** signed a separate representation letter to E&Y stating that he had no knowledge of any side agreements for the period March 4, 2001, to October 31, 2001.

55.     Based on **Pereira**, **Stanton**, and **McFarland's** knowledge of the sell-through payment term connected with the WWT sale, their representations and omissions to Riverstone's outside accountants were false and misleading.

56.     **Feldman's** procurement of the revised purchase order from WWT concealed the sale contingencies from Riverstone's outside accountants.  It also caused Riverstone's books, records, and accounts to be false.

**B.      The Vnetek Side Agreement**

57.     Riverstone personnel asked customers to remove non-standard terms from purchase orders and instead provide "clean" purchase orders (a purchase order with Riverstone's standard sales terms) and Riverstone personnel, in turn, committed to the non-standard terms in a side letter or verbal agreement.

58.     **Feldman** and **Kern** were aware of this practice of getting a "clean" purchase order, which was needed to "get through audit."

59.     On November 29, 2001, three days before the end of Riverstone's third quarter, Vnetek Communications, Inc. ("Vnetek"), a New Hampshire-based reseller, sent **Feldman** a "clean" $2.0 million purchase order reflecting net 30 payment terms.

60.     However, to induce the sale, **Feldman** signed a side agreement with Vnetek giving it full return rights and a sell-through payment term for the order.

61.     At the time he granted Vnetek the full return rights and a sell-through payment term, **Feldman** knew these terms prohibited revenue recognition under GAAP.

9

COMPLAINT

62.     The sale contingencies granted to Vnetek by **Feldman** were approved by **Pereira**, **Stanton**, and **McFarland**.

63.     Despite the known contingencies, **Pereira**, **Stanton**, **Feldman**, and **McFarland** caused Riverstone to recognize $1.5 million of revenues for the third quarter that ended December 1, 2001, from the Vnetek sale.

64.     **Feldman's** procurement of the "clean" purchase order from Vnetek and use of a side agreement concealed the sale contingencies from Riverstone's outside accountants.  It also caused Riverstone's books, records, and accounts to be false.

**C.     The Technica Side Agreement**

65.     In early 2002, Riverstone was negotiating an opportunity for a large sale to the Defense Information Systems Agency ("DISA"), a branch of the United States Department of Defense.

66.     Riverstone used resellers to "pull deals forward," meaning to take product in advance of a sale to an end user so that Riverstone could recognize revenues in an earlier quarter for the purpose of meeting Wall Street expectations.   This practice was known to **Kern**, **Feldman**, and **McFarland**.

67.     Because the DISA sale could not be consummated by the quarter ending March 2, 2002, Riverstone's sales personnel approached Technica Corporation ("Technica"), a Virginia-based reseller, about purchasing the DISA inventory before March 2, 2002, with the understanding that Technica did not have to pay for the inventory until it was resold to DISA.

68.     To induce the sale, **Kern** approved a side agreement granting Technica a sell-through payment term and unlimited stock rotation rights for the order.

69.     On February 19, 2002, Technica placed a "clean" $2.0 million purchase order with Riverstone that did not reference the sales contingencies.

70.     At the time he approved the Technica side agreement, **Kern** knew it was improper to recognize revenues on the transaction under GAAP and that Riverstone intended to include the Technica deal in its revenues for the quarter.

10

COMPLAINT

71.     On May 1, 2002, a month before Riverstone filed its Form 10-K for the fiscal year ending March 2, 2002, **Cornmesser** received an e-mail from the Riverstone sales person on the Technica account informing her of the side agreement and the sell-through payment term, which she forwarded to **McFarland**.

72.     **McFarland** took no action on **Cornmesser's** e-mail, and did not request a copy of the side agreement.

73.      **McFarland** did not bring the Technica side agreement to the attention of Riverstone's outside accountants.

74.     Notwithstanding their knowledge of the contingency, **Kern** and **McFarland** caused Riverstone improperly to record $2.0 million of revenues in the quarter ending March 2, 2002, on the Technica transaction.

75.     Just days after **McFarland** was informed of the Technica side agreement, Riverstone's sales personnel approached Technica to take additional product for the DISA deal.

76.     On May 23, 2002, in the last week of the quarter ending June 1, 2002, **Kern** approved a second side agreement granting Technica a sell-through payment term and unlimited stock rotation rights with respect to an additional $2.8 million purchase order.

77.     **Kern** caused Riverstone to recognize $2.8 million of revenues on the second Technica transaction for the quarter ending June 1, 2002, despite the existence of the side agreement.  This transaction with Technica comprised 9.4% of Riverstone's revenues for the quarter.

78.     On May 30, 2002, within days after the execution of the second Technica side agreement, **Kern** signed a false representation letter to E&Y stating that he had no knowledge of any side agreements with Riverstone's customers.

79.     Shortly after being informed that Technica had been given a sell-through payment term for its initial $2.0 million purchase order, **McFarland** signed a false representation letter on May 28, 2002, to E&Y stating that Riverstone had not agreed to sell-through payment terms with its resellers.

11

COMPLAINT

80.     **Kern, McFarland**, and **Cornmesser** caused Riverstone's books, records, and accounts to be false by failing to record the side agreements with Technica or by recording revenues without appropriate reserves on contingent sales.

D.      **The TM Telecom Side Agreement**

81.     In 2002, Riverstone was working on a potential investment transaction involving a Brazilian end-user called Intelig Telecom ("Intelig"). The parties contemplated that Riverstone would invest approximately $1.0 million in Intelig in return for Intelig's commitment to purchase Riverstone product in the amount of Riverstone's investment.

82.     Because the Intelig investment deal could not be completed in the quarter ending June 1, 2002, Riverstone sales personnel engaged in discussions with Florida-based reseller TM Telecom, Inc. ("TM Telecom") about submitting a $1.0 million purchase order prior to the end of the quarter to purchase the product Riverstone intended to sell to Intelig, i.e., to pull the deal forward.

83.     To induce the sale, **Kern** approved granting TM Telecom a sell-through payment term for the order, which was conveyed to TM Telecom verbally by a Riverstone sales manager.

84.     On May 24, 2002, in the last week of the quarter, TM Telecom submitted the purchase order to Riverstone for approximately $1.0 million of product.

85.     However, TM Telecom had no need for the Riverstone product and did not have the independent ability to pay for it.

86.     The investment deal with Intelig was not completed by June 1, 2002.

87.     At the time that the side agreement with TM Telecom was reached, **Kern** knew that the sale contingency would prohibit revenue recognition under GAAP, that Riverstone intended to recognize revenues on the TM Telecom deal, and that such contingencies were being concealed by omitting references to them in the sales documentation.

88.     Despite the contingent payment term, **Kern** caused Riverstone to recognize revenues of $1.0 million on the TM Telecom sale for the quarter ending June 1, 2002.

COMPLAINT

89.     The investment deal with Intelig was never consummated and TM Telecom returned all of the Riverstone product nine months later.

90.     **Kern** caused Riverstone's books, records, and accounts to be false by failing to record the side agreement with TM Telecom.

**E.     Additional Contingent Sales Improperly Recorded As Revenues**

91.     In addition to the foregoing transactions, **Stanton**, **Kern**, and **McFarland** approved or had knowledge of the following additional contingent sales for which Riverstone improperly recognized revenues contrary to GAAP:

    a)  Everbright, $1.0 million improper revenues during the quarter that ended September 1, 2001, involving **Kern**;

    b)  Keytron S.A., $1.4 million total improper revenues during the quarters that ended September 1, 2001, and December 2, 2001, involving **Kern**;

    c)  REON Broadband, $200,000 improper revenues during the quarter that ended September 1, 2001, involving **Kern**;

    d)  Smartnet Technology, Inc., $500,000 improper revenues during the quarter that ended September 1, 2001, involving **Kern**;

    e)  ZTE Corporation, $1.4 million improper revenues during the quarter that ended September 1, 2001, involving **Kern**;

    f)  Spacnet, $700,000 improper revenues during the quarter that ended December 1, 2001, involving **Kern** and **McFarland**;

    g)  Landata Payama, S.A., $2.1 million total improper revenues during the quarters that ended December 1, 2001, and March 2, 2002, involving **Kern**;

    h)  All Networks, $900,000 improper revenues during the quarter that ended December 1, 2001, involving **Stanton**, **Kern**, and **McFarland**;

    i)  Commverge, $2.1 million improper revenues during the quarter that ended March 2, 2002, involving **Kern**;

13

COMPLAINT

j)  Vodatel, $2.6 million improper revenues during the quarter that ended March 2, 2002, involving **Kern**;

k)  KDC Corp., $1.5 million improper revenues during June 1, 2002, involving **Kern** and **McFarland**;

l)  Solunet, Inc., $5 million improper revenue during the quarters that ended September 1, 2001, December 1, 2001, and March 2, 2002, involving **Kern**; and

m)  Trispec, $1.0 million improper revenues during the quarter that ended September 1, 2001, December 1, 2001, March 2, 2002, involving **Kern**.

## VII.   RIVERSTONE'S SYSTEM OF INTERNAL ACCOUNTING CONTROLS WAS INADEQUATE AND EACH OF THE DEFENDANTS CONTRIBUTED TO RIVERSTONE'S IMPROPER RECORDKEEPING AND CONCEALED INFORMATION FROM RIVERSTONE'S OUTSIDE ACCOUNTANTS

92.    Riverstone did not devise or maintain a system of internal accounting controls that allowed it to prepare financial statement in conformity with GAAP.

93.    In some instances, non-standard sales terms, including sell-through payment terms, were not communicated from the sales group to members of the finance department.  This problem was specifically brought to the attention of **Stanton**, **Kern**, and **McFarland**, but they never instituted a formal policy to ensure that all non-standard sales terms were properly documented and communicated to the finance department.

94.    **Pereira**, **Stanton**, and **McFarland** did not perform any investigation and failed to correct Riverstone's books, records, and accounts when sales contingencies were brought to their attention.

95.    **Kern**, **Feldman**, and **Cornmesser** encouraged others to remove or misstate non-standard sales terms on purchase orders, resulting in inaccurate and incomplete sales records.

96.    **Cornmesser** failed to keep complete customer files or preserve their integrity, removed side agreements from customer files at the direction of **Kern**, entered false information into Riverstone's order management system, and circumvented Riverstone's credit approval process.

14

COMPLAINT

97.     **Pereira**, **Stanton**, and **McFarland** knew, or were reckless in not knowing, that internal control weaknesses existed at Riverstone, and they failed to take adequate steps to rectify them.

98.     Each of the Defendants, in a collaborative effort to conceal sales contingencies or other revenue obstacles from Riverstone's outside accountants, was responsible for the falsification of Riverstone's accounting records or knowingly circumvented the accounting policies that Riverstone had implemented.

## VIII.   DEFENDANTS RECEIVED ILL-GOTTEN GAINS
## AS A RESULT OF THEIR CONDUCT

99.     Between June 1, 2001, and June 1, 2002, while the Defendants knowingly or recklessly caused Riverstone to falsely overstate revenues in financial statements that were reported to the SEC and investors, or falsified Riverstone's accounting records, each of the Defendants, except **McFarland**, sold Riverstone stock at artificially inflated prices or received additional compensation as a result of their illegal conduct.

100.    The Defendants received at least the following estimated amounts of compensation and other financial gains:

a)  During the relevant period, **Pereira** received at least $1,236,712 in gains from stock sales.

b)  During the relevant period, **Stanton** received at least $533,273 in gains from stock sales.

c)  During the relevant period, **Kern** received at least $503,410 in gains from stock sales, and $154,324 in sales commissions.

d)  During the relevant period, **Feldman** received at least $998,499 in gains from stock sales, and $3,808 in bonuses.

e)  During the relevant period, **Cornmesser** at least received $57,726 in gains from stock sales, and $4,000 in bonuses.

COMPLAINT

**FIRST CLAIM FOR RELIEF**
**Fraud – Violations of Exchange Act Section 10(b) and Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
(Against Defendants **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland**)

101.    The SEC realleges paragraphs 1 through 100 above.

102.    Based on the conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland**, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person; in violation of Section 10(b) of the Exchange Act and Rule 10b-5. [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

103.    **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** violated, and unless restrained and enjoined will in the future violate, Section 10(b) of the Exchange Act and Rule 10b-5.

104.    Based on the conduct alleged above, Riverstone violated Section 10(b) of the Exchange Act and Rule 10b-5.

105.    Alternatively, based on the conduct alleged above, **Kern** and **Feldman** knowingly provided substantial assistance to Riverstone in its violations of Section 10(b) of the Exchange Act and Rule 10b-5, and therefore each is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

106.    **Kern** and **Feldman** aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

16

COMPLAINT

**SECOND CLAIM FOR RELIEF**
**False SEC Filings - Exchange Act Section 13(a) and Exchange Act**
**Rules 12b-20, 13a-1, and 13a-13**
**[15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20,**
**240.13a-1, and 240.13a-13]**
(Against Defendants **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland**)

107.    The SEC realleges paragraphs 1 through 100 above.

108.    Riverstone filed with the SEC three quarterly reports on Forms 10-Q and one annual report on Form 10-K that contained materially false and misleading information in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13.  [15 U.S.C. § 78m(a) and 17 C.F.R. §§  240.12b-20, 240.13a-1 and 240.13a-13].

109.    Based on the conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** knowingly provided substantial assistance to Riverstone in its violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13, and therefore each is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

110.    **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§  240.12b-20, 240.13a-1 and 240.13a-13].

**THIRD CLAIM FOR RELIEF**
**False Books and Records - Exchange Act Section 13(b)(5) and Rule 13b2-1**
**[15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1]**
(Against All Defendants)

111.    The SEC realleges paragraphs 1 through 100 above.

112.    Based on the conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser** knowingly circumvented Riverstone's system of internal accounting controls, knowingly falsified Riverstone's books, records, or accounts, and directly or indirectly falsified or caused to be falsified books, records, or accounts described in Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

COMPLAINT

113.   **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser**, violated, and unless restrained and enjoined will continue to violate, Section 13(b)(5) of the Exchange Act and Rule 13b2-1 [15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1].

### FOURTH CLAIM FOR RELIEF
### False Books and Records - Exchange Act Section 13(b)(2)(A)
### [15 U.S.C. § 78m(b)(2)(A)]
(Against All Defendants)

114.   The SEC realleges paragraphs 1 through 100 above.

115.   Based on the conduct alleged above, Riverstone violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] which requires issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to make and keep books, records, and accounts which in reasonable detail accurately and fairly reflect its transactions and disposition of assets.

116.   Based on the conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser** knowingly provided substantial assistance to Riverstone in its violations of Section 13(b)(2)(A) of the Exchange Act, and therefore each is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

117.   **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser** aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

### FIFTH CLAIM FOR RELIEF
### False Books and Records - Exchange Act Section 13(b)(2)(B)(ii)
### [15 U.S.C. § 78m(b)(2)(B)(ii)]
(Against Defendants **Pereira**, **Stanton**, and **McFarland**)

118.   The SEC realleges paragraphs 1 through 100 above.

119.   Based on the conduct alleged above, Riverstone violated Section 13(b)(2)(B)(ii) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)(ii)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a system of internal accounting controls sufficient to provide reasonable assure that its transactions

are recorded as necessary to permit preparation of financial statements in conformity with GAAP or other criteria applicable to the statements.

120.    Based on the conduct alleged above, **Pereira**, **Stanton**, and **McFarland** knowingly provided substantial assistance to Riverstone in its violations of Section 13(b)(2)(B)(ii), and therefore each of them liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

121.    **Pereira**, **Stanton**, and **McFarland** aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 13(b)(2)(B)(ii) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)(ii)].

**SIXTH CLAIM FOR RELIEF**
**Deceit of Accountants - Exchange Act Rule 13b2-2**
**[17 C.F.R. § 240.13b2-2]**
(Against All Defendants)

122.    The SEC realleges paragraphs 1 through 100 above.

123.    By engaging in the acts and conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland**, who were directors or officers of Riverstone when they engaged in the alleged acts and conduct, directly or indirectly, knowingly made or caused to be made materially false or misleading statements, or omitted to state or caused another person to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to an accountant in connection with an audit or examination of the financial statements of Riverstone required to be made or the preparation or filing of reports required to be filed by Riverstone with the SEC.

124.    Through the conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** violated, and unless restrained and enjoined will continue to violate, Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

125.    Through the conduct alleged above, **Cornmesser** knowingly provided substantial assistance to **Kern**, **Feldman**, and **McFarland** in their violations of Rule 13b2-2, and therefore

1  is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. §
2  78t(e)].

3      126.    **Cornmesser** aided and abetted, and unless restrained and enjoined will continue
4  to aid and abet, violations of Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

5

6                                  **PRAYER FOR RELIEF**

7      The SEC respectfully requests that this Court:

8                                         I.

9      Find that Defendants **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser**
10 committed the violations alleged;

11                                        II.

12     Enter an injunction permanently restraining and enjoining Defendants **Pereira**, **Stanton**,
13 **Kern**, **Feldman**, **McFarland**, and **Cornmesser** from violating, directly or indirectly, or aiding and
14 abetting violations of the law and rules alleged in this Complaint;

15                                       III.

16     Order defendants **Pereira**, **Stanton**, **Kern**, **Feldman**, and **Cornmesser** to disgorge all ill-
17 gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in
18 this Complaint, including, but not limited to, bonuses, commissions, and proceeds from stock
19 sales, plus pre-judgment and post-judgment interest;

20                                       IV.

21     Order Defendants **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser** to
22 pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §  78u(d)(3)] in
23 an amount to be determined by the Court, and post-judgment interest;

24                                        V.

25     Prohibit Defendants **Pereira**, **Stanton**, and **Kern**, pursuant to Section 21(d)(2) of the
26 Exchange Act [15 U.S.C. § 78u(d)(2)] from serving as an officer or director of any company
27 having a class of securities registered with the SEC pursuant to Section 12 of the Exchange Act

28

COMPLAINT

[15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act

[15 U.S.C. § 78o(d)];

VI.

Retain jurisdiction of this action in accordance with the principles of equity and the

Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and

decrees that may be entered, or to entertain any suitable application or motion for additional

relief within the jurisdiction of this Court; and

VII.

Grant such relief as this Court may determine is just and necessary.

DATED:  October 12, 2006.


s/Leslie J. Hughes
Leslie J. Hughes Esq. (Colo. 15043)


s/Lee C. Robinson
Lee C. Robinson (Colo. 32734)

Attorneys for Plaintiff
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO  80202-2656
Telephone                    (303) 844-1000
Fax                              (303) 844-1068

COMPLAINT