Westlaw.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 1

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

S.E.C. Release No.
Initial Decision

**\*1** IN THE MATTER OF ROBERT G. WEEKS, DAVID A. HESTERMAN, AND KENNETH L. WEEKS
Administrative Proceeding File No. 3-9952

February 4, 2002

INITIAL DECISION

APPEARANCES:

Thomas D. Carter for the Division of Enforcement, Securities and Exchange Commission.

James N. Barber for Respondent Robert G. Weeks.

David W. Parsons for Respondents David A. Hesterman and Kenneth L. Weeks.
BEFORE: James T. Kelly, Administrative Law Judge
 The Securities and Exchange Commission (SEC or Commission) issued its Order Instituting Proceedings (OIP) on August 2, 1999, pursuant to Section 8A of the Securities Act of 1933 (Securities Act) and Sections 15(b)(6)(A) and 21C of the Securities Exchange Act of 1934 (Exchange Act). The Commission amended the OIP on November 5, 1999.

 In relevant part, the amended OIP alleges that, between June 1995 and November 1996, Respondents Robert G. Weeks (Robert Weeks), David A. Hesterman (Hesterman), and Kenneth L. Weeks (Kenneth Weeks) took control of Dynamic American Corporation (Dynamic American), a Utah corporation, exercised authority over the company's

nominal officers and directors, and baselessly inflated its assets.[FN1] The amended OIP further alleges that the three Respondents then disseminated false and misleading statements regarding the company's assets and its operations to purchasers and sellers of Dynamic American's stock. The amended OIP also asserts that Respondents sold over fifty million shares of Dynamic American stock in the United States without benefit of a registration statement or a valid exemption from registration. Finally, the amended OIP charges Respondents with causing reporting and recordkeeping violations by Dynamic American and with willfully failing to file required stock ownership reports.

 The amended OIP alleges that Respondents willfully violated Sections 5(a), 5(c), and 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder. It further alleges that Respondents willfully violated Sections 13(b)(5), 13(d), 13(g), and 16(a) of the Exchange Act, and Rules 13d-1, 13d-2, and 16a-3 thereunder. Finally, it claims that Respondents caused Dynamic American's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B)(ii) of the Exchange Act, and Rules 13a-1, 13a-10, 13a-11, 13a-13, 12b-20, and 12b-25 thereunder. As relief for these alleged violations, the Division of Enforcement (Division) seeks cease and desist orders, disgorgement of ill-gotten gains, civil money penalties, and penny stock bars against all three Respondents.

 I held a public hearing in Salt Lake City, Utah, on July 10 through 14 and July 17 through 18, 2000. Robert Weeks appeared in person and testified. Hesterman and Kenneth Weeks did not appear, although their attorney participated by offering arguments and cross-examining witnesses. The parties have had an opportunity to file proposed findings of fact, conclusions of law, and briefs, and the matter is ready for decision.[FN2] I base my findings and conclusions on the entire record and on the demeanor of the witnesses who testified at the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release                    Page 2
No.)

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

hearing. I applied "preponderance of the evidence" as the applicable standard of proof. See Steadman v. SEC, 450 U.S. 91, 97-104 (1981). I have considered and rejected all arguments, proposed findings, and conclusions that are inconsistent with this decision.

## PRELIMINARY ISSUES

### 1. Delays Encountered In Resolving The Case.

**\*2**  Before addressing the merits, some explanation is warranted for the age of the case. After the Commission issued the OIP, it took five months simply to get started. First, the Division sought to amend the OIP. As noted, the Commission granted that relief on November 5, 1999. Second, the Office of the U.S. Attorney for the District of Utah requested a ninety-day stay in this proceeding to permit completion of two related grand jury investigations. I granted that request by Order of September 28, 1999. Third, Respondent Kenneth Weeks was not served with the OIP or the Commission's Order amending the OIP until January 5, 2000.

Shortly before the hearing was to begin, Respondents Hesterman and Kenneth Weeks alleged that certain Division personnel had violated the grand jury secrecy rule in the investigation leading to this administrative proceeding and in a related criminal investigation involving the officials of Pan World Minerals International, Inc. (Pan World). The purported grand jury secrecy violations related to the manner in which the investigative testimony of Robert Cordes (Cordes), a key figure in this case, had been obtained. As relief, Hesterman and Kenneth Weeks sought dismissal, summary disposition, a stay, or the suppression of evidence in this proceeding. After briefing and a telephonic prehearing conference, I denied the motion for summary disposition and the alternative motion to postpone the oral hearing. I also denied the motion to dismiss or suppress, without prejudice to renewal at a later date. I held that, if Respondents diligently pursued contempt relief in federal district court and obtained a ruling in that forum on their claim of grand jury secrecy violations, I would keep the administrative record open for an appropriate period to receive the results. See Order of July 7,

2000. At the administrative hearing, I also permitted Respondents to question a Commission employee about the circumstances under which the Division took the investigative testimony of Cordes (Tr. 1107-13, 1121-27).

The motion that Hesterman and Kenneth Weeks eventually filed in district court sought only to suppress testimony and documents that the Office of the U.S. Attorney had obtained from Cordes. It alleged that an administrative subpoena from the Dynamic American civil investigation had been misused to develop evidence for the Pan World criminal case. In their district court motion, Hesterman and Kenneth Weeks did not repeat many of their earlier allegations of grand jury secrecy violations by the Division's staff, and they never requested the district court to make a finding of contempt (Memorandum in Support of Motion to Suppress Evidence Relating to Robert Cordes and for Discovery, dated September 13, 2000, attached to Division's Response to Kenneth Weeks's and Hesterman's Answer to Show Cause Order, dated September 14, 2000).

I stayed the posthearing briefing schedule in this proceeding, pending the district court's resolution of the motion to suppress. See Orders of August 29, 2000; September 21, 2000; October 24, 2000; November 27, 2000; January 9, 2001; and February 27, 2001.

**\*3**  On May 8, 2001, U.S. Magistrate Judge Ronald N. Boyce issued a Report and Recommendation denying Hesterman's and Kenneth Weeks's motion to suppress the testimony and evidence obtained from Cordes (DX 191). Among other things, the Magistrate Judge determined that there was no due process violation in the manner in which the evidence was obtained from Cordes. He further found that there was no prohibition on using the information from Cordes gained in the Dynamic American civil investigation in the Pan World criminal case. The Magistrate Judge also held that once a person communicates information to a third party, even with the understanding that the communication is to be confidential, he cannot object if that person discloses the information, or records thereof, to government authorities.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                                                                                          Page 3

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

The posthearing stay added eight months to the age of this case, but I believed it prudent to have a complete record on such a sensitive allegation. Cf. Siegel Trading Co., Inc., [1977-1980 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,527 at 22,182 (CFTC Dec. 16, 1977) ("While the [Commodity Futures Trading Commission (CFTC)] considers even the allegation of violations of Grand Jury secrecy by [CFTC] personnel to be a very serious matter, the [CFTC] will consider such charges only in the context of a well-developed factual record."). I requested the parties to advise me if either side filed written objections to the Magistrate Judge's Report and Recommendation. See Order of April 19, 2001. I have received no such notice, and I consider the allegations of governmental misconduct to be abandoned.

**2. Robert Weeks's Motion To Strike The Division's References To Pan World.**

In June 1997, the Commission filed a civil injunctive complaint in the U.S. District Court for the District of Utah, alleging that Pan World, Robert Weeks, Hesterman, Kenneth Weeks, and others violated the registration and antifraud provisions of the federal securities laws from 1989 through 1995. See SEC v. Pan World Minerals, Int'l, Inc., No. 2:97 CV 425B (D. Utah), SEC Litig. Rel. No. 15380 (June 2, 1997).

In May 1998, a grand jury indicted Robert Weeks and Hesterman on three counts of securities fraud in connection with the sale of Pan World stock during 1992 and 1993 (DX 191 at 2). See United States v. Weeks, No 2:98 CR 728S (D. Utah), SEC Litig. Rel. No. 15758 (May 28, 1998). In December 1999, the grand jury returned a superceding indictment that added Kenneth Weeks and others as defendants in that criminal case. The superceding indictment also added new charges relating to money laundering (DX 191 at 2).

The district court stayed the Commission's civil action pending resolution of the parallel criminal action. The stay was still in effect in February 2001 when the district court entered an order administratively closing the case with the provision that any party could move to reopen it (DX 191 at 3). The criminal case is still pending.

*4  The Division's posthearing pleadings make frequent reference to Pan World. In this, they contrast with the amended OIP, which never mentioned Pan World. Robert Weeks moves to strike all such references in the Division's posthearing pleadings. He argues that the Division is seeking to introduce irrelevant information only to besmirch the character of Respondents (RW Br. at 8). The Division insists that it referred to Pan World only to test the credibility, knowledge of prior wrongdoing, and bias of Respondents' witnesses (Div. Reply Br. at 16).

Robert Weeks's motion will be granted in part and denied in part. At this juncture, the allegations in both Pan World proceedings remain unproven (Tr. 196). It is inappropriate for the Division to assert, as if it were an adjudicated fact, that Hesterman and Kenneth Weeks controlled Pan World at the time that the company was selling unregistered securities (Div. Prop. Find. 291, 308, 310; Div. Reply Br. at 16). Cf. Fed. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."). It is likewise inappropriate for the Division to argue that certain witnesses in the present proceeding lacked credibility because they previously provided professional services for Pan World or for each other (Div. Prop. Find. 291,302-03, 306, 308, 310, 327, 330). The Division presented absolutely no evidence that such witnesses did anything illegal, immoral, or unethical in their dealings with Pan World, and I reject its efforts to create "guilt by association." Finally, the Commission has made clear that uncharged and unproven misconduct provides no basis for enhanced sanctions. See Int'l S'holders Servs. Corp., 46 S.E.C. 378, 386 n. 19 (1976).

That is not to say that all evidence concerning Pan World is irrelevant here. As shown above, Respondents were quite willing to draw attention to Pan World when they were alleging that the Division's staff violated the grand jury secrecy rule. Moreover, in response to questions posed' by his own attorney, Robert Weeks asserted that the Commission had "harassed [him] for eight years in Pan World" (Tr. 246). Cf. SEC v. Orton, 1996 U.S. App. LEXIS 28998 (10th Cir. 1996) (noting that the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 4

(Cite as:  Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

Commission's investigation of Pan World commenced in January 1992). At all times relevant to the operation of Dynamic American, Robert Weeks knew of the Commission's investigation of Pan World, as well as the grand jury investigation that he believed would lead to his indictment (Tr. 208). From May 10 to May 22, 1995, the Commission suspended trading in Pan World stock. See Exchange Act Rel. No. 35697 (May 10, 1995). On August 8, 1995, the U.S. District Court for the District of Utah entered a permanent injunction against Pan World relating to violations of the securities registration requirements in Section 5 of the Securities Act. See SEC v. Pan World Minerals, Int'l, Inc., No. 95 C 434S (D. Utah), SEC Litig. Rel. No. 14606 (Aug. 16, 1995). The Division may properly refer to these facts in its effort to show that Robert Weeks had a motive to hide his alleged control of Dynamic American. Cf. Fed. R. Evid. 404(b) (evidence of other crimes, wrongs, or acts may be admissible to prove motive or intent).

**3. Adverse Inference From Refusal To Testify.**

**\*5** The Division subpoenaed both Hesterman and Kenneth Weeks to testify as a part of its case-in-chief. Neither Respondent appeared at the hearing. I found that the subpoenas had been properly served (Tr. 5-13, 472-73, 677, 1131-33, 1152-54; DX 189). The attorney for Hesterman and Kenneth Weeks stipulated that both Respondents would have asserted their Fifth Amendment right against self-incrimination if they had appeared (Tr. 1152-54). In these circumstances, an adverse inference may be drawn from their refusal to testify. See Pagel, Inc. v. SEC, 803 F.2d 942, 946-47 (8th Cir. 1986); N. Sims Organ & Co. v. SEC, 293 F.2d 78, 80-81 (2d Cir. 1961); see also Baxter v. Palmigiano, 425 U.S. 308, 319 (1976). No adverse inference is appropriate as to Robert Weeks, who did appear and testify.

**4. Cordes's Investigative Testimony.**

Cordes is a Canadian citizen who resides in the Bahamas (Tr. 1134). He operates Management and Services Company, Ltd. (MASCO), which forms corporations in various jurisdictions and provides nominee officers and directors for some of them. On instructions from Kenneth Weeks, Cordes or

MASCO established several offshore corporations that transacted business in Dynamic American stock (DX 191 at 5). Proceeds from such transactions were deposited in the Bahamian bank accounts of these offshore corporations and then distributed at the direction of Kenneth Weeks or Hesterman (DX 181, DX 182).

Respondents were not present when the Division took Cordes's investigative testimony on January 27 and 28, 1999 (DX 184, DX 185). The Division subpoenaed Cordes to testify at the hearing, but he failed to appear (Tr. 1133-34; DX 188). It then requested that I accept into evidence the transcript of Cordes's investigative testimony, as well as the documents that Cordes authenticated during his investigative testimony (Tr. 1133-51, 1155-61; DX 91, DX 92, DX 93, DX 95, DX 127, DX 129, DX 130, DX 184, DX 185). See Rule 235(a) of the Commission's Rules of Practice (describing the circumstances under which a prior sworn statement of a witness who is not a party may be introduced into the record). Respondents objected, citing their right to conduct such cross-examination as may be required for a full and true disclosure of the facts. See Rule 326 of the Commission's Rules of Practice; 5 U.S.C. § 556(d); Barry C. Scutillo, CPA, 74 SEC Docket 2497, 2533-34 (May 3, 2001) (Initial Decision) (collecting cases that discuss the importance of cross-examination), review granted. I admitted the investigative transcript into evidence under Rule 235(a)(2) (providing that a motion to introduce a prior sworn statement may be granted if the witness is out of the United States and the party offering the prior sworn statement did not procure the absence of the witness).

**\*6** In anticipation of such a ruling, counsel for Respondents interviewed Cordes by telephone and obtained from him an affidavit that cast doubt on his earlier investigative testimony (Tr. 1136-37, 1150-51). Respondents then offered that affidavit into evidence. The Division did not object, and I also accepted it into the record (Tr. 1501-03; RX 135).[FN3]

While Cordes's investigative transcript and his affidavit are in evidence, both must be weighed carefully. See SEC v. Harrison, 80 F. Supp. 226, 232 (D.D.C. 1948) (holding that investigative

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                        Page 5

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

testimony that is not subject to cross-examination should not be disregarded, but "must be subjected to the strictest scrutiny for possible ambiguity and equivocation"), appeal dismissed, 184 F.2d 691 (D.C. Cir. 1950), vacated as moot, 340 U.S. 908 (1951); SEC v. Glass Marine Indus., Inc., 194 F. Supp. 879, 884 (D. Del. 1961) (following Harrison and holding that judicial reservation about such statements "goes to the credibility to be assigned to the ex parte statements and not to their admissibility ").

There are two decisions evaluating prior sworn statements accepted into evidence under Rule 235 of the Commission's Rules of Practice, and both are consistent with Harrison and Glass Marine. See MGSI, Sec., Inc., 71 SEC Docket 1307, 1316-17 (Jan. 12, 2000) (Initial Decision) (admitting an investigative transcript into evidence under Rule 235(a)(4), notwithstanding the lack of opportunity to cross-examine, but giving reduced weight to the statement because there was no cross-examination), final, 71 SEC Docket 1972 (Feb. 11, 2000); Carroll A. Wallace, CPA, 73 SEC Docket 3969, 4014 (Dec. 18, 2000) (Initial Decision) (accepting into evidence the investigative transcript of a New Zealand accountant, giving it little weight, and refusing to make demeanor-based credibility findings), review granted.

In short, both the federal courts and the Commission's Administrative Law Judges have recognized that ex parte investigative transcripts have limitations as fact-finding tools. By analogy, the same limitations apply to affidavits, particularly where Respondents' counsel and the affiant " negotiated every sentence" (Tr. 1151). This Initial Decision evaluates the evidence obtained from Cordes with these limitations in mind.

## 5. Confidential Marital Communications Privilege.

Susan Weeks was an important witness. The Division offered her testimony to link her former husband, Kenneth Weeks, to Cordes, to several offshore corporations formed by Cordes or MASCO, and to the flow of funds between the United States, Canada, and the Bahamas. Kenneth Weeks invoked the confidential marital communications privilege to bar such testimony. I overruled his objection and accepted the testimony, but I also advised Kenneth Weeks's attorney that he could seek reconsideration of my bench ruling in his posthearing brief (Tr. 889). As noted, Kenneth Weeks did not file a posthearing brief. To facilitate further review, the basis for my ruling is set forth below.

*7 The Commission's Rules of Practice do not explicitly recognize that claims of common law privilege may be raised in contested adjudicatory hearings. To be sure, Rule 230(b)(1)(i) of the Commission's Rules of Practice permits the Division to withhold investigative documents from respondents on the grounds of unspecified privilege. However, there is no provision in the Commission's Rules of Practice that authorizes a respondent to invoke a common law privilege to bar the introduction of evidence by the Division. Rule 300 of the Commission's Rules of Practice requires that all hearings shall be conducted in a fair and impartial manner. I interpret Rule 300 as permitting the invocation of common law privileges in a Commission administrative proceeding to the same extent that Rule 501 of the Federal Rules of Evidence would permit the invocation of common law privileges in federal district court. The issue for decision is whether Kenneth Weeks properly invoked the confidential marital communications privilege under the facts of this case.

Evidentiary privileges in litigation are not favored and their scope must be construed narrowly. See Univ. of Pennsylvania v. EEOC, 493 U.S. 182, 189 (1990) (collecting cases). Federal common law recognizes two types of marital privilege: the privilege against adverse spousal testimony and the confidential marital communications privilege. See Trammel v. United States, 445 U.S. 40, 50-51 (1980). The former allows one spouse called as a witness against the other in a criminal proceeding to refuse to testify; it is designed to protect marital harmony at the time the testimony is demanded. The latter prohibits disclosure, in civil and criminal cases, of confidential communications from one spouse to another; it is designed to protect and further marital intimacy as of the time the communication is made between the spouses. See Blau v. United States, 340 U.S. 332, 333 (1951);

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                                    Page 6

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

Wolfle v. United States, 291 U.S. 7, 14 (1934). Unlike the adverse testimonial privilege, the marital communications privilege generally survives a terminated marriage. See Pereira v. United States, 347 U.S. 1, 6 (1954); United States v. Marashi, 913 F.2d 724, 729 (9th Cir. 1990).

The confidential marital communications privilege may be asserted against the production of evidence when four prerequisites are met: (1) there must have been a communication; (2) there must have been a valid marriage at the time of the communication; (3) the communication must have been made in confidence; and (4) the privilege must not have been waived. See SEC v. Lavin, 111 F.3d 921, 925 (D.C. Cir. 1997); Marashi, 913 F.2d at 729-30.

**8** Much of Susan Weeks's testimony did not involve confidential marital communications. Rather, it involved things that Susan Weeks observed or overheard: she received packages at her home, sent by overnight courier from the Bahamas (Tr. 849-50); she saw checks from a Bahamian bank made payable to the spouses' creditors (Tr. 858-60, 862); she overheard Kenneth Weeks talking to Cordes by telephone, and instructing Cordes to send money (Tr. 854); and she overheard Kenneth Weeks talking to Hesterman by telephone, and discussing an offshore corporation that figured in the case (Tr. 853-54). Such evidence was not privileged.

Other aspects of Susan Weeks's testimony did involve communications between husband and wife. The principal ones were Kenneth Weeks's identification of Cordes as "Bahama Bob" (Tr. 854); Kenneth Weeks's admission that he and Robert Weeks kept Hesterman behind the scenes because of Hesterman's prior criminal conviction (Tr. 871-73); and Kenneth Weeks's statement in the summer of 1997 that, if anything ever happened to him, Susan Weeks should call Bahama Bob, who would see to it that she would have "more money than [she] could spend" so that she could provide for their children "very well forever" (Tr. 854-55). FN[FN4] Kenneth Weeks also told his wife that he used a third party to do the offshore banking for himself and Hesterman, and he bragged that the government would never find his offshore accounts

(Tr. 889-91).

The courts have determined that the confidential marital communications privilege will not apply to communications made while the spouses, although still technically married, are living separate lives with no reasonable expectation of reconciliation. See United States v. Singleton, 260 F.3d 1295, 1300-01 (11th Cir. 2001) (holding that the privilege is not available in cases of permanent separation prior to divorce); United States v. Roberson, 859 F.2d 1376, 1378 (9th Cir. 1988) (holding that the privilege did not apply, based only on the evidence of separation and irreconcilability at the time of the conversation, and without regard to whether the marriage was still valid under state law); In re Witness Before Grand Jury, 791 F.2d 234, 238 (2d Cir. 1986) ("[A] court may rely primarily on the duration of the couple's physical estrangement, which is the guiding factor in determining ' permanent separation' and which is usually clear from the record. The longer the period of estrangement at the time of the subject ' communications,' the easier it will be for the government to show that the couple, though still legally wed, had been in fact permanently separated and thus could not invoke the privilege."). A trial court must first determine if the spouses were separated at the time of the communication and then, if so, it should develop the record as to the irreconcilability of the marriage. See Singleton, 260 F.3d at 1301 (holding that cohabitation and other evidence of intent or lack of intent to reconcile are important factors); United States v. Murphy, 65 F.3d 758, 761 (9th Cir. 1995) (applying Roberson, 859 F.2d at 1381).

**9** Kenneth and Susan Weeks were married in October 1983 and their divorce became final on October 8, 1999 (Tr. 839-40). Kenneth Weeks moved out of the spouses' marital home in Sandy, Utah, in November 1997 (Tr. 839). Thereafter, he lived in New York City. When he returned to Utah to visit his children, he either stayed in hotels or at his sister's house (Tr. 441, 446-47, 839). Based on the case law cited above, any communications between Kenneth and Susan Weeks after November 1997 were not privileged.

Communications back to November 1995 were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                                      Page 7

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

not privileged either. Kenneth Weeks traveled extensively, starting in 1992 (Tr. 840-41, 845-46). He lived apart from his wife for six months in 1996 and for seven months in 1997(Tr. 447, 841, 845-46). His brother considered him to be a resident of New York at the relevant time (Tr. 201-02). While extensive business travel alone would not necessarily be probative of marital separation, Kenneth Weeks had been romantically involved with Michele Martin-also a New York resident-as early as November 1995 (Tr. 471, 842-43). He maintained a joint bank account with Michele Martin as early as September 1995 (DX 158). He married Michele Martin as soon as his divorce from Susan Weeks became final (Tr. 446-47). In August 1997, Kenneth Weeks informed his wife that he was not sure he was happy with her, and he refused her request to seek marriage counseling (Tr. 844-46). I conclude that Kenneth and Susan Weeks were permanently separated as of November 1995, at the very latest, and that marital communications from that point forward were not privileged.

### 6. Robert Weeks's Motion to Sanction the Division by Striking Its Expert Witness Testimony.

At the hearing and in their briefs, the parties skirmished over a July 25, 1995, document entitled " Bolivian Tin & Silver, S.A., An Overview and Preliminary Business Plan" (RW Br. at 25-28; Div. Reply Br. at 17-19). The complete document is several hundred pages long. It includes a fourteen-page text, written in English, as well as extensive appendices. Some of the appendices are in English and some are in Spanish. There are no English translations for the materials written in Spanish. The Division's exhibit list, dated May 26, 2000, identified the document as prospective DX 28. FN[FN5] However, prospective DX 28 included only the first fourteen pages of text. Respondents never identified any prospective exhibits before the hearing, even after receiving a second chance to do so (Tr. 296-97). See Order of June 19, 2000.

Respondents objected to the Division's identification of only a portion of the document as a prospective exhibit (Tr. 1010-11, 1163-64). They sought to introduce the entire document into the record as RX 25 (Tr. 1012-15). Cf. Fed. R. Evid. 106 (the "Rule of Completeness"). Respondents' expansive understanding of the Rule of Completeness is not justified. It does not mean that an entire writing is automatically admissible whenever any part of it is introduced. See United States v. Haddad, 10 F.3d 1252, 1259 (7th Cir. 1993); United States v. Soures, 736 F.2d 87, 91 (3d Cir. 1984). Nor does it make admissible what should otherwise be excluded. See United States Football League v. Nat'l Football League, 842 F.2d 1335, 1375-76 (2d Cir. 1988); United States v. Burreson, 643 F.2d 1344, 1349-50 (9th Cir. 1981). I was particularly concerned about those portions of RX 25 that were written in Spanish, but were not accompanied by an English translation (Tr. 629-30, 1017-18, 1166). See Scutillo, 74 SEC Docket at 2531-32 (holding that it is fundamentally unfair to opposing parties and to decision makers to offer a foreign language document without a verbatim translation by a qualified interpreter).

*10 Once Respondents raised an objection, the Division had to make a choice: it could acquiesce in the admission of more of the document than it intended, or it could forego the use of the originally proffered portion. Cf. American Bald Eagle v. Bhatti , 9 F.3d 163, 167-68 (1st Cir. 1993). The Division chose the latter option and it never offered the partial document into evidence (Tr. 1162-64, 1260-61). I denied Respondents' motion to introduce RX 25 during the Division's case-in-chief (Tr. 1018).

Robert Weeks then asked me to suspend the hearing for "at least" thirty days so that he could obtain Spanish-to-English translations. See Motion to Continue Administrative Hearing, dated July 14, 2000. Rule 111(d) of the Commission's Rules of Practice gives hearing officers discretion to regulate the course of the proceeding and the conduct of the parties and their counsel. In the exercise of that broad discretion, I denied the motion (Tr. 1162-67). Robert Weeks had already missed the deadline for identifying proposed exhibits (Tr. 1167). See Order of June 19, 2000. He remained silent at a prehearing conference at which the parties agreed that the hearing, once commenced, would continue to completion (Tr. 1167). Based on the absence of good cause, the length of the proceedings to date,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                                    Page 8

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

and the stage of the proceedings at the time of the request, an adjournment was not warranted under Rule 161 of the Commission's Rules of Practice.

Respondents then elected not to translate any Spanish-language documents into English. During Respondents' case, I accepted into evidence the English-language portions of RX 25, but I refused to accept the Spanish-language portions because they were not accompanied by English-language translations (Tr. 1273-78).

Robert Weeks now argues that the Division was " ethically required" to translate the Spanish-language documents during its investigation (RW Br. at 27). As a sanction for the Division's purported ethical lapse, Robert Weeks asks me to strike the testimony of the Division's expert witnesses. His theory is that the Division provided its experts with only a small portion of the data and materials that were in its possession, and then herded its experts into offering opinions that the Spanish-language documents would have discredited (RW Br. at 25-28). That request for sanctions is denied. There is no reason to assume that the significance of the Spanish-language documents was apparent during the investigation; indeed, their significance has not been established even today. I conclude that there was no misconduct by the Division. If Respondents wanted to use the Spanish-language documents for cross-examination of the Division's experts, or during their case-in-chief, it was incumbent upon them, not the Division, to have the documents translated.

Robert Weeks also maintains that it was " unconscionable" to force Respondents to incur the considerable expense of translating Spanish-language documents into English (RW Br. at 27). There is no merit to that claim, either. The general rule requires each party to finance its own litigation. That applies with full force to translation expenses. See In re Puerto Rico Elec. Power Auth., 687 F.2d 501, 506-09 (1st Cir. 1982); In re Korean Air Lines Disaster of Sept. 1, 1983, 103 F.R.D. 357 (D.D.C. 1984). If Respondents ultimately prevail in this adversary adjudication, and can show that they are otherwise eligible, they would be free to seek recovery of any translation expenses under the Equal Access to Justice Act, 5 U.S.C. § 504. See

SEC v. Kaufman, 835 F. Supp. 157, 159-60 (S.D.N.Y. 1993), aff'd sub nom. SEC v. PriceWaterhouse, 41 F.3d 805 (2d Cir. 1994); Viktoria-Schaefer Int'l v. U.S. Dept. of Army, 659 F. Supp. 85, 89 (D.D.C. 1987).

**FINDINGS OF FACT**

The Regulatory Background

*11  In April 1990, the Commission adopted Regulation S, 17 C.F.R. §§ 230.901 et seq., to clarify and simplify the extraterritorial application of the registration provisions of the Securities Act. See Offshore Offers and Sales, 46 SEC Docket 40 (Apr. 24, 1990). The Commission intended to provide American issuers with an efficient capital-raising alternative whereby stock could be issued and sold outside the United States without registration. Regulation S contains a general statement providing that Section 5 of the Securities Act does not apply to offers and sales of securities that occur Outside the United States. The rule also has two non-exclusive safe harbors. See id. at 41. One safe harbor applies to offers and sales by issuers, distributors, and their affiliates who are involved in the distribution process. The other safe harbor applies to resales by persons other than an issuer. Regulation S is not available for any transaction or series of transactions that, although in technical compliance with the rules, is part of a plan or scheme to evade the registration requirements of the Securities Act. See Preliminary Note 2 to Regulation S. In such cases, registration under the Securities Act is required.

After a few years, it became clear that unscrupulous parties were aggressively exploiting Regulation S in ways that the Commission never intended. See Laurie P. Cohen, Rule Permitting Offshore Stock Sales Yields Deals That Spark SEC Concerns, Wall St. J., Apr. 26, 1994, available at 1994 WL-WSJ 295529. Some market participants were conducting placements of securities (purportedly offshore under Regulation S) under circumstances that indicated that such securities were in essence being placed offshore temporarily to evade the registration requirements. The temptations were obvious: it was quicker, less expensive, and avoided regulatory oversight. In the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release    Page 9
No.)

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

absence of a rule requiring the timely disclosure of unregistered sales of equity securities, issuers were able to sell shares offshore at a substantial discount to the domestic market price. The shares were then resold in the United States before the domestic market had been made aware of potential significant dilution or effects on the financial condition of the issuer of such transactions.

In June 1995, just as the events in the present case were starting to unfold, the Commission issued an interpretive release stating that such transactions ran afoul of Preliminary Note 2 would not be covered by the safe harbors, and would not be deemed an offer and sale outside the United States for purposes of the general statement in Regulation S. See Problematic Practices Under Regulation S, 59 SEC Docket 1998 (June 27, 1995) (Problematic Practices). The Commission promised to take enforcement action against those who sought to evade the registration requirements of the Securities Act under the color of compliance with Regulation S. See id. at 1999. The Division has subsequently done so several times. See e.g., SEC v. Schiffer, [1998 Supplement] Fed. Sec. L. Rep. (CCH) ¶ 90,247 at 91,085-86 (S.D.N.Y. 1998); SEC v. Cavanagh, 1 F. Supp. 2d 337 (S.D.N.Y. 1998), aff'd , 155 F.3d 129 (2d Cir. 1998); SEC v. Softpoint, Inc., 958 F. Supp. 846, 852-54, 859-61 (S.D.N.Y. 1997); Charles F. Kirby, 73 SEC Docket 3550, 3566-67 (Dec. 7, 2000) (Initial Decision), review granted. The Problematic Practices interpretive release did not create new law; it simply expressed the Commission's concern about practices that had always been unlawful.

*12 At the same time, the Commission proposed amendments to its annual and quarterly report forms for domestic issuers that would require the disclosure of unregistered sales of equity securities during the previous fiscal quarter, whether pursuant to a private placement, a Regulation S offering, or otherwise. See Streamlining Disclosure Requirements Relating to Significant Business Acquisitions and Requiring Quarterly Reporting of Unregistered Equity Sales, 59 SEC Docket 1991, 1993-94 (June 27, 1995). As adopted in October 1996, the final rules require quarterly reporting for exempt equity sales other than those made in reliance on Regulation S, and current reporting on

Form 8-K for Regulation S sales within fifteen days of their occurrence. See Periodic Reporting of Unregistered Equity Sales, 62 SEC Docket 3059, 3059 (Oct. 10, 1996). The amended rules took effect on November 18, 1996, just as the scheme alleged in the amended OIP was collapsing.

The Three Respondents

Robert Weeks lives in Holiday, Utah (Tr. 15). He graduated from the University of Utah in 1968 with a degree in industrial engineering (Tr. 17). After working as an engineer for Kennecott Copper for one year, he left the mining industry until 1989 (Tr. 17, 262). From 1989 through 1997, he was involved in several South American mining projects (Tr. 262-63). He was also president and chairman of the board of directors of Pan World (Tr. 1363, 1442). Robert Weeks characterized himself as an unpaid consultant for Dynamic American (Tr. 57-58, 114, 155, 280-81).

The record is silent about the educational backgrounds and work histories of Hesterman and Kenneth Weeks. Robert Weeks worked with Hesterman "off and on" for over ten years (Tr. 176). In March 1984, a grand jury indicted Hesterman for securities fraud in connection with a " check kiting" scheme. See SEC Litig. Rel. No. 10312 (Mar. 20, 1984). After Hesterman pled guilty, the federal district court sentenced him to three years in prison and also placed him on probation for five years. See SEC Litig. Rel. No. 10442 (July 2, 1984). Robert Weeks and others involved in Dynamic American's operations knew about Hesterman's criminal record, but they did not find it particularly disturbing (Tr. 299-300, 626, 1358-60, 1366).

Dynamic American and Jethro J. Barlow

Dynamic American was a Utah corporation, originally organized in 1961 under the name National Land Corporation (DX 14). At all times relevant to this proceeding, it focused on mining and mineral ventures (Tr. 302). By the end of 1994, Dynamic American had no mining activities, no revenues, no employees, and only $75.00 in its bank account (Tr. 302-03, 343-44, 1293; DX 14). Dynamic American did claim to own over $4.3

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)    Page 10

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

million worth of "high grade ore concentrates" near Pioche, Nevada, but it lacked the funds to put those assets into production (Tr. 1293; DX 14 at 3).FN[FN6] Jethro J. Barlow (Barlow), an accountant and management consultant, became president and chairman of Dynamic American's board of directors in July 1991 (Tr. 302; DX 14 at 6; official notice of Form 10-K for the year ending December 31, 1991 at F-9). Until mid-1995, Barlow conducted Dynamic American's business, such as it was, from Hildale, Utah, the small town on the Arizona-Utah border where he lived.

**\*13** Dynamic American's outside auditors had for several years included a "going concern" qualification to their reports on the company's financial condition (DX 14; official notice of Forms 10-K for years ending December 31, 1991, 1992, and 1993). Continuation of an entity as a "going concern" is assumed in financial reporting in the absence of significant information to the contrary. Information that significantly contradicts the "going concern" assumption relates to the entity's inability to continue to meet its obligations as they become due without substantial disposition of assets outside the ordinary course of business, restructuring of debt, externally forced revisions of its operations, or similar actions. See Codification of Statements on Auditing Standards § 341.01 (1994).

At the end of 1994, Dynamic American had ten million shares of common stock authorized and approximately 7.2 million shares of common stock outstanding (DX 14 at F4).FN[FN7] Barlow owned over 3.8 million shares (52% of the outstanding shares), and 3,400 public investors held the remaining 48% of the outstanding shares (Tr. 306, 429; DX 14 at 4, 8). At all relevant times, bid and ask prices for Dynamic American's common stock were posted on the National Association of Securities Dealers's (NASD) electronic bulletin board (DX 14 at 4).FN[FN8]

Dynamic American had value because it was a public company in good standing, had a trading history, claimed $4.3 million in assets on its audited financial statements, and offered net operating loss carry-forwards (Tr. 259, 305, 1480; DX 22). In other words, Dynamic American was attractive as a "shell corporation" for anyone seeking the back

door to the public markets and a way around the Commission's penny stock disclosure rules (Tr. 259, 482).FN[FN9]  In December 1994, Dynamic American held a special shareholder meeting to authorize up to a one-for-thirty-five reverse split of its common stock and the filing of restated articles of incorporation (Tr. 303, 1320-21; DX 14 at 4; official notice of Information Statement pursuant to Section 14(c) of the Exchange Act, filed November 10, 1994). The shareholders authorized the board of directors to determine the exact amount of the reverse split at a later date.

The Bolivian Tin Venture

Terry C. Turner (Turner) is a mining company entrepreneur and an attorney licensed to practice law in both Utah and Bolivia (Tr. 1361, 1490). As a businessman, Turner had introduced several South American mining properties to Robert Weeks over the years (Tr. 1446). As a lawyer, he was general counsel for Pan World from 1989 to 1991 and outside counsel for Dynamic American from 1995 through 1996 (Tr. 1442, 1444).

In 1994, Robert Weeks asked Turner to review some Bolivian mining properties for Pan World and later for Dynamic American (Tr. 1364). In the spring of 1995, Turner returned to Salt Lake City from Bolivia. Turner explained to Robert Weeks that Fernando Pero (Pero), a resident of La Paz, Bolivia, had expressed interest in selling his Bolivian mines and tin smelter for securities or cash (Tr. 912, 1366-68). The properties had belonged to Pero's family for generations (Tr. 1186, 1241).

**\*14** Pero's tin smelter had operated for fifty years in Oruro, Bolivia, but in 1992 it was compelled to move to a new location outside the Oruro city limits (DX 16, Due Diligence Analysis at 2; RX 25 at 7). Completion of the relocation had been hampered by a lack of funds (Tr. 50, 494, 496, 589). By mid-1995, the smelter was 75% to 80% complete, but it still needed a fuming furnace (Tr. 494, 496, 1225). Pero's tin mines were in the Tres Cruces area of Bolivia, approximately 150 kilometers (ninety miles) north of Oruro (DX 16, Due Diligence Analysis at 3, RX 25 at 4, RX 116). The mines were inactive, and operating capital was also required to reopen them (Tr. 50-51, 495). To run the smelter

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)    Page 11

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

while his mines were closed, Pero had been purchasing low-grade tin concentrates from independent producers (Tr. 50-51, 495, 1261). The smelter was operating at a low level and was barely breaking even (Tr. 495-96, 589, 1185, 1262; RX 25 at 7).

The Three Respondents Persuade Barlow To Surrender Control Of Dynamic American

By mid-1995, Dynamic American was looking for a larger opportunity in the mining industry (Tr. 305). It did not have to wait long. The matchmaker was Nathan W. Drage (Drage), a Salt Lake City attorney who represented Barlow, Dynamic American, Hesterman, and Pan World (Tr. 242, 304, 1288, 1291, 1329-31). Hesterman and Robert Weeks discussed Dynamic American with Drage, and Drage told Barlow to call Robert Weeks (Tr. 304, 1294).

Barlow traveled to Salt Lake City to meet with Robert Weeks, Hesterman, and Kenneth Weeks in June 1995 (Tr. 306, 321, 427). The three Respondents outlined for Barlow the possible acquisition of Pero's properties. They explained that the properties would be purchased with Dynamic American stock, that the venture would require more stock than Barlow held, and that it would require him to transfer his control of Dynamic American to new ownership (Tr. 306). After the merger, Dynamic American would be responsible for raising the money Pero needed for operating capital.

In exchange for surrendering control of Dynamic American, the three Respondents promised Barlow that certain of his and Dynamic American's aged payables would be retired or refinanced; that Barlow would receive cash payments of $3,000 per month, with possible increases to $10,000 per month; and that Barlow would get a residual interest in other projects (Tr. 315-18; DX 22). Barlow never insisted that the agreement be memorialized in writing. He lacked a clear understanding as to who was obligated to pay him, and whether the payments would come from capital contributions or the eventual profits of the Bolivian mining operations (Tr. 316-18).

Once Barlow decided to relinquish control and to allow Dynamic American to go on to other projects without him, his later decisions were "fairly cooperative" to "facilitate the initial agreement" (Tr. 409). I find as a fact that Barlow began to take directions from the three Respondents at the Salt Lake City meeting in June 1995. After that meeting, Barlow made no independent policy decisions relating to Dynamic American. I find it particularly significant that Barlow signed a corporate resolution on June 15, 1995, authorizing the issuance of 600,000 shares of Dynamic American common stock to a foreign entity that was not even incorporated until June 28, 1995 (DX 1 at DA 41, DX 91, DX 127 at 10615 and 10793, DX 184 at 102).

*15 Dynamic American then spruced itself up: it authorized a one-for-twenty reverse split of its common stock, increased the authorized shares of its common stock from ten million shares to fifty million shares, created three new classes of preferred stock, underwent an untimely audit of its 1994 financial statements, and filed its overdue 1994 annual report with the Commission (Tr. 252, 502-04, 595-96, 636, 1298, 1320; DX 3, DX 14 at 4, DX 16 at 3). Hesterman guided Barlow through the necessary steps (Tr. 502-04, 595-96).

Robert Weeks Travels To Bolivia

Alan K. Burton (Burton) is a mining engineer who lives in Novato, California (Tr. 478, 508). He has extensive mining experience, including nine years as a project engineer with Bechtel Corporation (Bechtel) and twelve years as vice president of the investment banking group at Bank of America (Tr. 479; DX 16 at 4). Burton left Bank of America in 1992. Thereafter, he was a part-time consultant to Bechtel, his former employer, from his home in Novato (Tr. 478, 609; DX 16). Burton had known Robert Weeks for one or two years, but the two men had never worked together (Tr. 487).

Robert Weeks contacted Burton in the second quarter of 1995. He informed Burton that he and " his interests" had acquired Dynamic American, a shell corporation, and had identified tin assets in Bolivia they wanted to purchase in return for Dynamic American stock. The proceeds would be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release    Page 12
No.)

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

used to refurbish the smelter and reopen the tin mines (Tr. 479-80). Robert Weeks asked Burton to travel with him to Bolivia, inspect Pero's properties, and determine if the assets were worth pursuing (Tr. 49-51, 53-54, 106-07, 493).

In June 1995, Robert Weeks and Burton spent about a week in Bolivia, where they observed the smelter and the mines and met with Pero and Turner. They also met with Ronald L. Atwood (Atwood), Ph.D., a metallurgist who was Turner's business partner in various South American mining ventures (Tr. 49-50, 495, 513-14, 1252-53, 1272-73). According to Robert Weeks and Turner, Pero's asking price was firm at $40 million (Tr. 108, 1386).FN[FN10] Robert Weeks asked Burton to prepare a report that would support a $40 million valuation (Tr. 106-07, 504).

Robert Weeks and Burton understood in July 1995 that Dynamic American would have to put up $10 million to bring the Bolivian operations up to full capacity (Tr. 498). In particular, they understood that Pero's top priority was to acquire a fuming furnace from Germany for the smelter (Tr. 496).

Burton completed his report on September 5, 1995. It was in the form of a pro forma cash flow analysis, and Dynamic American filed it as an exhibit to its quarterly report for the period ending June 30, 1995 (DX 16). Burton estimated that it would take $2 million to complete the relocation of the smelter. Once funding was available, he opined that completion of the smelter's relocation could occur within six months.

With respect to the mines in the Tres Cruces region, Burton concluded that the area had never been systematically explored or drilled (DX 16). He knew that the term "reserves" had many definitions, that Pero's underground tin reserves could not be considered "proven" by the Commission's definition, and that the absence of proven reserves would make it difficult, if not impossible, to raise funds through debt financing (Tr. 506-11,618-19, 627-29). Burton informed Robert Weeks, who was disappointed (Tr. 511-12).

*16  Nonetheless, Burton opined in his report that

the probability of developing one or more major ore bodies in the area was extremely high and he stated that an early high priority would be a systematic and thorough exploration program (DX 16). Burton wrote that "it would be nice to have more definitive information" on the available ore bodies, but he found that the shortage of knowledge was "largely offset by the attractiveness of the exploration play." He concluded that the project was "clearly worth at least $40 million" (DX 16).

Bolivian Tin & Silver, S.A.

Although Robert Weeks had engaged Turner to scout Bolivian mining properties for Pan World and Dynamic American, Turner reported back to Robert Weeks as the representative of a new and mysterious client, Bolivian Tin & Silver, S.A. (BT&S). BT&S was a corporation organized under the laws of the Turks and Caicos Islands, British West Indies (Tr. 1375; DX 5, RX 133). Paragraph III.B.2.a of the amended OIP alleges that BT&S was an affiliate of Dynamic American.FN[FN11]

Robert Weeks described himself as a paid consultant or "conduit" for BT&S (Tr. 27, 280). He stated that Turner and Pero hired him to bring experts to Bolivia who could evaluate Pero's properties and then to find someone to finance the project (Tr. 30-31). Burton understood from conversations with Robert Weeks that the entity acquiring Pero's properties was comprised of North American and Bolivian interests. He believed that the North American interests were Robert Weeks, Hesterman, and Kenneth Weeks (Tr. 480, 483). He inferred that the Bolivian interests included Pero and possibly Turner (Tr. 491-92). Robert Weeks told Burton that a company had been set up in the Caribbean and that the shares held by the North American interests and the Bolivian interests would be transferred to that offshore entity to reduce the holding periods before Dynamic American's stock could be resold in the United States (Tr. 119, 487). I credit Burton's testimony. I infer that he was referring to BT&S and to Regulation S.

In October 1996, Robert Weeks told Barlow that Pero owned 25% of BT&S and that he, Hesterman, and Kenneth Weeks collectively owned another three-fifths (Tr. 308-10; DX 25 at DA 204).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 13

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

FN[FN12] I find as a fact that the three Respondents were at least partial owners of BT&S, and collectively had the authority to control it. The Division asks me to infer that Turner owned the remaining 15% of BT&S (Div. Reply Br. at 11). FN[FN13] I expressly decline to do so. The Division had the opportunity to question Turner on this subject at the hearing, but it elected not to do so. Under the circumstances, no such inference is appropriate.

Dynamic American Acquires The Bolivian Tin Properties In A Two-Step Transaction

Dynamic American acquired the Bolivian tin properties in a two-step transaction. In step one of the transaction, BT&S purchased all right, title, and interest in Pero's properties. In exchange, BT&S promised to give Pero five million shares of Dynamic American common stock, plus cash, which BT&S anticipated receiving from Dynamic American (Tr. 1383-84; RX 133). The contract provided that the resale of Dynamic American shares would be governed by the laws of the United States and the regulations promulgated by the Commission. It specified the rate at which Pero could resell his Dynamic American shares once the holding period expired (a maximum of $20,000 per month during the first year and $50,000 per month during the second year). The contract also called for BT&S to pay Pero at least $72,000 per year for consulting services, plus a bonus of $200,000 per year (RX 133, Exhibit A). Finally, the contract provided that Pero or his representative would have a seat on Dynamic American's board of directors. Drage was to hold the five million shares of Dynamic American common stock in escrow for sixty days, while Dynamic American completed a due diligence analysis of the Bolivian tin properties. Robert Weeks was present in La Paz when Pero and Turner signed the contract (Tr. 102-04, 283-84). FN[FN14]

*17 In step two of the transaction, BT&S passed through to Dynamic American the Bolivian mining assets it had purchased from Pero (DX 5). In return, Dynamic American agreed to pay BT&S $40 million, consisting of twenty million shares of its Class A convertible preferred stock with a face value of $2 per share. Each share was convertible to

one share of restricted Dynamic American common stock. BT&S's promise to pay Pero five million shares of Dynamic American common stock was to come out of the convertible preferred stock that BT&S received from Dynamic American. As in step one, the Dynamic American-BT&S contract provided that the laws of the United States and the Commission's regulations would govern the resale of Dynamic American shares. It also specified the rate at which Pero could resell his Dynamic American shares, pledged payment to Pero for consulting services, offered Pero an annual bonus, and provided Pero or his representative a seat on Dynamic American's board of directors (DX 5). Turner drafted the contract (Tr. 88, 1388). Turner signed on behalf of BT&S, and Barlow signed for Dynamic American (Tr. 331, 1388). FN[FN15] Barlow did not negotiate the terms of the transaction and he never communicated with Pero (Tr. 327-28,336).

After the transaction, BT&S became Dynamic American's largest shareholder. Two of the contractual terms merit attention. First, BT&S did not own any Dynamic American stock when it agreed to terms with Pero. Second, although Pero was willing to sell his Bolivian properties for five million shares of Dynamic American stock, Dynamic American agreed to pay twenty million shares of its stock to acquire the properties from BT&S.

Robert Weeks Selects Figurehead Officers And Directors For Dynamic American And Barlow Ratifies His Choices

From 1991 through mid-1995, Barlow and his brothers were Dynamic American's only officers and directors (Tr. 301-02; DX 14 at 6-7). When Barlow agreed to surrender control of the company, he understood that a capable mining person would replace him as president (Tr. 353-55). After mid-1995, Barlow remained as a director. He proved willing to sign documents about which he knew nothing, as long as Robert Weeks or Hesterman told him the documents were necessary to the success of the Bolivian tin venture (Tr. 338, 340, 342, 346-48, 351, 355, 359). Barlow's brother, Oliver, also remained a director of Dynamic American, but he had very little involvement in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release   Page 14
No.)

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

company's affairs (Tr. 328, 340, 346-47, 1292, 1306).

On August 1, 1995, Burton met with Robert Weeks, Hesterman, and perhaps Kenneth Weeks at the Pan World office in Salt Lake City (Tr. 520-21). Robert Weeks asked Burton to become president, chief executive officer, and chairman of the board of directors of Dynamic American (Tr. 116-17, 516; RW Br. at 16). Burton agreed and negotiated the terms of his compensation with Hesterman (Tr. 516; DX3 at 4360). The three Respondents promised Burton an office in San Francisco, California, a salary of $5,000 per month, and stock options (Tr. 500, 513, 571, 609). Robert Weeks then sent Barlow the corporate resolutions ratifying Burton's employment, and Barlow signed them (Tr. 352-55; DX 1 at DA 444-45). Barlow played no role in selecting his successor (Tr. 353-55).

*18 Burton assumed his new titles about a month before he completed his due diligence analysis (Tr. 513-14). In reality, Burton had few duties. Burton described himself as a "president in waiting," with little to do until Robert Weeks obtained the necessary financing (Tr. 521). He acknowledged that he "robber stamped" corporate resolutions about which he knew next to nothing (Tr. 560-61). If Robert Weeks and Hesterman did not want to answer Burton's questions about the company's operations or finances, they would be evasive, or would tell Burton that certain things were none of his business (Tr. 541-44, 553, 609-10). Burton meekly accepted those responses. Burton also proved remarkably naive: when he learned of Hesterman's securities fraud conviction, he accepted the explanation that Hesterman had taken the blame for his father, and the assurance that, because of that conviction, Hesterman would be careful to turn square corners in the future (Tr. 626).

J. Edwards Cox (Cox) owned a small software business in the Salt Lake City area and was a friend and neighbor of Robert Weeks (Tr. 141, 169-70, 224, 906). Until the spring of 1995, Cox was working out of a basement office in his home (Tr. 891, 935). Robert Weeks offered him office space in the Pan World suite, and Cox worked there until the spring of 1997 (Tr. 141, 169, 201, 895). In August 1995, Robert Weeks asked Cox to become

vice president and a director of Dynamic American (Tr. 142, 170, 896, 902). Cox agreed to do so, partly out of gratitude for the office space and partly out of a sense of obligation to and friendship for Robert Weeks (Tr. 906, 935). Cox knew that the Commission's investigation of Pan World was underway and that Robert Weeks, Hesterman, and Kenneth Weeks preferred not to be formally involved in the management of Dynamic American (Tr. 208-09, 271-72, 909-10).

Cox had no knowledge of the mining industry (Tr. 224). He made no management decisions for Dynamic American and he never attended a board meeting (Tr. 902, 906). He answered the office telephone, fielded investor inquiries, and signed corporate resolutions because Robert Weeks asked him to do so (Tr. 225; 906, 934-35, 950-51). Cox also transmitted directions from Robert Weeks to Barlow (Tr. 363; DX 24 at DA 459).

Barlow, Burton, and Cox did not manage Dynamic American's finances after June 1995. Barlow maintained Dynamic American's bank account at the Bank of Ephraim in central Utah, but that account had a balance of only $75.00. When Robert Weeks and Hesterman needed Barlow to write a $5,000 check on July 31, 1995, for an investment banking agreement, they had to wire the money to the Bank of Ephraim to cover the draft (Tr. 370-73, 423-24; DX 10). Cox opened another account for Dynamic American at a bank in Salt Lake City, but he only used it for one transaction (Tr. 910-11). Burton executed a signature card for that account, but he did not know if the account was ever opened (Tr. 527). Burton knew nothing about Dynamic American's account at the Bank of Ephraim (Tr. 527).

*19 Barlow prepared Dynamic American's quarterly financial statements as of March 30, 1995, and June 30, 1995, carrying forward the numbers from the prior quarters (Tr. 379-80, 384). Turner provided Barlow with figures from Bolivia (Tr. 313). After compiling this information, Barlow sent the quarterly financial statements to Robert Weeks and the annual financial statements to the outside auditors (Tr. 313, 384). Barlow discussed the financial statements as of June 30, 1995, with Robert Weeks (Tr. 380).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)    Page 15

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

Barlow's diary confirms that Robert Weeks and Hesterman were involved in preparing financial statements for inclusion in Dynamic American's quarterly and annual reports to the Commission. On one occasion, Robert Weeks informed Barlow that he needed the Form 10-Q as soon as possible (DX 25 at DA 187). On another, Robert Weeks advised Barlow that he was moving Dynamic American's fiscal year end to September 30 to match that used by the Bolivian mining venture (DX 25 at DA 188). Hesterman informed Barlow that the NASD wanted to know why the auditor's opinion letter for the calendar year 1994 audit had been included with the fiscal year 1995 audit (DX 25 at DA 197). Hesterman also advised Barlow that he had signed Barlow's name on letters, and kept Barlow up to date on the progress of the fiscal year 1995 audit (DX 25 at DA 197).

Dynamic American Operates Out Of Pan World's Office In Salt Lake City

Dynamic American's periodic reports to the Commission listed Barlow's post office box and home in Hildale as the corporation's mailing address through March 31, 1995 (DX 14, DX 15). Its reports to the Commission after that date used Burton's home in Novato as the corporation's mailing address (DX 16, DX 18, DX 20, DX 21). In fact, Dynamic American conducted its business from Salt Lake City after June 1995.

At all relevant times, Robert Weeks and Hesterman worked at Pan World's office in Salt Lake City (Tr. 114, 121, 201, 442, 703-05). Kenneth Weeks had an office in the same suite that he used when he was in Salt Lake City. Cox also worked in that suite, as did Bill Bosgraaf (Bosgraaf), Pan World's office manager/secretary (Tr. 703, 745). Bosgraaf spent 20% to 25% of his time on Dynamic American business (Tr. 744). Bosgraaf answered the telephone for Dynamic American, typed Dynamic American corporate resolutions and press releases at Hesterman's request, and assembled and mailed information to prospective Dynamic American investors (Tr. 705-07, 710-11, 717-18, 721, 723). Bosgraaf used Pan World's postage meter to pay for Dynamic American's mailings (Tr. 744). Bosgraaf also designed Dynamic American's corporate letterhead

and stored it, along with other Dynamic American records, on the hard drive of Pan World's office computer (Tr. 716). Pan World, not Dynamic American, paid Bosgraaf's salary (Tr. 743-44).

**\*20** Robert Weeks was the principal contact with Barlow, Burton, and Cox. Once Dynamic American corporate resolutions were generated in the Salt Lake City office, Robert Weeks sent them to Barlow for signature (Tr. 337-39, 364-70; DX 24). Robert Weeks also told Barlow where to forward those documents after Barlow had signed them.

Dynamic American Values Its Bolivian Mining Properties At $40 Million And Then At $38.6 Million

Dynamic American valued the Bolivian mines and smelter at $40 million in the unaudited balance sheet it filed with the Commission for the quarter ending September 30, 1995 (DX 18). It later valued those properties at $38.6 million in the amended annual report it filed with the Commission for the fiscal year ending September 30, 1995 (DX 21). FN[FN16] Paragraph III.B.2.b of the amended OIP alleges that Dynamic American made similar representations about the valuation of the Bolivian mining properties in the balance sheet of its quarterly report for June 30, 1995, and in the balance sheet of the original, annual report it filed for the fiscal year ending September 30, 1995. Those allegations are inaccurate, but any error is harmless. FN[FN17]

The $40 million valuation was the price supposedly paid under the BT&S-Dynamic American contract. It represented twenty million Class A convertible preferred shares of Dynamic American, at an assigned value of $2 per share. Later, as reported in an amended annual report for the fiscal year ending September 30, 1995, Dynamic American reduced to $38.6 million the value it attributed to the Bolivian mineral properties and smelter. The change was based upon new Dynamic American Class B convertible preferred shares issued to BT&S. Dynamic American did this because the original preferred shares (when issued as restricted common stock in November 1995) turned out to be worth considerably less than the $2 per share recited in the BT&S-Dynamic American

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 16

(Cite as:   Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

contract (DX 1 at 4566-67, DX 21 at 5-6). In fact, BT&S never received convertible preferred shares of any value (DX 42). BT&S eventually received twenty million shares of Dynamic American restricted common stock, but the market value of that stock on the date of issuance was less than $6 million (Tr. 184, 670-72; DX 42, DX 190).[FN18] The shares had a restrictive legend and could not be sold until the two-year holding period had expired (Tr. 182, 670, 1455-56; DX 177 at 27).

Dynamic American Values Its Pioche Assets At $4.3 Million

Dynamic American also claimed as assets 35,000 tons of tailings in the vicinity of Pioche, Nevada. See supra notes 6, 9. In its financial statements for the year ending December 31, 1993, Dynamic American had valued these tailings in excess of $4.3 million (official notice of 1993 Form 10-K). This valuation was based on their historical cost-the previously recorded values of the assets Dynamic American had exchanged for the tailings (DX 180 at 3). Barlow had attempted to put the Pioche assets into production, but he was unsuccessful (Tr. 1293).

**\*21** Dynamic American continued to carry forward the $4.3 million valuation of the Pioche assets on its audited financial statements for the years ending December 31, 1994, and September 30, 1995 (DX 14, DX 20, DX 21). See supra note 9. It also reported the same valuation on its unaudited financial statements for the quarters ending March 31, 1995; June 30, 1995; and September 30, 1995 (DX 15, DX 16, DX 18).

The Division presented expert testimony challenging Dynamic American's valuation of the Pioche assets.[FN19] Although Respondents offered no rebuttal to the Division's valuation analysis, they demonstrated that they never changed the valuation after they became involved with Dynamic American. They asserted that they had nothing to do with the Pioche asset valuation in the first place, and were not shown to have known that it was improper. This defense will be considered below.

Dynamic American Issues Shares To Foreign Persons In Purported Reliance On Regulation S

From June 1995 through late 1996, Dynamic American issued approximately fifty-six million shares of stock in the names of three foreign corporations and one foreign individual.

Stockton, Ltd. (Stockton), was a corporation organized under the laws of Nevis, West Indies, on June 28, 1995 (DX 91, DX 127, DX 184 at 102). It was involuntarily dissolved on July 1, 1998 (DX 184 at 77). Stockton had no employees and its only business was investing in securities (DX 184 at 124-25). Kenneth Weeks directed Cordes and MASCO to form Stockton; Cordes then sent Stockton's bills to Kenneth Weeks (DX 91, DX 184 at 76, 80-83, 87). Kenneth Weeks instructed Cordes and MASCO to open brokerage accounts for Stockton, to sign documents for Stockton, and to establish a bank account for Stockton at Canadian Imperial Bank of Commerce (CIBC) in Freeport, Bahamas (DX 93, DX 184 at 78, 86, 93, 100, 126). Cordes knew that Hesterman was also associated with Stockton, but he dealt less frequently with Hesterman (DX 95, DX 184 at 84-85, 89-90, 107-08).

Beginning in June 1995, Stockton received over 23.6 million shares of Dynamic American stock authorized by Dynamic American corporate resolutions (Tr. 797; DX 1, DX 169). For example, on June 15, 1995, Dynamic American's directors authorized the issuance of 600,000 shares of common stock to Stockton; on October 30, 1995, the board authorized the conversion of Stockton's Class B convertible preferred shares to common stock and directed the transfer agent to issue 1.75 million shares of common stock; on February 15, 1996, the board authorized the issuance of 4.2 million shares of common stock to Stockton; on March 1, 1996, the board authorized the issuance of 5.5 million shares of common stock to Stockton; and on May 1, 1996, the board authorized the issuance of four million shares of common stock to Stockton (DX 1).[FN20] All such shares were issued pursuant to Regulation S (DX 1). Another three million shares were authorized on February 5, 1996, and 4.6 million more shares were authorized on July 22, 1996 (DX 169).

**\*22** Barlow had no idea what Stockton was or what services it had performed for Dynamic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199, Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                                                    Page 17

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

American, and he never asked (Tr. 346-47, 356-57, 360-61): He just signed the resolutions at the request of Robert Weeks or Hesterman, and then forwarded the executed documents to Dynamic American's transfer agent or returned them to Salt Lake City. Burton signed some of these resolutions, even though he was not aware of any services rendered, or payments made, by Stockton to Dynamic American. When Burton asked Robert Weeks or Hesterman for an explanation, he was informed that it was none of his business (Tr. 552-53; 556-57, 561). Even though Cordes and his employees at MASCO were the nominal officers of Stockton, Cordes had no idea what services Stockton performed for Dynamic American (DX 184 at 79, 108-09). There is no evidence that Stockton paid anything for these shares.

Nevada County Mining, Inc. (NCM), was another Nevis corporation, organized on June 28, 1995, and run by Cordes and MASCO at Kenneth Weeks's instruction (DX 127, DX 129, DX 184 at 71, 184, 189). Kenneth Weeks ordered Cordes to change the name of NCM to Hamilton, Ltd. (Hamilton); that change took effect on August 7, 1996 (DX 127, DX 184 at 185-86, 189). NCM/Hamilton had no employees and its only business was investing in securities (DX 184 at 198-99). Kenneth Weeks directed the disbursements from NCM's/Hamilton's Bahamian bank account (DX 184 at 189, 200).

Dynamic American issued sixteen million shares of stock to NCM/Hamilton. Dynamic American's directors authorized the issuance to NCM of six million shares of restricted common stock on or about June 30, 1995 (DX 1). By corporate resolution dated July 1, 1996, Dynamic American's directors authorized issuance to "Hamilton" of five million shares of unrestricted common stock (DX 1).[FN21] Finally, on August 30, 1996, the directors authorized issuance of another five million shares of unrestricted common stock to Hamilton (DX 1, DX 169). All such resolutions invoked Regulation S (DX 1).

I have considered Cordes's affidavit, which states that Hesterman and Kenneth Weeks were merely consultants for Stockton and Hamilton, and which asserts that they were not the legal or beneficial owners of either company (RX 135 at ¶ 5). The

documentary evidence that Cordes provided during his investigative testimony outweighs the affidavit. I find as a fact that Hesterman and Kenneth Weeks controlled Stockton and NCM/Hamilton.

Fernando Cordero (Cordero) is a Bolivian attorney who purportedly performed consulting and legal work for Dynamic American in Bolivia (Tr. 23-24, 231-32, 1313-14, 1339; DX 18 at 5). In a Form S-8 dated July 14, 1995, Dynamic American described Cordero as "an employee of the company's newly acquired subsidiary" (official notice). The specific nature of Cordero's services was unknown to Robert Weeks, Barlow, Burton, Cox, and Drage (Tr. 23-24, 231, 342, 551, 556, 561, 933, 1314, 1339).[FN22]

**\*23** Dynamic American issued 10.9 million shares of common stock to Cordero. On June 14, 1995, Dynamic American's directors authorized issuance of 150,000 shares of common stock to Cordero (DX 1). The transfer agent issued those common shares on July 20, 1995 (DX 177). On July 18, 1995, Dynamic American's directors authorized issuance of 100,000 Class B convertible preferred shares to Cordero. Those shares could be converted to common stock at a ratio of ten common shares for one convertible preferred share. On September 18, 1995, Dynamic American's directors stated that Cordero had instructed the company to convert the Class B convertible preferred shares to common stock. The board then authorized the transfer agent to issue Cordero one million common shares, noting that the Regulation S holding period had passed and instructing the transfer agent to issue the certificates without a restrictive legend. On October 30, 1995, Dynamic American's board stated that Cordero had instructed the company to convert additional Class B convertible preferred shares to common stock. The board authorized the transfer agent to issue 1.75 million common shares to him. The board again noted that the Regulation S holding period had expired, and it instructed the transfer agent to issue the shares without restrictive legend. On December 15, 1995, the board authorized issuance of five million common shares to Cordero. On March 1, 1996, the directors authorized issuance of 2.5 million common shares to Cordero. The transfer agent issued those shares on May 31, 1996 (Tr. 656; DX 177 at 27, 1476). Finally, on July 19,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 18

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

1996, the directors authorized issuance of another 500,000 shares to Cordero (DX 1).

The Division does not request a finding that Cordero was a nominee for any of the three Respondents. Most of the shares of Dynamic American stock originally issued to Cordero were later reissued in the name of Stockton.

I have already described the distribution of twenty million shares of Dynamic American to BT&S in November 1995. See supra note 18. The most significant feature of that distribution was its timing. It did not occur until well after the three Respondents had already caused Dynamic American to issue millions of shares to Stockton, NCM/Hamilton, and Cordero.

Dynamic American Touts The Bolivian Tin Venture To The Investing Public

Robert Weeks or Hesterman told Burton that they were going to raise $10 million to finance the Bolivian tin venture, either through private placements or a public offering (Tr. 518-20, 527-28). To achieve that goal, Robert Weeks, Burton, Cox, and others traveled to New York, Boston, London, Los Angeles, and San Francisco (Tr. 528-33, 536-38, 602, 906, 922). They staffed booths at investors' conventions, distributed promotional literature, and pitched the Bolivian tin venture to prospective market makers and investors. Robert Weeks also promoted Dynamic American by taping a television "infomercial" and by appearing on a radio talk show aimed at investors (Tr. 532-33, 601-02, 731-32, 922). These efforts were not successful; the fact that the Bolivian mines lacked proven reserves was frequently identified as a negative factor (Tr. 511, 548-49).

*24 The Division has identified several press releases, letters, and fact sheets that allegedly misrepresented Dynamic American's efforts to raise capital for the Bolivian tin venture and the profitability of the venture. In each instance, the documents originated in the Respondents' Salt Lake City office (Tr. 364-65, 571-72). Robert Weeks reviewed at least some of these documents for accuracy (Tr. 144-45, 148-49, 159-65). Robert Weeks and Hesterman then supervised Bosgraaf as

he mailed Dynamic American information packets to prospective investors (Tr. 717-18). The information packets typically included press releases, fact sheets, and Dynamic American's Forms 10-Q and 10-K (Tr. 709-10, 893-94, 897-901).

Press releases. On August 10, 1995, Dynamic American announced its acquisition of the Bolivian tin smelter and mines for a price of $40 million (DX 3). In relevant part, the press release stated that the smelter had been retooled and modernized with upgraded "state of the art" equipment from Germany and that, with an investment of $500,000 for minor capital improvements and a revolving concentrate purchase fund, revenues could be expected to increase from their present level of $2.5 million per year to about $12 million per year, with about a 50% net operating margin.

The press release also contained the following disclaimer: "At the present time, [Dynamic American] has insufficient capital to maximize its investment in the assets. However, after close of escrow, [Burton], newly appointed president of [Dynamic American], is considering with the assistance of investment bankers and other professional consultants, various methods of recapitalizing the company" (DX 3). Similar disclaimers appeared in Dynamic American's quarterly reports for the periods ending June 30, 1995, and September 30, 1995 (DX 16 at 6 ("At the time of publication, [Dynamic American] has no firm plans as to how it could obtain sufficient capital to maximize its investment and meet the afore described capital requirements."), DX 18 at 7 (same)).

On May 21, 1996, Dynamic American announced that its Bolivian operating subsidiary had obtained $1 million in financing (DX 3, DX 34). The press release further stated that the company had invested the capital in its Bolivian tin operations and that the transaction would enable smelter revenues to increase to $6 million annually. The Division contends that the document was inaccurate because it implied that Dynamic American had raised the $1 million when, in fact, Pero had raised the money on his own (Tr. 175, 571-72). At the time, BT&S had given Dynamic American notice of its intent to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 19

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

rescind the parties' contract (DX 42). Respondents argue that no default occurred until December 1996 or January 1997, and that Dynamic American was entitled to take credit for the work done by Pero (Tr. 1494-95; RW Br. at 38).

On July 1, 1996, Dynamic American announced that Vanity A.V.V. Aruba (Vanity Aruba), an Aruba corporation, had extended a "firm offer" to provide $11 million in cash in exchange for 30% of Dynamic American's Bolivian assets and 25% of its outstanding common stock (DX 3). The July 1 press release stated that the transaction was expected to close within sixty days. The Division's theory is that the three Respondents knew that Dynamic American was in default on its obligations to BT&S, and was in no position to deliver 30% of the Bolivian assets to Vanity Aruba.

 *25 On September 27, 1996, Dynamic American issued another announcement, stating that Vanity Aruba was continuing with its analysis of the Bolivian properties and that "all communications with Vanity [Aruba] indicate positive progress" (DX 3). The September 27 announcement also stated that Dynamic American expected closing to occur before the end of the calendar year. In fact, Vanity Aruba never provided any financing to Dynamic American (Tr. 129-30, 173-74, 219-21, 243-46, 275-77).

Letters and fact sheets. In July 1995, Dynamic American sent a "Dear Investor" letter to its shareholders (DX 7). The letter, which originated in Respondents' Salt Lake City office and which Barlow signed at Robert Weeks's request, informed the shareholders of Dynamic American's contract to acquire the Bolivian tin smelter and mines (Tr. 366-69). The letter projected the impact of capital investment in the tin smelter and mines. It did not state that Dynamic American would make the capital investment, but the Division argues that it clearly implied that Dynamic American intended to do so. In relevant part, the letter recited that the Bolivian properties then had revenues of approximately $2.5 million per year. It projected that a first phase investment of $500,000 would raise revenues to about $12 million per year, and that a second phase investment of $3 million would raise revenues to about $37 million per year. The

letter forecast a net operating margin of about 50%.

The letter also claimed that the mines being acquired showed "commercial values" in tin and other metals of about $100 per ton. It cautioned that the mines "must be drilled to confirm this estimation" (DX 7 at DA 51).

A second "Dear Investor" letter and a September 6, 1995, narrative announced Dynamic American's acquisition of the Bolivian tin properties (DX 32, DX 33). Burton prepared the narrative at Hesterman's request and he forwarded it to Robert Weeks and Hesterman in Salt Lake City (Tr. 568-73). Burton testified that someone else signed his name to that "Dear Investor" letter without his permission (Tr. 568-69). The "Dear Investor" letter implied that the smelter already had a fuming furnace and that it was currently capable of handling low grade concentrates efficiently. It also stated that Dynamic American planned the " immediate construction" of a new concentrator. The letter estimated that, with relatively minor capital additions, the Bolivian properties could generate an annual income of up to $30 million. The letter stated that two tailings piles, with about 500,000 tons each, had "proven" reserves of about 1% tin and significant quantities of other metals. It further reported that a German geological consulting firm had categorized in excess of two million tons of underground ore in a "proven/probable" category, at about 0.9% tin. The letter concluded that there were sufficient reserves to justify a six-year mine life.

 *26 Dynamic American also distributed two fact sheets to investors (DX 8, DX 9). These documents stated that the existing tailings piles at the Bolivian mines had one million tons of "proven reserves." They also stated that the underground ore bodies contained $157 million in proven, probable, possible, and prospective reserves (DX 8 at 3, DX 9 at 3). The fact sheets reported that two of the mines "have only been partially evaluated," while the third mine "needs extensive sampling" (DX 8 at 3, DX 9 at 3). Finally, the fact sheets presented pro forma financial data representing that Dynamic American's assets were over $44 million. The fact sheets contained a disclaimer stating that Dynamic American's "expectation of results is subject to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                                Page 20

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

adequate financing."

  The letterhead for the first fact sheet used Burton's home address in Novato, but provided a telephone number with a Utah area code for investors to call (Tr. 573; DX 8). The second fact sheet projected that, if Dynamic American were to invest $5.5 million in the Bolivian tin venture, the market value of Dynamic American's stock would be $17 per share within eighteen months (DX 9).

Two Of The Foreign Entities Receiving Dynamic American Stock Resell It Into The United States

  Stockton and Hamilton resold most of their unregistered shares into the United States through Canadian and American brokerage accounts (DX 169, DX 181, DX 182). In some instances, the shares covered short sales (Tr. 522; DX 25 at 220, DX 185 at 253).[FN23] The brokerage firms forwarded the proceeds of these transactions to Stockton's and Hamilton's accounts at CIBC in the Bahamas. Stockton received $3,363,289 from the brokerage firms, while Hamilton received $378,154 (DX 181, DX 182). Cordes and MASCO then disbursed the proceeds to Respondents, to persons who had performed services for Dynamic American, and to others, based on telephonic instructions from Hesterman or Kenneth Weeks. The Division's case for disgorgement focuses on receipts by and disbursements from those two Bahamian bank accounts (DX 181, DX 182).

  After Dynamic American issued twenty million shares of restricted common stock to BT&S, BT&S split up that stock into ten parcels of two million shares each (Tr. 1455-57; DX 177 at 6-7). A representative of BT&S then persuaded Dynamic American's transfer agent to reissue the stock certificates without a restrictive legend (which required a two-year holding period) and to treat the shares as subject to Regulation S (which required only a forty-day holding period) (Tr. 651-52; DX 177 at 6-7). The record does not show whether these twenty million shares were ever resold, or, if they were resold, what happened to the proceeds. [FN24] As a result, these twenty million shares do not figure in the Division's request for disgorgement.

Hesterman instructed the transfer agent to reissue the vast majority of the 10.9 million common shares that Dynamic American had originally issued to Cordero (DX 177). Most of these shares were reissued to Stockton or to Canadian and American brokerage accounts in Stockton's name; a smaller quantity of Cordero's shares was reissued to pay Dynamic American's creditors (DX 177 at 906, 1323, 1327, 1534-35, 1761, 1877-80, 2001-02). The shares that Cordero continued to own do not figure in the Division's request for disgorgement. Except to the extent that Cordero's shares were reissued to Stockton and traded through Stockton's brokerage accounts, they will not be considered further (DX 169 at 2-4).

  *27 Between August 1995 and November 1996, Stockton's and Hamilton's brokerage accounts resold approximately thirty-three million shares of Dynamic American stock (including six million shares initially issued to Cordero) for proceeds in excess of $3.7 million (DX 169, DX 181, DX 182).

  The over-the-counter market for Dynamic American's common stock was essentially inactive from February 9, 1995, through July 3, 1995, with only sporadic transactions (DX 190). During June 1995, for example, there were only three recorded transactions, involving a total of 140 shares, at a price of $1.25 per share. The trading price of Dynamic American common stock rose during July 1995 on steady trading volume. It peaked at $9.00 per share on August 9, 1995. Thereafter, the share price dropped dramatically, while the trading volume remained steady. By the end of August 1995, Dynamic American traded at $4.50 per share. By October 5, 1995, the price per share had declined to below $1.00. It never reached $1.00 again (DX 190).

  Dr. Steven F. Nielsen (Nielsen) is a dentist from Shelley, Idaho (Tr. 968). He and his wife opened a securities account in October 1994 with La Jolla Capital Corporation (La Jolla), a broker located in San Diego, California (Tr. 970, 981).[FN25] On August 14, 1995, Nielsen bought 850 shares of Dynamic American at $9.00 per share (Tr. 971; DX 168) (settlement date). The price per share dropped almost immediately. When Nielsen contacted his account representative to express concern, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                                    Page 21

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

representative persuaded him that the price "should be coming back because of the strength of the company" (Tr. 973). On January 2, 1996, Nielsen bought another 800 shares of Dynamic American at $0.21 per share (DX 179) (settlement date). Both transactions resulted in total losses.

Dynamic American Defaults On Its Contractual Obligations To Pero, BT&S, and Burton

Very few of the millions of dollars raised by Stockton's and NCM/Hamilton's sales of Dynamic American stock ever found their way to Bolivia (DX 48 at 2). Robert Weeks claimed that Pero eventually received $200,000 to $400,000 (Tr. 134-37). He offered no documentary evidence to support that assertion and I do not give it much credence.[FN26] No money was ever available to drill holes and test for reserves (Tr. 512-13). Although the fuming furnace was critical to the smelter's operation and would have cost less than $1 million, Dynamic American never provided the capital to acquire it (Tr. 496). Pero bought the fuming furnace in May 1996, without Dynamic American's involvement (Tr. 175, 496, 572).

In May 1996, a representative of BT&S wrote to Barlow and Burton, declared Dynamic American in default on its contractual obligations, and expressed BT&S's intent to rescind the parties' contract (DX 42). As a separate matter, Burton never received the salary, the stock options, or the San Francisco office that the three Respondents had promised him (Tr. 513, 516). His total compensation over ten months had been approximately $8,000. When Burton learned of Pero's complaints, it reinforced his own doubts about the venture (Tr. 578-79). Burton resigned his positions with Dynamic American in June 1996 (Tr. 517; DX 3 at 5717).

Dynamic American's Slow Death

*28  After Burton resigned, Cox took over as Dynamic American's acting president (DX 20 at 12; DX 21 at 13). Dynamic American eventually filed an untimely annual report and an amended annual report for the fiscal year ending September 30, 1995, but those were the last periodic reports that it ever submitted to the Commission (DX 20, DX 21, DX 170).

The amended annual report for fiscal year 1995 found at least one interested reader. Turner studied it carefully and learned that Dynamic American had issued 38.5 million shares to consultants after the end of fiscal year 1995 (DX 21, financial statements, note 14 at 19). He complained to Barlow and Cox about the dilution of BT&S's shares (DX 48, DX 50). When he did not receive a prompt explanation that satisfied him, he threatened to alert federal and state regulatory agencies, brokerage firms making a market in Dynamic American's stock, the shareholders, and Vanity Aruba (DX 51). Turner did not pursue this course after Robert Weeks went to Bolivia to talk to him (DX 25 at DA 205). In addition, Drage made veiled suggestions that Dynamic American might allege that Turner had committed fraud (DX 54, DX 55, DX 56).

The Department of Commerce of the State of Utah involuntarily dissolved Dynamic American's corporate charter on December 1, 1996 (Tr. 392). Pero terminated his contract with BT&S and reasserted his ownership of the Bolivian smelter and mines in December 1996 or January 1997 (Tr. 1494-95). Once the Commission commenced its formal investigation, Robert Weeks simply walked away from Dynamic American (Tr. 245-46). Cox resigned his positions in the spring of 1997 (Tr. 895).

Dynamic American's stock continued to trade actively during the first half of 1997, at prices below $0.04 per share (DX 190 at 1-6). In June 1999, a telephone solicitor for Centex Securities, Inc., called Nielsen with the news that Dynamic American's stock was "starting to move again" (Tr. 974, 993-94). The solicitor inquired if Nielsen would be interested in making a purchase (Tr. 993-94). Nielsen wisely declined. Ultimately, the Commission brought the matter to a close by revoking the registration of Dynamic American's common stock. See Dynamic American Corp., 70 SEC Docket 3187 (Nov. 1, 1999) (default order).

Witness Credibility

Several of the Division's factual and summary witnesses were credible, including Carleen Achuff, Bosgraaf, Burton, Cox, Ginger Monson, Nielsen,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 22

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

and Susan Weeks. Burton and Cox were named as Respondents in this proceeding, and both settled by agreeing to cease and desist orders. See Jethro J. Barlow, CPA, 71 SEC Docket 2565 (March 15, 2000) (settlement order). I was nonetheless satisfied that they testified fully about their knowledge of Dynamic American's affairs. Despite the bitter divorce of Kenneth and Susan Weeks, I reject Respondents' suggestion that Susan Weeks's testimony should be discounted because she was motivated by spite and could hardly wait to testify against her former husband (Tr. 883-87). I found her to be highly credible.

*29  Barbara Hesterman, the mother of Respondent Hesterman, was obviously hostile to the Division, but she was generally credible. It would have been difficult for an issuer to effectuate the distribution of a massive amount of unregistered securities without help from an accommodating transfer agent. Bogutski provided that help here. In an unrelated proceeding, the Commission has already barred Bogutski from association with any broker, dealer, municipal securities dealer, transfer agent, investment advisor, or investment company. See Robert Bogutski, 66 SEC Docket 1046 (Jan. 20, 1998) (settlement order). In addition, the U.S. District Court for the Northern District of Texas has permanently enjoined Bogutski from future violations of the antifraud provisions of Section 10(b) of the Exchange Act and the transfer agent recordkeeping provisions of Section 17A of the Exchange Act. See SEC v. Enviromint Holdings, Inc., No. 3:45-CV-2192-H (N.D. Tex.), SEC Litig. Rel. No. 15620 (Jan. 15, 1998) (consent order unrelated to Dynamic American). In 1989, Bogutski pleaded guilty to a felony count of embezzling funds from a national bank. See Bogutski, 66 SEC Docket at 1047. Despite this extensive disciplinary history, I found Bogutski to be generally credible because his testimony was supported by contemporaneous documents (DX 177).[FN][FN27]

Barlow was a very guarded witness and I am persuaded that he recounted only a fraction of what he actually knew. He, too, was a Respondent in this proceeding, and defaulted. See Jethro J. Barlow, CPA, 71 SEC Docket 1903 (Feb. 14, 2000) (default order) (requiring him to cease and desist from future violations of the securities laws and barring

him from appearing and practicing before the Commission as an accountant). Barlow's testimony was only partially credible.

Cordes testified only during the investigation and I make no demeanor-based credibility findings as to him. A search of various electronic data bases discloses that Cordes and MASCO have had prior brushes with the American judicial system. For example, both figured prominently in the events leading to a criminal prosecution of others for unlawfully transporting incinerator ash from the United States for the purpose of dumping it in the ocean. See United States v. Reilly, 33 F.3d 1396, 1400-01 & n.2 (3d Cir. 1994). In related civil litigation, Cordes and others were found in civil contempt for violating an order of preliminary injunction. See Joseph Paolino & Sons, Inc. v. Amalgamated Shipping Corp., 1989 U.S. Dist. LEXIS 8056 at *7 (E.D. Pa. July 17, 1989). The district court ordered Cordes and the other contemnors to pay $30,000, plus costs and attorney's fees, as sanctions for their contempt. See id. at *14. I have weighed Cordes's investigative testimony and particularly his eleventh-hour affidavit of recantation with this contempt finding in mind.

*30  Robert Weeks was not a very truthful witness, and I gave little weight to his testimony. His innumerable "I don't recall" answers were particularly unworthy of belief. Robert Weeks is a large, gruff man, and I have little doubt that Barlow and Burton, both of whom are soft-spoken and physically slight, found him somewhat intimidating. Atwood has known Robert Weeks for a long time and attested to his dominant personality (Tr. 1242, 1273 ("[W]hen he's present, he's always in charge. That's Bob Weeks's modus operandi.")). Atwood's observation was confirmed by Robert Weeks's conduct during the hearing. On one occasion, when Robert Weeks grew weary of testifying and unilaterally decided it was time for a break, he simply got up from the witness stand and started to leave the hearing room. I directed him to sit down and ordered the questioning to continue (Tr. 271). The break came after another attorney finished questioning him (Tr. 275). On a different occasion, Robert Weeks had started to leave the hearing room while Division counsel was cross-examining

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                                    Page 23

(Cite as:   Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

Turner. When Robert Weeks heard the Division's question, he stopped in his tracks at the back of the hearing room, looked at the witness, and shook his head from side to side, signaling the witness on how to answer (Tr. 1440-42).

The Division urges me to find that all of Robert Weeks's defense witnesses were incredible (Div. Prop. Find. 290-330). In essence, the Division depicts Atwood, Drage, and Turner as uncharged accomplices in the distribution of unregistered securities and/or the antifraud violations alleged in the amended OIP.

I disagree with the Division as to Atwood, whom I found to be generally truthful. Atwood prepared a Preliminary Business Plan for BT&S that contained a cash flow analysis and estimated the net present value of Pero's properties (RX 25). The plan was predicated on BT&S's ability to invest $6 million in those properties. Atwood acknowledged that, if those funds were not invested, the plan would not work (Tr. 1262-64). That testimony did not demonstrate a lack of credibility. Likewise, the fact that Atwood had prior business relationships with Pan World and with Turner provided no basis for impugning his credibility. The Division offered no evidence that Atwood engaged in any sort of misconduct in those dealings.

Drage represented Barlow and/or Dynamic American from 1992 through 1997 (Tr. 1291, 1331). He also represented Hesterman after 1993 (Tr. 1330). Drage prepared Dynamic American's Forms 10-Q and 10-K through early 1995, and he reviewed the Forms 10-Q and 10-K that Hesterman partially drafted after mid-1995 (Tr. 725, 1307-08, 1348). Drage also reviewed corporate resolutions authorizing the issuance of millions of shares of Dynamic American stock to purported consultants, knowing that Hesterman, not Barlow or Burton, had initiated them (Tr. 1333-34, 1350). Drage was aware of the Commission's concern about abuses of Regulation S, yet he issued letters expressing the views that Dynamic American could issue unregistered stock in reliance on Regulation S, and that such stock could properly be resold into the United States after forty days (Tr. 672-73, 1314-16, 1336-38).

*31 I agree with the Division that Drage had a strong personal motive to skew his testimony in favor of Respondents: his legal advice to Dynamic American will be second-guessed if the three Respondents are held liable, and it will be vindicated if the charges are dismissed. Drage's testimony that the three Respondents were merely " consultants" to Dynamic American, rather than undisclosed controlling persons, as well as his assertion that Barlow and Burton exercised independent judgment in conducting Dynamic American's affairs after mid-1995, reflected a deliberate blindness to obvious facts. The diligence that Drage exercised before issuing his opinion letters is also highly suspect. Quite simply, I found much of Drage's testimony to be false.

Turner was a much more polished witness than Robert Weeks, but he was no more credible. Turner testified that the three Respondents were not the shareholders or beneficial owners of BT&S. When the Division asked him who the true owners were, he invoked Bolivian attorney-client privilege on behalf of BT&S and refused to answer (Tr. 1375-83,    1476-77).[FN28]    After    Dynamic American issued twenty million shares of restricted common stock to BT&S, BT&S split up that stock into ten parcels of two million shares each (Tr. 1455-57). Turner also refused on the grounds of attorney-client privilege to say what consideration BT&S had received from the corporations accepting those shares (Tr. 1460-63). I found his invocation of privilege inappropriate and directed him to answer (Tr. 1464, 1466).[FN29] At that juncture, Turner claimed not to recall (Tr. 1466-69). His purported memory lapse was incredible.

Turner's letterhead stationery listed Michele Martin's apartment as his New York City "office" address (Tr. 1105-06, 1448-51; DX 161, RX 133). By coincidence, that was the same apartment address that Hesterman used when he instructed the transfer agent to send Dynamic American stock certificates to Cordero by overnight courier (Tr. 661-62; DX 177 at 3398). I infer that Turner was revolved in the scheme to issue and distribute unregistered Dynamic American stock to BT&S and to Cordero, and then to resell it into the United States. I have given very little weight to his

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release      Page 24
No.)

(Cite as:   Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

testimony.

## DISCUSSION AND CONCLUSIONS

This Initial Decision concludes that the Division has presented a strong case on the securities registration violations, the reporting and recordkeeping violations, the failure to file beneficial ownership reports, and most of the antifraud violations. The evidence of misconduct is weaker, but still sufficient, with respect to the affiliation between Dynamic American and BT&S between mid-June and mid-July 1995, the misrepresentation of reserves in informal communications such as press releases and fact sheets, and Respondents' personal culpability for the issuer's valuation of the Pioche tailings at $4.3 million. Finally, the case for deeming Dynamic American's common stock to be "penny stock" when it traded at or above $5.00 per share has not been made.

## 1. Securities Registration Violations.

**\*32** Paragraphs III.C.1 and III.C.2 of the amended OIP allege that the three Respondents willfully violated Sections 5(a) and 5(c) of the Securities Act by offering to sell, selling, and delivering after sale to members of the public Dynamic American's stock when no registration statement was filed or in effect and no exemption from registration was available.

Section 5(a) of the Securities Act provides that, unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly, to sell or deliver the security through the use of any means or instrumentality of transportation or communication in interstate commerce or of the mails. Section 5(c) of the Securities Act provides a similar prohibition as to offers to sell a security unless a registration statement has been filed with the Commission. A prima facie case for a violation of Section 5 of the Securities Act is established by showing that: (1) no registration statement was in effect or filed as to the securities; (2) a person, directly or indirectly, sold or offered to sell the securities; and (3) the sale was made through the use of interstate facilities or the mails. See SEC v. Continental Tobacco Co., 463

F.2d 137, 155 (5th Cir. 1972). A showing of scienter is not required. See SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1046-47 (2d Cir. 1976). Willfulness is shown where a person intends to commit an act that constitutes a violation. There is no requirement that the actor also be aware that he is violating any statutes or regulations. See Wonsover v. SEC, 205 F.3d 408, 414 (D.C. Cir. 2000); Arthur Lipper Corp. v. SEC, 547 F.2d 171, 180 (2d Cir. 1976).

If the Division meets its burden of proving the prima facie elements of a Section 5 violation, the burden shifts to Respondents to prove the availability of any exemptions. See SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953). Sections 3 and 4 of the Securities Act provide various exemptions from registration and certain Commission regulations provide safe harbors from registration. Exemptions from registration are affirmative defenses that must be proved by the person claiming the exemptions. See Swenson v. Engelstad, 626 F.2d 421, 425 (5th Cir. 1980); Lively v. Hirschfeld, 440 F.2d 631, 632 (10th Cir. 1971). Affirmative defenses must be pled in an answer, or they are waived. See Rule 220(c) of the Commission's Rules of Practice; cf. Fed. R. Civ. Pro. 8(c). Claims of exemption from the registration provisions of the Securities Act are construed strictly against the claimant. See SEC v. Murphy, 626 F.2d 633, 641 (9th Cir. 1980); Quinn & Co. v. SEC, 452 F.2d 943, 945-46 (10th Cir. 1971).

**\*33** No registration statement was filed with the Commission for the fifty million Dynamic American shares issued to foreign persons or the thirty-two million shares subsequently resold in the United States (DX 170, DX 172). Respondents' answers to the amended OIP did not assert that any exemptions from registration were applicable. The facts show that all three Respondents were extensively involved in the offer, sale, and delivery of the unregistered stock.

There is no merit to Robert Weeks's argument that his purported lack of control over Dynamic American's affairs absolves him of liability for his role in the offer, sale, and delivery of Dynamic American's common stock. The prohibitions of Section 5 are not limited to controlling persons.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 25

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

Rather, the language of the statute sweeps broadly to encompass "any person" who offers or sells an unregistered, non-exempt security.

Robert Weeks contends that the Division failed to show that he personally played a role in Dynamic American's issuance of fifty million shares of stock or the resale of thirty-two million of those shares in the United States (RW Br. at 40-52). He asserts that the testimony of Barlow and Burton was ambiguous on this point. While some of that testimony failed to distinguish whether particular acts were those of Robert Weeks or Hesterman, Barlow made clear that Robert Weeks was his principal contact (Tr. 312, 319, 400). Documentary evidence also showed Robert Weeks as the actor. For example, Barlow signed corporate resolutions at Robert Weeks's request (DX 22). In addition, there are facsimile cover sheets from Robert Weeks to Barlow, transmitting corporate resolutions and documents for Barlow's signature (DX 24 at 31, 40, 74).

Robert Weeks also relies on Bosgraaf's and Drage's testimony that Hesterman handled all the details of corporate resolutions and stock issuance, because Robert Weeks was not particularly skilled at such matters (Tr. 741-42, 743, 1356). That testimony must be balanced against Atwood's observation that Robert Weeks was in charge, wherever he went (Tr. 1273). I conclude that Robert Weeks delegated this aspect of the stock-issuance scheme to Hesterman, and that such delegation cannot absolve him from culpability.

Robert Weeks further claims that his own role was narrowly confined to Dynamic American's acquisition of the Bolivian tin venture, to attempts to get the project into production, and to unsuccessful efforts to find financing for the venture. The testimony of Cox was to the contrary. Cox routinely conferred with Robert Weeks before he signed corporate resolutions authorizing the issuance of millions of shares of Dynamic American stock to Stockton, NCM/Hamilton, BT&S, and others (Tr. 934-35, 950-51; DX 1). Cox rarely dealt with Hesterman (Tr. 915). Robert Weeks also was involved in the offer and sale of Dynamic American stock through the television infomercial, radio talk shows, and his work at investor conventions. Those promotional activities were aimed at the general

public and were not confined to private placements.

**\*34** Notwithstanding Respondents' failure to assert any exemption to the registration requirement in their answers, I have considered the statutory exemptions in the Securities Act and the applicable SEC rules. I find that none applies to the offer and sale of Dynamic American's common stock.

The Dynamic American offering fails to qualify for exemption under Regulation S, which provides a safe harbor from registration for offshore securities transactions. As explained above, Regulation S shelters only <u>bona fide</u> overseas transactions; it is not a haven for any foreign stock distribution that is part of a plan to evade the registration provisions of the Securities Act. <u>See</u> Preliminary Note 2 to Regulation S. The present scheme was every bit as much an abuse of Regulation S as the schemes in <u>Schiffer</u>, <u>Cavanagh</u>, and <u>Softpoint</u>.

The three Respondents' participation in the offer and sale of Dynamic American stock involved the facilities of interstate commerce and the use of the mails. This prerequisite of a Section 5 violation is construed broadly to include tangential mailings and even intrastate telephone calls. <u>See United States v. Wolfson</u>, 405 F.2d 779, 783-84 (2d Cir. 1968). Here, the Section 5 jurisdictional requirement was amply satisfied by mailing packets of information to current shareholders and prospective investors and by the televised infomercial and radio broadcasts.

For the reasons stated, I conclude that the three Respondents willfully violated Sections 5(a) and 5(c) of the Securities Act by offering to sell, selling, and delivering after sale unregistered Dynamic American common stock by means of interstate commerce during the period June 1995 through November 1996.

### 2. Antifraud Violations.

Paragraphs III.B.1 and III.B.2 of the amended OIP allege that the three Respondents willfully violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 through a series of misrepresentations and omissions.

Section 17(a) of the Securities Act proscribes

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.) | Page 26

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

fraudulent conduct in the offer or sale of securities and Section 10(b) of the Exchange Act and Rule 10b-5 proscribe fraudulent conduct in connection with the purchase or sale of securities. These provisions prohibit essentially the same type of conduct. See United States v. Naftalin, 441 U.S. 768, 773 n.4 (1979). To prevail under Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5, the Division must show: (1) misstatements or omissions of material facts; (2) made in connection with the offer, sale, or purchase of securities; and (3) that Respondents acted with scienter. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976). No scienter requirement exists for violations of Sections 17(a)(2) or 17(a)(3) of the Securities Act; negligence alone is sufficient. See Aaron v. SEC, 446 U.S. 680, 701-02 (1980); Pagel, 803 F.2d at 946.

*35 A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision and if disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available. See Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988); TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

The Division need not prove detrimental reliance by customers in an enforcement proceeding. See Martin Herer Engelman, 52 S.E.C. 271, 283 n.43 (1995) (citing SEC v. Rana Research, Inc., 8 F.3d 1358, 1364 (9th Cir. 1993); SEC v. Blavin, 760 F.2d 706, 711 (6th Cir. 1985)).

Courts have interpreted broadly the requirement of Exchange Act Section 10(b) and Rule 10b-5 that violations must occur "in connection with" the purchase or sale of a security. See Superintendent of Ins. v. Bankers Life & Cas. Co., 404 U.S. 6, 12 (1971); In re Ames Dep't Stores, Inc., Stock Litig., 991 F.2d 953, 964-65 (2d Cir. 1993). The jurisdictional requirements of the antifraud provisions are also interpreted broadly, and are satisfied by intrastate telephone calls and even the most ancillary mailings. See Softpoint, 958 F. Supp. at 865.

Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." Hochfelder, 425 U.S. at 193 n. 12. It may be established by a showing of recklessness. David Disner, 52 S.E.C. 1217, 1222 & n.20 (1997) (citing Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc)). The en banc Ninth Circuit adopted the standard of recklessness articulated by the Seventh Circuit in Sundstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1044-45 (7th Cir. 1977): "[A] highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers and sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

a. The three Respondents failed to disclose that they were the de facto officers and directors of Dynamic American and that Barlow, Burton, and Cox were figureheads.

The Division presented a strong case that Robert Weeks, Hesterman, and Kenneth Weeks made all of the significant decisions affecting Dynamic American between mid-June 1995 and November 1996, and that Barlow, Burton, and Cox were no more than titular officers and directors who followed their instructions. See supra pp. 15-16, 20-21, and 36-38. A company cannot lawfully hide a significant figure in its management behind the vague title "consultant." See SEC v. Enterprise Solutions, Inc., 142 F. Supp. 2d 561, 574 (S.D.N.Y. 2001).

*36 The identity of a public company's officers and directors is material to the reasonable investor. See SEC v. Kimmes, 799 F. Supp 852, 856 (N.D. Ill. 1992), aff'd sub nom. SEC v. Quinn, 997 F.2d 287 (7th Cir. 1993). For that reason, Dynamic American's assertion that Barlow, Burton, and Cox were exercising managerial and directorial discretion was misleading as to a material fact. The misstatement was particularly aggravated in the case of Burton, given his extensive experience as a mining engineer. The failure to disclose the three Respondents' involvement with Dynamic American was also misleading as to a material fact. Disclosure of their significant participation in Dynamic

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 27

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

American would certainly have altered the total mix of information available to the reasonable investor. FN[FN30]

I conclude that the three Respondents acted with scienter by knowingly and intentionally misrepresenting the roles of Barlow, Burton, and Cox, and by concealing their own roles in Dynamic American.

The three Respondents are liable as primary violators for these material misrepresentations and omissions because they participated in a fraudulent scheme. See SEC v. U.S. Environmental, Inc., 155 F.3d 107, 111 (2d Cir. 1998); SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1471 (2d Cir. 1996); Enterprise Solutions, 142 F. Supp. 2d at 575.

b. The three Respondents failed to disclose that BT&S was an affiliate of Dynamic American and that Dynamic American's acquisition of the Bolivian mineral properties from BT&S was not an arms' length transaction.

Robert Weeks told Barlow that he, Hesterman, and Kenneth Weeks owned three-fifths of BT&S. Robert Weeks also outlined for Burton the three Respondents' plan to use a Caribbean corporation to exploit the perceived loopholes in Regulation S to offer and sell Dynamic American stock in the United States. I credit Burton's testimony and Barlow's diary. I reject as incredible the testimony of Robert Weeks and Turner that the three Respondents did not control BT&S. I presume that the three Respondents were rational economic actors, and that they were not merely donating their "consulting" services to Dynamic American. If the three Respondents did not own at least part of BT&S, there would be no plausible explanation as to how they expected to be compensated for their time and efforts in putting together the Bolivian tin venture.

Robert Weeks suggests that BT&S was nothing more than Pero's offshore alter ego, created because the Bolivian economy had experienced severe inflation during the mid-1980s, and because prosperous Bolivians were attempting to avoid Bolivian taxes and inflation in 1995 by sending their assets abroad (Tr. 1373-75; RW Br. at 23).

That explanation does not make sense in light of Burton's report. Burton wrote not only that "the Bolivian political situation is now quite stable, inflation is under control, and privatization is the order of the day," but also that "the entire Bolivian tax code is presently under review" (DX 16, Due Diligence Report, at 2, 4).

*37 Dynamic American told its shareholders very little about BT&S. It did not disclose the jurisdiction in which BT&S had been incorporated or the identity of BT&S's owners. It did not inform its shareholders that foreign secrecy laws barred it from learning the identity of BT&S's beneficial owners. It did not explain that the terms under which BT&S had acquired the Bolivian properties from Pero differed significantly from the terms under which Dynamic American acquired the same properties from BT&S a few days later. It eventually described BT&S as its largest shareholder (DX 20 at 13, DX 21 at 14). When an issuer is involved in a major acquisition, as Dynamic American was here, information about the financial and business relationship between the issuer and those on the other side of the bargaining table may be critical to the investor who is evaluating the acquisition. The question is whether the duty to disclose material information about BT&S to Dynamic American's shareholders initially belonged to Barlow, or to the three Respondents.

The Division argues that Barlow relinquished control of Dynamic American to the three Respondents at the Salt Lake City meeting in mid-June 1995 (Div. Prop. Find. 88, 97, 99, 100; Div. Br. at 14-15; Div Reply Br. at 11-13). Robert Weeks claims that any transfer of control did not occur until a month later, at the earliest, when Dynamic American signed its contract with BT&S (RW Br. at 13-15). If Robert Weeks is correct, the alleged affiliation between Dynamic American and BT&S would not have existed during the negotiations, there would have been no conflict of interest, and the allegation of a lack of arms' length bargaining between Dynamic American and BT&S would fail. Under Rule 12b-2, "control" may be measured through the ownership of voting securities, by contract, or otherwise. See supra note 11. BT&S did not "own" any Dynamic American voting securities until the autumn of 1995, well after

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 28

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

the transaction had closed. Barlow did not execute the contract until July 18, 1995. See supra note 15. Thus, resolution of the issue turns on whether control by the three Respondents was "otherwise" established as of mid-June 1995.

Barlow began to take directions from the three Respondents after the Salt Lake City meeting. He explained that once he made the decision to allow the company to go in a new direction without him, he stopped making independent policy judgments. He signed a corporate resolution authorizing the issuance of 600,000 shares of Dynamic American common stock to Stockton on June 15, 1995. On that basis, I conclude that Barlow surrendered control of Dynamic American to the three Respondents in mid-June 1995.

Although Pero sold his Bolivian properties to BT&S for five million shares of Dynamic American stock, Dynamic American paid twenty million shares to BT&S. It was material to Dynamic American's shareholders to know who owned BT&S and why Pero's properties had become so costly in such a short period of time. Because control had shifted from Barlow to the three Respondents in mid-June 1995, the duty to disclose this information to Dynamic American's shareholders rested with the three Respondents.

**\*38** I conclude that BT&S was an affiliate of Dynamic American as of mid-June 1995, and that the contract between BT&S and Dynamic American was not an arms' length transaction, as alleged in the amended OIP. Because the affiliation negated the presumption that Dynamic American was exercising independent judgment during its negotiations with BT&S, that affiliation was material information that Dynamic American's shareholders had a right to know. See SEC v. World-Wide Coin Invs., Ltd., 567 F. Supp. 724, 757 (N.D. Ga. 1983).

I further conclude that the three Respondents acted with scienter by knowingly and intentionally concealing the affiliation of Dynamic American and BT&S and the lack of arms' length bargaining over the Bolivian tin properties.

c. Respondents baselessly valued the Bolivian mining properties at $40 million and then at $38.6

million in Dynamic American's balance sheets.

Patten, the Division's accounting expert, opined that the valuations of the Bolivian mining properties at $40 million, and later at $38.6 million, did not comply with GAAP (DX 178). He stated that GAAP requires that an asset acquired for stock be valued at a reliably determined fair value. In Patten's view, neither the fair value of Dynamic American's convertible preferred shares, nor the fair value of the Bolivian mineral properties, were reliably determinable.

Patten explained that, although the Class A preferred shares were convertible to restricted common stock, there was no evidence to support the assigned redemption Value of $2 per share. He observed that there was no public market for Dynamic American's preferred stock. Moreover, given the conversion feature, Patten opined that the appropriate value should have been based on the trading price of the common stock and then discounted to reflect the restricted nature of such stock. When the Bolivian properties were later valued at $38.6 million, the value was similarly arbitrarily based on the issuance of one million shares of Dynamic American's Class B preferred stock with a stated face and redemption value of $38 per share, plus $600,000 of value ascribed to the twenty million shares of Class A preferred stock. As with the initial issuance of the Class A preferred shares, Patten found no evidence to support the stated face and redemption value of the Class B shares.

Patten also concluded that the fair value of the Bolivian mineral properties acquired was not reliably determinable. In particular, he testified that Burton's pro forma cash flow analysis was not supported by any mineral reserve studies. Based on the lack of proven reserves, Patten opined that Burton's report did not provide any basis for measuring the fair value of the Bolivian properties.

Snow, the Division's expert geologist, testified about the relationship between mineral reserves and Burton's cash flow analysis (DX 180). He explained that the tons of ore represented in a valid cash flow analysis must be based on a documented system analyzing ore thickness and areas of mineral

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 29

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

influence. In Snow's judgment, if the tons and grade estimates of the reserves are wrong, a cash flow analysis, no matter how carefully done, is useless. Burton stated that the Bolivian reserves were not considered proven by United States standards. He also characterized the Bolivian mines as just an interesting exploration opportunity. In Snow's opinion, no value could be attributed to the Bolivian mines on the basis of Burton's report (DX 180 at 5).

**\*39** Neither Snow nor the Division challenged Dynamic American's valuation of the new smelter outside Oruro (Tr. 1043-44, 1051, 1079-80; RW Br. at 32-34). In its September 30, 1995, quarterly report, Dynamic American apportioned approximately $20 million of the $40 million purchase price to the smelter (Tr. 1433-34; DX 18 at 3). At the hearing, Robert Weeks opined that the smelter alone was worth more than $50 million and Turner asserted that the smelter had a net present value of at least $40 million (Tr. 268, 1433-34). Turner and Atwood did not value the smelter separately when they wrote the Preliminary Business Plan in 1995 (Tr. 1430-34; RX 25). It would have been a simple matter for Respondents to demonstrate the actual construction cost of the smelter through documentary evidence. In the absence of such corroborating evidence, Robert Weeks's and Turner's hearing testimony about the value of the smelter was not trustworthy.

It is difficult for the untrained eye to discern $20 million or $40 million or $50 million worth of value from the photographs of the smelter (Tr. 1223-27, 1397-98; RX 110, RX 111, RX 112). However, I will not resolve the issue on that basis. Robert Weeks has exposed a rather large hole in the Division's case. The weight of the evidence fails to demonstrate that Dynamic American committed fraud when it apportioned approximately $20 million of the $40 million acquisition price to the new smelter.

Robert Weeks also argues that the Division improperly ignored one million tons of tailings that Pero owned in the Tres Cruces region of Bolivia (RW Br. at 39). Dynamic American valued the tailings at $10 million in its September 30, 1995, quarterly report (DX 18 at 3). Snow did not discuss these tailings in his prepared testimony (DX 180 at

5-6). At the hearing, Snow stated that he did not know enough about the metallurgy of the tailings to evaluate them (Tr. 1063-65). Respondents offered some evidence to show that Snow may well have been mistaken, and that Snow in fact had access to the three-dimensional data he claimed was missing (Tr. 1235-36; RX 125, RX 126). In contrast to Snow, Heard had discussed these tailings in his November 15, 1993, report, and Atwood and Turner had valued them at $81.5 million in their Preliminary Business Plan (Tr. 1063-65, 1222, 1235-36; RX 25 at 4-5 and Appendix 1, RX 104, RX 106). Robert Weeks insisted that the Bolivian tailings would "meet anybody's standards of proven reserves" (Tr. 268, 293).

Burton acknowledged that the tailings could be reworked, but he did not believe that there was much point to refurbishing the mills in the Tres Cruces region to treat only one million tons of tailings (Tr. 506-07, 618-19; DX 16, Due Diligence Report at 3). In Burton's judgment, the bulk of the future mining would come from tin ore that was still underground, and the tailings piles were largely irrelevant.

The primary purpose of Burton's report was to review Atwood's and Turner's Preliminary Business Plan and to determine a reasonable value for the proposed acquisition. Robert Weeks is not free to ignore Burton's analysis of the tailings and rely on the Preliminary Business Plan's valuation, simply because it used a much bigger number than Burton considered justified. I conclude that Burton's analysis, not Snow's, precluded Dynamic American from attributing any value to the tailings piles. I resolve this issue in the Division's favor.

**\*40** Reserves must be drilled, sampled, and categorized, so that the size, shape, depth and ore content are established in accordance with industry criteria. Based on the work of an American geologist he respected, Burton knew that the underground ore bodies in the Tres Cruces region had not been extensively explored. While there had been samples from adits, there had been very little drilling (Tr. 507, 598, 1280-82). Burton knew that the American geologist could not categorize the underground ore bodies as having proven reserves. He informed Robert Weeks, who expressed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 30

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

disappointment (Tr. 511-12). Burton was anxious to avoid the issue of reserves in his report (Tr. 598). I accept Snow's testimony that Dynamic American could not properly attribute any value to the underground ore bodies in these circumstances.

The acquisition price of Pero's assets had been set at $40 million even before Burton completed his due diligence analysis. I cannot accept the claim that Pero had set a non-negotiable price. See supra note 10. I conclude that Dynamic American overstated the value of the Bolivian mineral properties in its balance sheets for the quarter ending September 30, 1995, and the amended annual report for fiscal year ending September 30, 1995 (DX 18, DX 21). The same overstatements appeared in the pro forma post-escrow balance sheet in the June 30, 1995, quarterly report, and in the text of the annual report for the fiscal year ending September 30, 1995 (DX 16, DX 20). See supra note 17. The pro forma results were misleading in that they failed to describe fully the controlling accounting principles on which they were based. Giving Respondents the benefit of the doubt about the value of the new smelter outside Oruro, the overstatements involved approximately $20 million, a material amount.

d.  Respondents misrepresented the status of Dynamic American's operations in Bolivia.

Ability to fund. The amended OIP alleges that Respondents misrepresented Dynamic American's ability to fund its Bolivian operations. It is undisputed that Dynamic American made several representations that later proved to be inaccurate, such as a "Dear Investor" letter stating that the company "plans the immediate construction" of an expanded concentrator; a July 1, 1996, press release announcing a "firm offer" of $11 million in financing from Vanity Aruba; and a September 27, 1996, announcement that it expected to close the Vanity Aruba funding proposal by the end of the year (DX 3, DX 32). In addition, the cash flow projections in Burton's report assumed the company's ability to fund capital improvements of $10 million (DX 16).[FN][FN31] Burton's report was widely circulated after it was incorporated into Dynamic American's quarterly report.

Robert Weeks claims that at all relevant times the three Respondents believed that the necessary funding was imminent (RW Br. at 31). He argues that Dynamic American made a good faith effort to obtain funding through a series of financial presentations in New York, Boston, London, and California. He contends that the fact that these efforts were unsuccessful does not prove that Dynamic American's claims about its ability to fund the venture were fraudulent.

*41  Every promise "necessarily carries with it the implied assertion of an intention to perform it." Restatement of the Law, Torts 2d § 530 (1977). That implicit representation is at the core of all promissory undertakings and is obviously material to them. For this reason, as expressed by the Restatement, "a promise made without such an intention [i.e., to perform it] is fraudulent." See also W. Prosser and W. Keeton, The Law of Torts § 109 (5th Ed. 1984) (citations omitted):

Unless the present state of mind is misstated, there is of course no misrepresentation. When a promise is made in good faith, with the expectation of carrying it out, the fact that it subsequently is broken gives rise to no cause of action, either for deceit, or for equitable relief. Otherwise, any breach of contract would call for such a remedy. The mere breach of a promise is never enough in itself to establish the fraudulent intent.

The common law distinction between a fraudulent promise, made without intending to perform it, and mere breach of promise, has also been recognized in fraud cases decided under the federal securities laws. See Wharf (Holdings) Ltd. v. United Int'l. Holdings, Inc., 121 S. Ct. 1776, 1782 (2001); Threadgill v. Black, 730 F.2d 810, 811-12 (D.C. Cir. 1984); Walling v. Beverly Enterprises, 476 F.2d 393, 396-97 (9th Cir. 1973); A.T. Brod & Co. v. Perlow, 375 F.2d 393, 395-98 (2d Cir. 1967); cf. Wills v. First Financial Corp., [1984-1986 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,605 (CFTC May 31, 1985) (applying the same principles under the Commodity Exchange Act).

The implicit promise at issue here was the commitment of Dynamic American to use its best efforts to fund the Bolivian tin venture. Whether

Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 31

(Cite as:   Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

failure to obtain such funding constitutes fraud or mere breach of promise turns on the promisor's state of mind in making the promise. If the promise was made without the intention of performing it, or with the secret reservation not to perform fully, then fraud occurred. But if performance was in good faith intended when the promise was made, a subsequent default is at worst a breach of promise.

The intention of the promisor is a question of fact that is often determined by evaluation of external occurrences and inferences from the circumstances. See Wills, ¶ 22,605 at 30,596-97. Thus, fraud may be inferred if the promisor is insolvent, in bankruptcy, or otherwise lacks sufficient capability to perform the promise when made. The requisite intent not to perform can often be inferred from post-promise conduct: repudiating the promise shortly after it was made without any intervening event apparently justifying the breach; seeking to justify repudiation on something that was foreseen or foreseeable; failing to attempt even a degree of performance; or repudiating promises made to other persons similarly situated. See id.

*42 In the present case, there is evidence on both sides of the issue. In Respondents' favor, Robert Weeks, Burton, and others traveled extensively to several investor conventions. In addition, Burton considered Robert Weeks to be an optimist, but not a liar (Tr. 557, 590-91). In the Division's favor is evidence that Dynamic American began to issue massive amounts of its common stock to NCM/Hamilton and Stockton in June 1995, even before it signed the contract with BT&S. It never attempted to make partial performance on its promises in Bolivia. The Bolivian tin venture had no chance of succeeding because the three Respondents were misappropriating to themselves most of the cash they raised by selling Dynamic American stock through offshore accounts (DX 181, DX 182). For example, as Burton was resigning in June 1996, Kenneth Weeks was using Dynamic American's money to treat himself to a $64,390 sports car (Tr. 465-67; DX 171, DX 182 at 9). As Turner was complaining in October and November 1996 about Dynamic American's failure to follow through on its promises to BT&S, Kenneth Weeks withdrew $50,900 from Hamilton's account for the benefit of Robert Weeks and

Hesterman withdrew $57,000 from the same account (DX 181 at 2-3).

Dynamic American's announcement of a so-called "firm offer" of $11 million in funding from Vanity Aruba was fraudulent when made because Respondents knew or should have known it had no chance of succeeding. Respondents knew that Dynamic American would have to give Vanity Aruba 30% of its Bolivian assets if the loan were made. Dynamic American had no stake in the Bolivian properties that it could legitimately offer to Vanity Aruba at the time. The three Respondents also needed additional time to perform on their promises to Barlow and Burton almost as soon as they made those promises (Tr. 322-23, 563-64). The weight of the evidence supports the conclusion that Dynamic American's implicit promise to fund the Bolivian tin venture was fraudulent when made. This is not a case involving changed circumstances.

Profitability of the smelter. The amended OIP next alleges that the three Respondents committed fraud when Dynamic American claimed that the smelter outside Oruro was currently earning revenues of $2 to $2.5 million per year and when it forecast that the smelter would soon earn $12 million per year with a 50% operating margin. Pero had acquired several pieces of the smelter from Germany in 1994, before Dynamic American's involvement. However, the record shows that by mid-1995 the smelter was barely breaking even, was only 75% to 80% complete, and badly needed a fuming furnace. Pero lacked the operating capital to purchase one. In addition, Burton estimated that the smelter would not be complete until six months after funding was in place.

Robert Weeks now contends that Dynamic American simply relied on smelter earnings figures that Pero had provided, and that Atwood and Turner had incorporated into BT&S's Preliminary Business Plan (RX 25 at 7; RW Br. at 37-38). If that is what actually happened, it was reckless behavior. The purpose of Burton's investigation was to examine the assertions and assumptions in the Preliminary Business Plan with due diligence. For Robert Weeks now to claim that Burton's report was itself flawed, and that Dynamic American relied upon the work that Atwood and Turner had performed for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 32

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

BT&S, is to abandon any pretense of an arms' length relationship between Dynamic American and BT&S.

**\*43** In any event, Dynamic American could not legitimately rely on the smelter revenues in the Preliminary Business Plan because those figures were stale. Gross sales revenues from the old smelter in Oruro were irrelevant because that smelter had closed in 1991. There were no smelter revenues at all during 1992 or 1993. There was a claim of $1.6 million in smelter revenues during 1994, but Atwood and Turner did not explain how they had converted Bolivian currency into American dollars, or what assumptions they had made about the impact of Bolivian inflation on the revenue figures they presented. None of these historical revenue figures provided support for Dynamic American's claim of $2 to $2.5 million in annual earnings.

The only data remotely supporting Dynamic American's claim came from two weeks' worth of smelter revenues earned in late September 1995 ($77,000). If extrapolated, those figures would project to an annualized rate of revenues of $2 million (DX 18 at 4). However, those revenues had not been earned at the time of the August 10, 1995, press release (DX 3, DX 18). I conclude that the historical revenue figures, as well as the future predictions of revenues and operating margins, that Dynamic American presented in its press release were materially misleading. The omission of accurate information about the completion of the new smelter also rendered the press release fraudulent.

Proven and probable reserves. There are different definitions of the term "reserves" in different countries (Tr. 508, 597, 599, 623, 628, 1073-74, 1082, 1200-01, 1279). See Michael D. Fricklas & Douglas D. Foote, Obligations and Consequences of Ore Reserve Disclosures-Can Your Client and its Shareholders (and the SEC) Live Happily Ever After?, 39 Rocky Mt. Min. L. Inst. at § 12.03 [3] (1993) (Ore Reserve Disclosures). The Commission in 1992 adopted Industry Guide 7, Description of Property by Issuers Engaged or to be Engaged in Significant Mining Operations (Industry Guide 7) (RX 11). See Industry Guide 7, available at

http://www.sec.gov/divisions /corpfin/forms/industry.htm #secguide7. Industry Guide 7 establishes requirements for reporting reserve estimates and making disclosures regarding mining operations and adopts standard terminology for the description of reserve estimates.

Under Industry Guide 7, a reserve is defined as the part of a mineral deposit that could be economically and legally extracted or produced at the time of the reserve determination. Id. at ¶ (a)(1). Proven reserves are defined as reserves for which (a) quantity is computed from dimensions revealed in outcrops, trenches, workings or drill holes; grade and/or quality are computed from the results of detailed sampling, and (b) the sites for inspection, sampling, and measurement are spaced so closely and the geologic character is so well defined that size, shape, depth, and mineral content of reserves are well established. Id. at ¶ (a)(2). Probable reserves are defined as reserves for which quantity and grade and/or quality are computed from information similar to that used for proven reserves, but the sites for inspection, sampling, and measurement are farther apart or are otherwise less adequately spaced. Id. at ¶ (a)(3). With probable reserves, the degree of assurance, although lower than for proven reserves, is high enough to assume continuity between points of observation. Id.

**\*44** A registrant intending to own or operate a mining operation must disclose, for each mine, a brief description of economically significant rock formations and mineralizations. Id. at ¶ (b)(5). If proven or probable reserves have been established, the registrant must state the estimated tonnages and grades of such classes of reserves, as well as the name of the person making the estimates and the nature of his relationship to the registrant. Id.

Instruction 2 to Industry Guide 7 ¶ (b)(5) provides that the summation of proven and probable ore reserves is acceptable if the difference in degree of assurance between the two classes of reserves cannot be readily defined. Instruction 3 to Industry Guide 7 ¶ (b)(5) provides that estimates other than proven or probable reserves, and any estimated values of such reserves shall not be disclosed unless such information is required to be disclosed by foreign or state law. Instruction 3 contains an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 33

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

important proviso: where such estimates previously have been provided to a person (or any of its affiliates) that is offering to consolidate with the registrant, such estimates may be included.

Industry Guide 7 applies to certain filings made with the Commission under the Securities Act and the Exchange Act, including quarterly and annual reports filed on Forms 10-Q and 10-K. See 17 C.F.R. § 229.801(g) (Securities Act filings) and 17 C.F.R. § 229.802(g) (Exchange Act filings). Industry Guide 7 does not govern disclosures in less formal communications. See Ore Reserve Disclosures at § 12.03[1] n.85.[FN][FN32]

I conclude that Burton's report became subject to Industry Guide 7 once Respondents caused it to be attached as an exhibit to Dynamic American's quarterly report for the period ending June 30, 1995 (DX 16). Burton's report was materially misleading because Burton knew that a respected American geologist had refused to categorize the underground ore reserves in the Tres Cruces region as proven (Tr. 507, 598). I also conclude that the statement in Burton's report that a German consulting firm had categorized over two million tons of mineral deposits "in a proven/probable category" was materially misleading. First, Burton never even read the German consulting firm's report (Tr. 608, 623). Second, Atwood's and Turner's Preliminary Business Plan, which attempted to summarize the German consulting firm's report, broke down proven and probable reserve estimates into two separate categories (RX 25 at 5). Burton's report could not lump the two categories together and remain in compliance with Instruction 2 to Industry Guide 7 ¶ (b)(5). Finally, Burton's report was materially misleading for what it did not say: that Burton had no idea if the German consulting firm's definitions of the terms "reserves," "proven reserves," and "probable reserves" were the same ones that Instruction Guide 7 required Commission registrants to use.

**45** Dynamic American's "Dear Investor" letters and fact sheets were informal communications, not subject to Industry Guide 7. I nonetheless conclude that they were materially misleading in their discussion of the underground Bolivian reserves. It was misleading for Barlow's letter to assert that

there were "commercial values" in the Bolivian mineral deposits when he had no basis for assuming that such deposits could be economically extracted (DX 7). It was misleading for Burton's letter to place reliance on the German consulting firm's report when he had not read it. It was also misleading for the fact sheets to discuss "possible" and "prospective" reserves in the Bolivian mineral deposits without explaining the limitations applicable to those terms (DX 8, DX 9).[FN][FN33]

e. Respondents baselessly valued the Pioche tailings at approximately $4.3 million in Dynamic American's balance sheets.

Snow's expert geological testimony established that the maximum value of the Pioche tailings was approximately $1.6 million. Patten's expert accounting testimony demonstrated that Dynamic American's financial statements consistently failed to value the Pioche tailings in accordance with GAAP. See supra note 19. I credit this unchallenged testimony and conclude that Dynamic American's financial statements consistently overvalued the Pioche tailings by approximately $2.7 million, a material amount. Because the three Respondents distributed the financial statements to prospective investors, the misstatements were made in connection with the offer, sale, and purchase of Dynamic American's securities.

Robert Weeks raises two separate arguments (RW Br. at 9, 36). First, he notes that Paragraph III.F.1 of the amended OIP charges Barlow, an accountant, with "compiling" the financial information about the Pioche tailings that appeared in Dynamic American's quarterly financial statements and with "preparing" the same financial information for inclusion in Dynamic American's annual reports. Paragraph III.F.2 of the amended OIP also charges Barlow with engaging in improper professional conduct as an accountant by failing to ensure that the Pioche tailings were properly valued in accordance with GAAP. Robert Weeks essentially argues that Barlow's culpability (established by default) precludes a liability finding against him on this issue. Second, Robert Weeks observes that Dynamic American had been valuing the Pioche tailings at $4.3 million well before he, Hesterman, and Kenneth Weeks were ever involved

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 34

(Cite as:   Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

with the company. He points out that Barlow simply carried forward the $4.3 million valuation, without change (Tr. 380, 384). He argues that he was not shown to have known that the valuation was improper.

The Division asks me to take official notice of the Commission order sanctioning Dynamic American's outside auditor for his performance during the fiscal year 1995 audit (Div. Reply Br. at 14 n.2). See R. Gordon Jones, 74 SEC Docket 2604 (May 4, 2001) (settlement order) (finding "intentional, knowing, or reckless" violations of applicable professional standards). It is difficult to see how Jones assists the Division's case here. The findings in the settlement order are not binding on the parties in this proceeding. See id. at 2604 n.2. Moreover, the settlement order was silent with respect to the issue of whether Dynamic American's valuation of the Pioche tailings did or did not comply with GAAP. The settlement order did state that Jones violated generally accepted auditing standards (GAAS) because he "failed to obtain sufficient competent evidential matter to determine that a proper test had been done of the present value" of the Pioche tailings. See Jones, 74 SEC Docket at 2606. But GAAS have no application in the present proceeding.

**\*46** The evidence supports inferences on both sides of this issue. The three Respondents were aware of the $4.3 million valuation, but there is no direct evidence that they influenced Barlow to continue to report it after mid-June 1995. At most, they simply acquiesced in Barlow's practice of carrying forward the old valuation without change. Their lack of attention to this issue was consistent with their promise eventually to spin off the Pioche tailings and return them to Barlow (DX 22, DX 54 at 3). The three Respondents had a different plan for the company, one that focused on the Bolivian tin venture. Dynamic American's press releases, "Dear Investor" letters, and fact sheets touted the Bolivian tailings, but they never mentioned the Pioche tailings.

On the other hand, Hesterman told Robert Weeks that part of Dynamic American's attraction as a shell corporation was its ownership of an asset that had been audited (Tr. 259). In addition, Robert Weeks

called Barlow in February 1996, urging Barlow to take certain action quickly before the audit of the 1994 financial statements "goes stale" (DX 25 at DA 185). This was an oblique reference to Exchange Act Rule 3a51-1(g)(3), which provides that audited financial statements supporting a penny stock exclusion must be no more than fifteen months old. I infer that the three Respondents were at all times interested in finding a way to circumvent the penny stock disclosure rules. I further infer that they were quite willing not to ask Barlow too many questions about how he had valued the Pioche tailings in the first instance. The three Respondents paid nothing of any consequence to Barlow in return for obtaining control of assets that were allegedly worth $4.3 million. This was consistent with Robert Weeks's usual method of doing business, which was to buy for as much stock and as little cash as he could (Tr. 1272). Finally, Respondents' acquisition of the Dynamic American shell was followed closely by a series of antifraud violations that did involve scienter. This suggests that the acquisition of the Pioche tailings, and their continued valuation at $4.3 million, also involved scienter. I find in the Division's favor on this issue. FN[FN34]

### 3. Reporting and Recordkeeping Violations.

a. Negligently causing violations that do not require scienter.

Paragraph III.D.2 of the amended OIP alleges that Dynamic American repeatedly violated Section 13(a) of the Exchange Act and Rules 13a-1, 13a-10, 13a-11, 13a-13, 12b-20, and 12b-25 thereunder by filing untimely reports with the Commission, by filing reports that were materially false and misleading, and by failing to file other required reports. Paragraph III.D.3 of the amended OIP alleges that Dynamic American also violated Sections 13(b)(2)(A) and 13(b)(2)(B)(ii) of the Exchange Act by failing to make and keep books and records and to maintain a system of internal accounting controls. Paragraph III.D.4 of the amended OIP alleges that the three Respondents caused Dynamic American's violations, as described in Paragraphs III.D.2 and III.D.3.

**\*47** Section 13(a) of the Exchange Act and Rules

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 35

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

13a-1, 13a-13, and 12b-20 require issuers of securities registered pursuant to Section 12 of the Exchange Act to file periodic and other reports with the Commission. Implicit in these rules is the requirement that the reports accurately reflect the financial condition and operating results of the issuer. See United States v. Bilzerian, 926 F.2d 1285, 1298 (2d Cir. 1991); SEC v. Kalvex, Inc., 425 F. Supp. 310, 316 (S.D.N.Y. 1975). No showing of scienter is necessary to establish a violation of Section 13(a). See SEC v. McNulty, 137 F.3d 732, 740-41 (2d Cir. 1998). Rule 12b-20 further requires the inclusion of any additional material information that is necessary to make required statements, in light of the circumstances under which they were made, not misleading. Information regarding the financial condition of a company is presumptively material. See Blavin, 760 F.2d at 711.

Section 13(b)(2)(A) of the Exchange Act requires issuers of securities registered pursuant to Section 12 of the Exchange Act to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect its transactions and dispositions of assets. Section 13(b)(2)(B)(ii) of the Exchange Act requires every reporting company to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit the preparation of financial statements in conformity with GAAP and to maintain accountability for assets. No showing of scienter is necessary to establish violations of Section 13(b)(2). See World-Wide Coin, 567 F. Supp. at 749-51.

The meaning of the word "cause" in the Exchange Act has not been the subject of detailed judicial construction. See Berko v. SEC, 316 F.2d 137, 140-41 (2d Cir. 1963) (holding that conduct which is the "cause" of a violation must consist of more than merely conduct which has "to some degree been a factor" in the violation); R.H. Johnson & Co. v. SEC, 198 F.2d 690, 696 (2d Cir. 1952) (rejecting the contention that "cause" must always be interpreted to mean "an immediate or inducing cause"). Negligence is sufficient to establish liability for causing a primary violation that does not require scienter. KPMG Peat Marwick LLP, 74 SEC Docket 384, 421 (Jan. 19, 2001), recon. denied, 74 SEC Docket 1351 (Mar. 8, 2001), appeal pending, No. 01-1131 (D.C. Cir.); see Jeffrey M. Steinberg, 2001 SEC LEXIS 2640 at *120-38 (Initial Decision) (Dec. 20, 2001) (concluding that independent auditors did not "cause " three public corporations to file misleading financial statements), review granted.

**\*48** From June 1995 onward, Dynamic American filed two annual reports on Form 10-K and three quarterly reports on Form 10-Q (DX 14, DX 15, DX 16, DX 18, DX 20). All of these reports were filed late, and the company never notified the Commission of its inability to comply with the filing deadlines (DX 170). See Rule 12b-25. Dynamic American also filed an amended annual report on Form 10-K/A (DX 21). It did not file a transition report in connection with its change of fiscal year (DX 170). See Rule 13a-10. Dynamic American failed to file any reports for any periods after September 30, 1995 (DX 172).

Dynamic American filed no Forms 8-K during the period at issue here, even though it was required to do so by the change in control, the resignations of Burton and Cox as directors, and the decision to change its fiscal year-end from December to September. See Rule 13a-11 and Form 8-K, Items 1, 6, 8.

From June 1995 onward, Dynamic American never kept records of the reimbursement of expenses for its officers and directors, or the payment of other company expenses (Tr. 390-91). Burton received about $8,000 in salary and reimbursements, but the funds did not come to him through the Bank of Ephraim account that Barlow controlled or the Salt Lake City bank account that Cox controlled. Both of those corporate accounts were inactive. Pero purportedly received $200,000 to $400,000 from Dynamic American to fund the Bolivian tin venture (Tr. 134-37). Dynamic American kept no record of those disbursements, either. Payments to I-Data, Dynamic American's transfer agent, came from such off-the-books sources as Barbara Hesterman's checking account and Respondent Hesterman's personal credit card (Tr. 640-42; DX 177 at 31). Finally, Dynamic American kept no records of any compensation it

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 36

(Cite as:   Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

may have received for issuing stock to Stockton, NCM/Hamilton, Cordero, or BT&S.

When a company with publicly-traded securities ceases operations and winds up its affairs, as Dynamic American did in late 1996, it must notify the appropriate regulatory authorities and the investing public of its intentions. This ordinarily includes filing a certificate of dissolution with the state of incorporation, contacting the Commission to request the orderly termination of its periodic reporting requirements, and taking the necessary steps to halt public trading in its stock. The Commission's staff has issued no-action letters relieving a company from periodic reporting, provided the company is current in its Exchange Act reporting obligations, and agrees to disclose on Form 8-K any material events relating to its liquidation.[FN35] Dynamic American observed none of these formalities. As a result, Dynamic American's periodic reporting obligations continued until November 1, 1999, when the Commission revoked the registration of its common stock.

Respondents caused these violations by creating the predicament that resulted in Dynamic American's violations. The company's audited financial statements had contained "going concern" qualifications for several years. Dynamic American had not paid Drage for his legal services since 1994 (Tr. 1319). It was so far behind in making timely payments to its transfer agent that Bogutski threatened to "freeze the books" unless he was paid in advance (Tr. 640-42). Against this background, I infer that the untimely and/or unfiled annual reports were a direct result of the three Respondents' determination to divert to themselves funds raised by the sale of Dynamic American stock (DX 181, DX 182). That diversion of funds left the corporation with no money to pay its outside auditors. Robert Weeks and Hesterman made it impossible for Dynamic American's nominal officers and directors to keep accurate financial records by refusing to tell Burton what he needed to know (Tr. 541-44, 609-10). Hesterman and Kenneth Weeks caused the books and records violations by creating and maintaining bank accounts that were used for off-the-books payments. These included Hesterman's joint account with his mother, as well as Stockton's and NCM/Hamilton's accounts at

CIBC.

**\*49** I conclude that Dynamic American violated Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B)(ii) of the Exchange Act, and the Commission's implementing rules, as alleged in the amended OIP. I further conclude that the three Respondents caused Dynamic American's violations through acts and omissions that were at least negligent.

b. Knowing violations.

Section 13(b)(5) of the Exchange Act prohibits any person from knowingly circumventing or knowingly failing to implement a system of internal accounting controls, or from knowingly falsifying any book, record, or account of an issuer as described in Section 13(b)(2). Congress enacted this provision as part of the Foreign Corrupt Practices Act Amendments of 1988, 102 Stat. 1415. Scienter is required to establish a violation of Section 13(b)(5). See Jean-Paul Bolduc, 70 SEC Docket 380, 383 (July 13, 1999), interlocutory review granted.

Paragraph III.D.4 of the amended OIP alleges that the three Respondents willfully violated Section 13(b)(5) by knowingly circumventing or knowingly failing to implement a system of internal accounting controls for Dynamic American.

In its Statement of Policy regarding the Foreign Corrupt Practices Act of 1977, 21 SEC Docket 1466, 1470-71 (Jan. 29, 1981) (Policy Statement), the Commission recognized that Section 13(b)(2) of the Exchange Act does not mandate any particular kind of internal controls system. It explained that an issuer need not always select the best or the most effective control measures, as long as the one selected is reasonable under all the circumstances. See Policy Statement, 21 SEC Docket at 1467.

This is not a case where internal controls existed, but proved ineffective. Rather, it is a case where the issuer had no system of internal controls. As the de facto management of Dynamic American, and as the major owners of the offshore corporations that were Dynamic American's major owners, the three Respondents were responsible for implementing such a system. Hesterman and Kenneth Weeks were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 37

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

directly involved in creating and maintaining accounts designed to be used for off-the-books payments. Purportedly, Robert Weeks was unhappy once he learned of the full extent of Stockton's and NCM/Hamilton's ownership of shares (Tr. 1351-52). However, there is no evidence that he took any corrective action. I conclude that the three Respondents violated Section 13(b)(5) in ways that were both willful and knowing.

### 4. Failure to File Ownership Reports.

Paragraph III.E.2 of the amended OIP alleges that the three Respondents willfully violated Sections 13(d), 13(g), and 16(a) of the Exchange Act and Rules 13d-1, 13d-2, and 16a-3 thereunder by failing to file with the Commission reports with respect to the acquisitions and dispositions of the 50.55 million shares of Dynamic American's stock over which they had dispositive control and as to which they were the beneficial owners.

*50 Section 13(d) of the Exchange Act, in relevant part, provides that any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to Section 12 of the Exchange Act, is directly or indirectly the beneficial owner of more than 5% of the class, must, within ten days after the acquisition, file a disclosure statement with the Commission. The implementing rules require that such a statement be filed on Schedule 13D. Amendments to Schedule 13D must be filed promptly if any material changes occur to the facts set forth.

The purpose of Section 13(d) is to alert investors to potential changes in corporate control so that they can properly evaluate the company in which they have invested. See Bilzerian, 926 F.2d at 1297. The Commission has made clear that the duty to make Section 13(d) filings is not dependent on any intention to gain control of the company, but on a mechanical 5% ownership test. See Oppenheimer & Co., 47 S.E.C. 286, 287 (1980). The failure to make a required report, even though inadvertent, constitutes a willful violation. See id. at 288.

Section 13(g) of the Exchange Act, in relevant part, requires that any person who beneficially owns

more than 5% of an equity security of a class registered pursuant to Section 12 of the Exchange Act, must file with the Commission annual disclosure statements. Those filings are due within forty-five days of the end of each calendar year that the issuer's securities were registered with the Commission.

In relevant part, Section 16(a) of the Exchange Act requires that beneficial owners of more than 10% of any class of any equity security registered pursuant to Section 12 of the Exchange Act file a statement with the Commission within ten days of becoming a beneficial owner, reporting the amount of all equity securities of such issuer of which they are a beneficial owner. Section 16(a) also requires such beneficial owners to file with the Commission within ten days after the close of each calendar month, if there has been a change in his ownership of the issuer's equity securities during such month, a statement indicating such changes. The rules enacted pursuant to Section 16(a) provide that an initial statement should be made on Form 3. Subsequent statements of changes in beneficial ownership should be made on Form 4 or Form 5. The rules also specify the deadlines for filing the Forms.

No showing of scienter is required to prove violations of these reporting provisions. Cf. SEC v. Savoy Indus., 587 F.2d 1149, 1167 (D.C. Cir. 1978) ; SEC v. McNulty, 1996 U.S. Dist. LEXIS 10649 at *19-20 (S.D.N.Y. July 29, 1996).

Dynamic American's common stock was registered with the Commission under Section 12(g) of the Exchange Act at all relevant times (DX 14, DX 20, DX 21). In contrast, Dynamic American's Class A, Class B, and Class C convertible preferred stock was not registered with the Commission at any time. Respondents never filed with the Commission any beneficial ownership reports on Schedule 13D, Form 3, Form 4, or Form 5 (DX 173, DX 174, DX 175, DX 176).

*51 The three Respondents did not own any shares of Dynamic American common stock in their own names. The principal stockholders in Dynamic American were BT&S, Stockton, NCM/Hamilton, and Cordero.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)     Page 38

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

All three Respondents collectively controlled three-fifths of BT&S. See supra pp. 17-18. BT&S was affiliated with Dynamic American. See supra pp. 40-42. Hesterman and Kenneth Weeks controlled Stockton and NCM/Hamilton. See supra pp. 24-27. Respondents' beneficial ownership of securities nominally owned by Stockton, NCM/Hamilton, and/or BT&S resulted in beneficial ownership of Dynamic American. See Exchange Act Rules 13d-3(a) and 13d-5(b). Respondents were obliged to file beneficial ownership reports in June 1995 and later, once Dynamic American started to issue massive amounts of its common stock to Stockton and NCM/Hamilton (DX 1). At that juncture, Respondents became beneficial owners of more than 5% and 10% of Dynamic American's registered common stock. I conclude that Respondents' failure to file was willful within the meaning of Oppenheimer.

**5. Penny Stock.**

Paragraph III.A.1 of the amended OIP alleges that Dynamic American's common stock was " penny stock" at the time of the violations in this case. In relevant part, Section 3(a)(51)(A)(iv) of the Exchange Act defines "penny stock" as any equity security, other than a security that is excluded, on the basis of exceeding a minimum price, net tangible assets of the issuer, or other relevant criteria, from the definition of such term by Commission rule or regulation. The Commission's definitional rules for penny stock are promulgated in Exchange Act Rule 3a51-1. Section 3(a)(51)(A) of the Exchange Act determines the extent of the Commission's authority under Section 15(b)(6)(A) of the Exchange Act to censure, restrict the activities of, suspend, or bar a person from participating in an offering of penny stock.

Two of the exclusions in the Commission's penny stock definition are relevant here. First, equity securities that trade at or above $5.00 per share are excluded from the definition of penny stock by Exchange Act Rule 3a51-1(d). Second, if an issuer has been in continuous operation for more than three years and has net tangible assets in excess of $2 million, the issuer's stock is excluded from the definition of penny Stock by Rule 3a51-1(g)(1). Current audited financial statements must

demonstrate compliance with this minimum asset requirement. See Rule 3a51-1(g)(3)(i).

The Division acknowledges that Dynamic American's common stock traded above $5.00 per share for a few weeks in July and August 1995, but it claims that Respondents' fraud inflated the share prices at the time. It also acknowledges that Dynamic American's audited financial statements as of December 31, 1994, listed net tangible assets over $2 million, but it argues that those assets were overstated and that their "true" value never reached $2 million (Div. Br. at 54-55). The Division's theory is that, if the common stock had been fairly priced and if the Pioche tailings had been properly valued, Dynamic American never would have qualified for either exclusion (Div. Br. at 54-55).

a. The $5.00 per share minimum price exclusion.

**\*52** There is no merit to the Division's claim that the "true" market price of Dynamic American should be deemed to be something less than $5.00 per share during July and August 1995. The Division presented no evidence to support this theory, and the case law is not supportive. Cf. Andrews v. Comm'r, 135 F.2d 314, 318 (2d Cir. 1943) ("[T]he 'fair market value' of securities often consists of what honest and willing dupes (or, to use Americanese, 'suckers') were actually paying for similar securities on a 'rigged' market."); W.T. Grant Co. v. Duggan, 94 F.2d 859, 861 (2d Cir. 1938) (rejecting a claim that exchange prices were greatly inflated during the boom market of 1929 in excess of their actual value and finding it immaterial that the market crashed shortly after a security was valued).[FN][FN36]

As former Commission Chairman Arthur Levitt noted more than four years ago:
    The simplest way around the Penny Stock Rules … is to offer or sell securities that do not meet the technical definition of "penny stocks." The Commission today sees more fraud in … securities valued at $5[.00] or more….

    The Commission staff is … considering whether to recommend amendments to the Penny Stock Rules, such as broadening the definition of "penny stock" to include securities with a price greater than $5[.00] per share….

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 39

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

FN[FN37]

b. The $2 million net tangible asset exclusion.

Based on Snow's testimony, I have concluded that the Pioche tailings were never worth more than $1.6 million. Based on Patten's testimony, I have concluded that Dynamic American's financial statements failed to value the Pioche tailings in accordance with GAAP. See supra note 19.

The Commission was sensitive to claims that its proposed penny stock disclosure rules would place too heavy a burden of inquiry on the brokers and dealers who executed transactions in such stocks for the investing public. It thus crafted the net tangible asset standard because it wanted a figure that could be readily derived. See Penny Stock Disclosure Rules, 51 SEC Docket 557, 566 (Apr. 28, 1992). It did not want brokers to have to engage in the sort of due diligence analysis of an issuer that it typically requires of underwriters or auditors. See id. at 567. However, the Commission made clear that brokers and dealers could not rely on audited financial statements that they lacked a reasonable basis for believing were accurate. See Rule 3a51-1(g)(3).

In sustaining the charges of antifraud violations, I have determined that Dynamic American baselessly valued its Pioche tailings at $4.3 million. I see no reason why the same requirement that binds brokers and dealers-a reasonable basis for believing in the accuracy of the audited financial statements-should not be applied to the issuer and its de facto officers and directors. I therefore conclude that the three Respondents lacked a reasonable basis for relying on the accuracy of Dynamic American's audited financial statements as of December 31, 1994, and that they knew or should have known that they were participating in an offering of penny stock.

**\*53** In addition, there was an irregularity on the face of Dynamic American's "audited" financial statements for the fiscal year ending September 30, 1995 (DX 20). The independent auditor's certification letter was dated July 5, 1995, an obvious impossibility for an issuer with more than two months still remaining in its fiscal year. The NASD caught the error instantly (DX 25 at DA 197 ("Hesterman called-NASD wanted to know why last

year's opinion was on [this year's audit report]")). That irregularity precluded anyone from relying on these financial statements.

I conclude that Respondents knew or should have known that they were participating in an offering of penny stock before July 7, 1995, and after August 22, 1995. I further conclude that Dynamic American's common stock was not penny stock for those days between July 7, 1995, and August 22, 1995, when it traded at or above $5.00 per share.

## SANCTIONS

To protect the public interest, the Division seeks cease and desist orders, disgorgement of ill-gotten gains, substantial civil penalties, and orders barring all three Respondents from participating in any offering of penny stocks (Div. Br. at 49-55).

The public interest analysis requires that several factors be considered, including: (1) the egregiousness of the respondents' actions; (2) the isolated or recurrent nature of the infractions; (3) the degree of scienter involved; (4) the sincerity of the respondents' assurances against future violations; (5) the respondents' recognition of the wrongful nature of their conduct; and (6) the likelihood that their occupation will present opportunities for future violations. See Steadman v. SEC, 603 F.2d 1126, 1140 (5th Cir. 1979), aff'd on other grounds, 450 U.S. 91 (1981). The severity of sanctions depends on the facts of each case and the value of the sanctions in preventing a recurrence of the violative conduct. See Berko, 316 F.2d at 141. Sanctions should demonstrate to the particular respondent, the industry, and the public generally that egregious conduct elicits a harsh response. See Arthur Lipper, 547 F.2d at 184. Sanctions are not intended to punish a respondent, but to protect the public from future harm. See Leo Glassman, 46 S.E.C. 209, 211-12 (1975).

Cease And Desist Orders

Section 8A(a) of the Securities Act and Section 21C(a) of the Exchange Act authorize the Commission to impose a cease and desist order upon any person who "is violating, has violated, or is about to violate" any provision of the Securities

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 40

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

Act, the Exchange Act, or the rules and regulations thereunder. The sections also authorize the Commission to order a person to cease and desist from certain conduct if the person "is, was or would be a cause of [a] violation [of the Securities Act, the Exchange Act, or the rules and regulations thereunder], due to an act or omission the person knew or should have known would contribute to such violation."

**\*54** In KPMG Peat Marwick, 74 SEC Docket at 428-38, the Commission considered the standard for issuing cease and desist relief. It concluded that it would continue to consider the Steadman factors in light of the entire record, noting that no one factor is dispositive. It explained that the Division must show some risk of future violations. However, it also ruled that such a showing should be " significantly less than" that required for an injunction and that a single past violation ordinarily suffices to establish that the violator will engage in the same type of misconduct in the future. Id. at 430, 435.

Here, cease and desist orders are plainly warranted in the public interest. Respondents' violations were egregious. They were not isolated, but continued over seventeen months. With the limited exceptions noted above, the proven antifraud violations involved a high degree of scienter. Respondents have not offered any assurances against future violations, nor have they acknowledged the wrongful nature of their conduct. In the absence of cease and desist orders, future violations are quite likely.

Disgorgement Of Ill-Gotten Gains

Section 8A(e) of the Securities Act and Section 21C(e) of the Exchange Act provide that the Commission may enter an order requiring an accounting and disgorgement, including reasonable interest. Disgorgement seeks to deprive the wrongdoer of his ill-gotten gains. See SEC v. First City Fin. Corp., 890 F.2d 1215, 1230-32 (D.C. Cir. 1989). It returns the violator to where he would have been absent the violative activity. While an order to disgorge a certain amount need only be a reasonable approximation of profits causally connected to the violation, id. at 1231, the amount

disgorged must be approximately equal to the unjust enrichment, and may be ordered only against those who received such unjust enrichment. See Kenneth L. Lucas, 51 S.E.C. 1041, 1046 (1994) (overturning an order of disgorgement against two supervisors because it duplicated in part the amount ordered disgorged separately by a sales agent, and holding that different respondents "cannot be ordered to disgorge the same amounts").

Once the Division shows that its disgorgement figure reasonably approximates the amount of unjust enrichment, the burden of going forward shifts to the respondent to demonstrate clearly that the Division's disgorgement figure is not a reasonable approximation. See SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996); SEC v. Patel, 61 F.3d 137, 140 (2d Cir. 1995). Any risk of uncertainty as to the disgorgement amount falls on the wrongdoer whose illegal conduct created that uncertainty. See First City, 890 F.2d at 1232. The Commission has not permitted the wrongdoer to reduce that amount to reflect taxes paid or expenses incurred. See Laurie Jones Canady, 69 SEC Docket 1468, 1486-87 (Apr. 5, 1999), recon. denied, 70 SEC Docket 905 (Aug. 6, 1999), review denied, 230 F.2d 362 (D.C. Cir. 2000); L.C. Wegard & Co., 67 SEC Docket 814, 823-24 (May 29, 1998).

**\*55** The Division argues that the three Respondents should be held jointly and severally liable for the disgorgement of $3,741,443-all of the proceeds flowing into the Stockton and NCM/Hamilton accounts at CIBC that were attributable to transactions in Dynamic American stock (DX 181, DX 182; Div. Prop. Find. # 257; Div. Br. at 51-52).[FN38] Citing Hughes Capital, 124 F.3d at 455, and First Jersey, 101 F.3d at 1475, the Division urges me to hold that joint-and-several liability for disgorgement of all ill-gotten gains should be the default rule in all cases where two or more individuals or entities have collaborated or have close relationships in engaging in illegal conduct.

The cases imposing joint-and-several liability for disgorgement of all ill-gotten gains involved circumstances that are not present here. In Hughes Capital, 124 F.3d at 456, joint-and-several liability for disgorgement was held to be appropriate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(Cite as:   Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

because there was no documentary evidence to contradict the clear evidence that the individual defendants benefited substantially from the unlawful scheme. In SEC v. First Pacific Bancorp, 142 F.3d 1186, 1191-92 (9th Cir. 1998), the "close relationship" that warranted joint-and-several liability existed because the individual defendant was chairman of the board, chief executive officer, and majority shareholder of the corporate co-defendants. In First Jersey, 101 F.3d at 1475-76, joint-and-several liability for disgorgement rested on Section 20(a) of the Exchange Act (which provides that a controlling person shall be jointly and severally liable with and to the same extent as the controlled person), and on the finding that the controlling individual owned 100% of the stock of the controlled corporation. In Cambridge Group, Inc., 50 S.E.C. 752, 754 n.4 (1991), aff'd in part and rev'd in part sub nom. Hateley v. SEC, 8 F.3d 653, 656 (9th Cir. 1993), the Commission stated that the NASD's imposition of joint-and-several liability " does not seem unfair" as to a husband and wife and their family-held corporation.

In Hughes Capital, 124 F.3d at 456, on which the Division principally relies, the Third Circuit recognized that "the division of liability is an intensely factual determination." The court also stated: "[I]n some cases, a court may be able easily to identify the recipient of ill-gotten profits and apportionment is practical, [although] that is not usually the case." Id. at 455. In arguing that apportionment was impossible here, the Division omitted these rather important passages from its brief (Div. Br. at 51). The Division cannot simply assume that the amount of unjust enrichment cannot be reasonably approximated and measured as to each individual respondent; rather, it is necessary for the fact-finder to determine the issue of impossibility on a case-by-case basis after a hearing. Cf. CFTC v. Am. Metals Exch. Corp., 991 F.2d 71, 77-78 (3d Cir. 1993) ("Without holding a hearing, … the district court … had no basis upon which to conclude that it would be inordinately difficult to measure unlawful profits."). At the hearing in this case, the Division's summary witness completely undercut the argument for joint-and-several liability by all three Respondents for over $3.7 million in ill-gotten gains (Tr. 827):

*56 Q: Was it difficult for you to ascertain

the substance of these records?

A: The CIBC bank account records?

Q: No, the-well, yes.

A: For the most part, no. It was pretty straightforward.

Q: I mean, the proceeds come in and they go out.

A: Right.

Q: And you knew where they went, correct?

A: Based on the documents, yes.In these circumstances, the Division's efforts to give the broadest possible reading to the cases imposing joint-and-several liability for disgorgement cannot be accepted. With two limited exceptions addressed below, the present case is the exception to the general rule that Hughes Capital recognized:

The imposition of joint-and-several liability in excess of $3.7 million against all three Respondents would be unreasonable and inequitable as to Robert Weeks. Robert Weeks never controlled the flow of funds into or out of the Stockton and NCM/Hamilton accounts. Moreover, the record is filled with evidence that the three Respondents did not divide equally the proceeds from the sale of Dynamic American stock. Kenneth Weeks lived a flashy lifestyle, complete with a custom-built house, a fancy sports car, jewelry, and extensive travel (Tr. 457, 465, 851, 867, 876; DX 171). Kenneth Weeks frequently complained that Hesterman had too many cars, too many expenses, and needed to start living within his means (Tr. 876-78). In contrast to his fellow Respondents, Robert Weeks lived a low-key lifestyle. He lost a credit card for non-payment, he owned no checking or savings accounts, and he was in serious financial difficulty at the times relevant to this case (Tr. 189, 240-41, 297-98).

As an alternative to joint-and-several liability for disgorgement of $3,741,443, the Division presented evidence of the lesser amounts of unjust enrichment accruing to each individual Respondent. With the minor modifications, described below, I accept the Division's calculations. All figures are rounded to the nearest dollar.

The Division seeks disgorgement of $171,500 from Robert Weeks (Div. Prop. Find. # 259; Div.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 42

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

Br. at 52). The record shows transfers from Stockton and Hamilton to Robert Weeks's close friend, Maria Rosa Baez (Baez), in the amounts of $50,900 and $3,000 (Tr. 189-90, 903-05; DX 181, DX 182). In addition, the record demonstrates that Robert Weeks, Insurance Trust, a company he owned, and Baez received payments of $109,100 from Hesterman's account at First Security Bank and $8,500 from Washington National, Ltd., a corporation controlled by Kenneth Weeks (Tr. 18-19, 193, 690-91, 694-95, 1116-21; DX 163, DX 184 at Tr. 193-94). When these figures are combined, the total benefit accruing to Robert Weeks was $171,500. I will order him to disgorge that amount.

The Division next petitions for disgorgement of $968,700 from Hesterman (Div. Prop. Find. 248, 256, 261; Div. Br. at 53). Hesterman and his mother held a joint account at First Security Bank (Tr. 234-35, 679, 681; DX 163). The record shows wire transfers to that joint account of $98,800 from Hamilton and $862,900 from Stockton (DX 181, DX 182). When those two figures are combined, the total is $961,700. It is undisputed that Hesterman paid Robert Weeks $109,100 from this account (Tr. 234-35, 238-39, 689-91, 694-95, 1116-21). Since I have already attributed that $109,100 to Robert Weeks, I decline to attribute it to Hesterman, as well. See Lucas, 51 S.E.C. at 1047. After correcting for an arithmetical error and double counting in the Division's pleadings, I will order Hesterman to disgorge $852,600.

**\*57** The Division also seeks disgorgement of $2,531,831 from Kenneth Weeks (Div. Prop. Find. # 258; Div. Br. at 52). From Hamilton's account at CIBC, the Division attributes disbursements of $228,927 to Kenneth Weeks (DX 181). This includes payments to Daninger's ($9,127), Kenneth Weeks Insurance Service ($10,000), Maxwell Carpets ($3,000), Michele Martin ($24,800), and Washington National, Ltd. ($182,000). From Stockton's account at CIBC, the Division attributes $2,207,109 to Kenneth Weeks (DX 182). This includes payments to Augusta National Trust ($162,500), Canyon Corporation ($30,000), Castle Pines ($1,000), Colonial National, Ltd. ($7,266), Dave Strong Porsche Audi ($64,390), Kenneth Weeks Insurance Service ($64,200), Michele

Martin ($886,754), O.C. Tanner ($5,000), The Sanctuary ($75,068), and Washington National, Ltd. ($910,931). When the sums received from Hamilton and Stockton are combined and rounded, the total received by Kenneth Weeks was $2,436,036. That amount must be reduced by $8,500, to reflect the payment that Washington National, Ltd., made to Robert Weeks, as described above (Tr. 1116-21). Kenneth Weeks will be ordered to disgorge $2,427,536.

I do not agree with the Division that Kenneth Weeks should disgorge another $89,000 (Div. Prop. Find. #256). This sum reflects a payment by Hamilton on February 20, 1997, to Dipo Construction Company for the earnest money deposit on Kenneth Weeks's new house in Utah (Tr. 861-62; DX 130 at 11401, 11408; DX 171). The Hamilton account balance was only $8,674.13 as of December 6, 1996; the Division has acknowledged that, after that date, deposits to the Hamilton account did not come from sales of Dynamic American stock (DX 181 at 3).

I also reject the Division's claim that Kenneth Weeks should disgorge $90,910 in credit card payments made from the Stockton account (Div. Prop. Find. # 248). The Division's summary witness initially attributed these credit card payments to all three Respondents, jointly and severally (Tr. 808-09). Cross-examination showed that position to be untenable as to Robert Weeks (Tr. 240-41, 819-22). The Division then stated that "it would be in the [province] of the Court" to determine if such credit card payments benefited any one of the Respondents (Tr. 1093-94). The Division's posthearing pleadings add nothing new on this issue. Because the Division has offered no record citations to support its claim that such payments benefited only Kenneth Weeks, no individual disgorgement will be ordered. But see infra note 40.

The Division fares no better with its claim that $4,885 in Discover Card bills, paid by Stockton in mid-1996, should be attributed to Kenneth Weeks (Div. Prop. Find. # 248; DX 182). The argument finds its only support in evidence that Kenneth Weeks caused CIBC to issue a cashier's check to pay $2,000 to Discover Card on April 25, 1997 (Tr. 859-61, 864, 887-88; DX 171). The difficulty with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release        Page 43
No.)

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

this evidence (which Susan Weeks provided shortly before the hearing) is that it conflicted with evidence the Division previously obtained from Cordes (DX 130). The Bahamian bank records clearly show that Stockton's account at CIBC was inactive, with only a token balance, after March 1, 1997 (DX 130 at 11310-25). The Division has acknowledged that deposits to the Hamilton account after December 6, 1996, did not come from transactions in Dynamic American stock (DX 181 at 3). In addition, Hamilton's account at CIBC was inactive at the relevant time (DX 130 at 11411) (monthly statement of May 15, 1997). While the April 25, 1997, Discover Card payment obviously benefited Kenneth Weeks, there is an insufficient basis for inferring that the payment was linked to transactions in Dynamic American stock.[FN39]

**\*58** Finally, I reject the Division's argument that Kenneth Weeks should disgorge another $185,000 paid by CIBC cashier's checks to Dipo Construction Company from July 1997 to October 1997 (Div. Prop. Find. # 256). There is no question that these payments benefited Kenneth Weeks (Tr. 457-58, 858-59; DX 171). However, Stockton's account at CIBC was inactive after March 1, 1997 (DX 130 at 11310-25) and Hamilton's account was inactive after July 15, 1997 (DX 130 at 11424-40). As noted, the Division acknowledges that deposits to the Hamilton account after December 6, 1996, did not come from transactions in Dynamic American stock (DX 181 at 3). Accordingly, there is no basis for inferring that the payments represented the proceeds of transactions in Dynamic American stock.

To summarize, the Division has shown that $3,741,443 flowed into the Stockton and NCM/Hamilton accounts at CIBC and was attributable to transactions in Dynamic American stock. Of that amount, the record shows that Robert Weeks received $171,500, Hesterman received $852,600, and Kenneth Weeks received $2,427,536. When the sums received individually by each of the three Respondents are added together, the total is $3,451,636, or over 92% of the total. The difference between the amount flowing into the two Bahamian accounts and the amounts disbursed from the two accounts to individual Respondents is therefore $289,807 ($3,741,443 minus $3,451,636), or less than 8% of the total. As to this amount, two separate awards of joint-and-several liability are appropriate.[FN40]

I see no purpose in ordering the three Respondents to make an accounting. Cf. Canady, 2001 SEC LEXIS 2469 (Initial Decision on Remand) (Nov. 26, 2001), review granted. Prejudgment interest shall be due on all sums disgorged, with the rate of interest computed as specified in Rule 600 of the Commission's Rules of Practice. The Division has suggested that interest should be computed starting in December 1996, and I concur.

Civil Monetary Penalties

Under Section 21B(a) of the Exchange Act, the Commission may assess civil monetary penalties if the respondent has willfully violated the Securities Act, the Exchange Act, or the rules and regulations thereunder. It must also find that such penalties are in the public interest. See Section 21B(c) of the Exchange Act. Six factors are relevant to the public interest determination: (1) fraud; (2) harm to others; (3) unjust enrichment; (4) prior violations; (5) deterrence; and (6) such other matters as justice may require. Not all factors may be relevant in a given case, and the factors need not all carry equal weight. In its discretion, the Commission may consider evidence of the respondent's ability to pay. See Section 21B(d) of the Exchange Act.

Section 21B(b) of the Exchange Act specifies a three-tier system identifying the maximum amount of a penalty. For each "act or omission" by a natural person, the maximum amount of a penalty in the first tier is $5,000; in the second tier, it is $50,000; and in the third tier, it is $100,000.[FN41] A second-tier penalty is permissible if the act or omission involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement. A third tier-penalty must have not only involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, but also must have "directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or resulted in substantial pecuniary gain to the person who committed the act or omission."

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 44

(Cite as:  Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

**\*59** The statutory maximum is not an overall limitation, but a limitation per violation. Thus, a " Dear Investor" letter containing one fraudulent misrepresentation, when mailed to 3,400 Dynamic American shareholders, constitutes 3,400 separate acts or omissions. Likewise, each sale of unregistered securities, each failure to file a quarterly or annual report or a Form 8-K, each failure to file a timely report, and each failure to file a beneficial ownership report constitutes a separate act or omission. See United States v. Reader's Digest Ass'n., 662 F.2d 955, 966, 970 (3d Cir. 1981) (holding that each individual mailing constitutes a separate violation of an FTC consent order). The Division requests civil penalties of $600,000 as to each Respondent (Div. Br. at 49, 54).[FN42] Penalties at that level are well within the statutory ceiling.

Third-tier penalties are warranted for the proven antifraud violations. The misconduct established on this record involved fraud, deceit, and the reckless disregard of regulatory requirements. It also created significant risk of substantial losses to the investing public and resulted in substantial financial gain to the three Respondents. In addition, first-tier civil penalties are warranted for the offer and sale of unregistered securities, the reporting and recordkeeping violations, and the failure to file ownership reports.

I will impose civil penalties of $200,000 against Robert Weeks and Kenneth Weeks. Based on his prior securities fraud conviction, Hesterman is a repeat offender. I will impose a civil penalty of $250,000 against him. While the events in this case occurred more than ten years after his conviction, it is evident that Hesterman never rehabilitated himself.[FN43] I conclude that the $600,000 penalties sought by the Division involve overreaching and are not consistent with the public interest. At the same time, I recognize that the civil penalties in settled cases involving both antifraud violations and sham offshore transactions to sell unregistered securities in purported reliance on Regulation S generally have been lower than $200,000.[FN44] However, the Commission has recently reiterated that those who offer to settle may properly receive lesser sanctions than they otherwise might have received, based on pragmatic

considerations such as the avoidance of time-and-manpower-consuming adversary proceedings. See Stonegate Secs., Inc., 76 SEC Docket 111, 116 n.21 (Oct. 16, 2001) (collecting cases).

No Issue Of Inability To Pay

Well before the hearing, I advised Respondents that, if they were going to claim inability to pay disgorgement or civil penalties, they would have to submit detailed financial statements on Form D-A, as well as supporting income tax returns, at the hearing (Prehearing Conference of April 18, 2000, at 14-16; Order of April 18, 2000). See Rule 630 of the Commission's Rules of Practice; Terry T. Steen, 53 S.E.C. 618, 626-28 (1998) (holding that an ALJ may require the filing of sworn financial statements). All three Respondents expressed the intent to make such filings, but only Robert Weeks even attempted to do so. Robert Weeks's prehearing submission was woefully incomplete (Prehearing Conference of June 28, 2000, at 19-20). He never offered it as a hearing exhibit, and he eventually withdrew it from consideration (Tr. 1501, 1503). I conclude that all three Respondents have waived any claim of inability to pay.

Penny Stock Bars

**\*60** As here relevant, Section 15(b)(6)(A) of the Exchange Act permits the Commission to bar a person from participating in an offering of penny stock if it finds that: (1) such person has willfully violated any provision of the federal securities laws; (2) at the time of the violation, such person was participating in an offering of any penny stock; and (3) such a bar is in the public interest. Section 15(b)(6)(C) of the Exchange Act defines "person participating in an offering of penny stock" to include anyone "acting as a promoter, finder, consultant, agent, or other person who engages in activities with a broker, dealer, or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock."

Respondents' willful violations of the federal securities laws have been discussed throughout this Initial Decision. The violations were serious and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 45

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

continued over a long period of time. Dynamic American's common stock was penny stock, with the exception of a few weeks during July and August 1995 when it was trading above $5.00 per share. The willful violations occurred while Dynamic American's stock was penny stock. Whether Respondents are described as promoters, finders, consultants, or de facto officers and directors of Dynamic American, all three were extensively involved with a broker (La Jolla) and an issuer (Dynamic American) in both the issuance of Dynamic American common stock and in attempting to induce the purchase or sale of Dynamic American common stock. In Robert Weeks's case, that involvement included, but was not limited to, promotional trips to London, New York, Boston, and California, as well as participation in a television infomercial and radio talk shows. Based on the Steadman factors discussed above, penny stock bars are clearly warranted in the public interest.

**RECORD CERTIFICATION**

Pursuant to Rule 351(b) of the Commission's Rules of Practice, I certify that the record includes the items set forth in the record index issued by the Secretary of the Commission on October 23, 2001.

**ORDER**

Based on the findings and conclusions set forth above,

IT IS ORDERED THAT Robert G. Weeks, David A. Hesterman, and Kenneth L. Weeks cease and desist from committing or causing any violation or future violation of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933, Sections 10(b), 13(a), 13(b)(2)(A), 13(b)(2)(B)(ii), 13(b)(5), 13(d), 13(g), and 16(a) of the Securities Exchange Act of 1934, and Rules 10b-5, 13a-1, 13a-10, 13a-11, 13a-13, 13d-1, 13d-2, 16a-3, 12b-20, and 12b-25 thereunder;

IT IS FURTHER ORDERED THAT Robert G. Weeks disgorge $171,500, plus prejudgment interest computed at the rate set forth in Rule 600 of the Commission's Rules of Practice, from December 1, 1996, to the last day of the month preceding the month in which payment is made;

**\*61** IT IS FURTHER ORDERED THAT David A. Hesterman disgorge $852,600, plus prejudgment interest computed at the rate set forth in Rule 600 of the Commission's Rules of Practice, from December 1, 1996, to the last day of the month preceding the month in which payment is made;

IT IS FURTHER ORDERED THAT Kenneth L. Weeks disgorge $2,427,536, plus prejudgment interest computed at the rate set forth in Rule 600 of the Commission's Rules of Practice, from December 1, 1996, to the last day of the month preceding the month in which payment is made;

IT IS FURTHER ORDERED THAT Robert G. Weeks and Kenneth L. Weeks, jointly and severally, disgorge $16,294, plus prejudgment interest computed at the rate set forth in Rule 600 of the Commission's Rules of Practice, from December 1, 1996, to the last day of the month preceding the month in which payment is made; such disgorgement shall be in addition to the amounts these two Respondents are ordered to disgorge separately;

IT IS FURTHER ORDERED THAT David A. Hesterman and Kenneth L. Weeks, jointly and severally, disgorge $273,513, plus prejudgment interest computed at the rate set forth in Rule 600 of the Commission's Rules of Practice, from December 1, 1996, to the last day of the month preceding the month in which payment is made; such disgorgement shall be in addition to the amounts these two Respondents are ordered to disgorge separately and, in the case of Kenneth L. Weeks, in addition to the amount he is ordered to disgorge jointly and severally with Robert G. Weeks;

IT IS FURTHER ORDERED THAT Robert G. Weeks pay a civil penalty of $200,000, that David A. Hesterman pay a civil penalty of $250,000, and that Kenneth L. Weeks pay a civil penalty of $200,000;

IT IS FURTHER ORDERED THAT Robert G. Weeks, David A. Hesterman, and Kenneth L. Weeks are barred from participating in any offering of penny stock.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                                    Page 46

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

Payment of the disgorgement, interest, and civil penalties shall be made on the first day following the day this Initial Decision becomes final. Payment shall be made by certified check, United States Postal money order, bank cashier's check, or bank money order, payable to the Securities and Exchange Commission. The payments, and cover letters identifying the Respondents and the proceeding designation, should be delivered to the Comptroller, Securities and Exchange Commission, Operations Center, 6432 General Green Way, Stop 0-3, Alexandria, Virginia 22312. A copy of the cover letters should be sent to the Commission's Division of Enforcement.

This Order shall become effective in accordance with and subject to the provisions of Rule 360 of the Commission's Rules of Practice. Pursuant to that Rule, a petition for review of this Initial Decision may be filed within twenty-one days after service of the Initial Decision. It shall become the final decision of the Commission as to each party who has not filed a petition for review pursuant to Rule 360(d)(1) within twenty-one days after service of the Initial Decision on that party, unless the Commission, pursuant to Rule 360(b)(1), determines on its own initiative to review this Initial Decision as to that party. If a party timely files a petition for review, or the Commission acts to review on its own motion, the Initial Decision shall not become final as to that party.

*62 James T. Kelly
Administrative Law Judge

FN1. Dynamic American's nominal officers and directors were also named as Respondents in this proceeding. As described below, one defaulted and two settled with the Commission.

FN2. The hearing transcript, as amended by my Order of August 29, 2000, will be cited as "Tr. ___. " The hearing exhibits offered by the Division and by Respondents will be cited as "DX ___" and " RX___," respectively. The Division's Proposed Findings of Fact and Conclusions of Law and the Division's Posthearing Brief, both dated June 1, 2001, will be cited as "Div. Prop. Find. ___" and " Div. Br.___," respectively. Respondent Robert

Weeks's Posthearing Brief, dated September 3, 2001, will be cited as "RW Br.___." The Division's Reply Brief, dated September 19, 2001, will be cited as "Div. Reply Br. ___." I have not received any posthearing pleadings from Respondents Hesterman and Kenneth Weeks. See Order of September 10, 2001.

FN3. Rule 235(a) of the Commission's Rules of Practice may be applied only if the absent witness's prior sworn statements are "otherwise admissible." Under Rule 320 of the Commission's Rules of Practice, an Administrative Law Judge "may" receive relevant evidence and "shall" exclude all evidence that is irrelevant, immaterial, or unduly repetitious. Because the parties seek to admit DX 184, DX 185, and RX 135 for the truth of the matters asserted therein, I have also considered the Commission's position on hearsay. In determining when to admit and whether to rely on hearsay evidence, the Commission has consistently evaluated its probative value, its reliability, and the fairness of its use. See Harry Gliksman, 71 SEC Docket 892, 901 (Dec. 20, 1999), aff'd, 2001 U.S. App. LEXIS 25479 (9th Cir. Nov. 26, 2001); Charles D. Tom, 50 S.E.C. 1142, 1145 (1992). The Commission has expressed a preference for inclusiveness in doubtful cases. See City of Anaheim , 71 SEC Docket 191, 193-94 & nn.4-8 (Nov. 16, 1999). While the Federal Rules of Civil Procedure and the Federal Rules of Evidence do not govern the Commission's administrative proceedings, they often provide helpful guidance on issues not directly addressed by the Commission's Rules of Practice. Cf. Yanopoulos v. Dept. of Navy, 796 F.2d 468, 471 (Fed. Cir. 1986). I conclude that Cordes's investigative testimony and affidavit are " otherwise admissible."

FN4. At the time he made these statements, Kenneth Weeks had no motive to shift blame to anyone else or to minimize his own culpability. His lack of exculpatory motive while inculpating himself in misconduct provides the circumstantial guarantee of reliability that underpins the hearsay exception for statements against interest and distinguishes this case from the confrontation clause problem in Lilly v. Virginia, 527 U.S. 116 (1999). See United States v. Boone, 229 F.3d 1231, 1232-34 (9th Cir. 2000) (collecting cases), cert.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

Page 47

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

denied, 121 S. Ct. 1747 (2001). By its own terms, the Sixth Amendment right of confrontation applies only in criminal cases. It does not apply in administrative proceedings. See Hannah v. Larche, 363 U.S. 420, 440 n. 16 (1960). I therefore find unpersuasive Respondents' reliance on Lilly (Tr. 871).

FN5. Prospective DX 28 does not appear on the Exhibit List of September 25, 2001, because the Division never offered it at the hearing.

FN6. The Division objected to Dynamic American's use of the term "ore concentrates" and insisted that these assets were nothing more than tailings- waste materials produced during previous mineral processing operations (DX 180, Appendix 2). The Division's point is well taken, and this decision will refer to the Pioche assets as tailings.

FN7. On May 7, 1971, National Land Corporation filed a Form 10 registration statement, which was declared effective on March 16, 1972, registering a class of its securities with the Commission pursuant to Section 12(g) of the Exchange Act (official notice).

FN8. The electronic bulletin board was not a " stock exchange." At the relevant times, the bulletin board did not meet the definition of an exchange in Section 3(a)(1) of the Exchange Act and it was not registered as an exchange under Section 6 of the Exchange Act. The bulletin board simply provided an electronic quotation medium for subscribing members to reflect market-making interest in various securities. See NASD Manual, OTC Bulletin Board Service Rules, ¶¶ 2571 et seq. (July 1994); see also Section 15A(b)(11) of the Exchange Act (requiring NASD's rules to address the form and content of quotations relating to " securities sold otherwise than on a national securities exchange").

FN9. The $4.3 million valuation for the Pioche tailings first appeared in Dynamic American's financial statements for the year ending December 31, 1993 (official notice of 1993 Form 10-K). As an issuer that could claim to have been in continuous operation for more than three years and to have net tangible assets in excess of $2 million, Dynamic

American's common stock was arguably excluded from the definition of "penny stock" in Section 3(a)(51)(A)(iv) of the Exchange Act and Rule 3a51-1(g)(1) thereunder. The exclusion would remain in effect as long as Dynamic American filed current audited financial statements with the Commission. The exclusion allowed brokers with a reasonable basis for believing that the audited financial statements were accurate to make a market in Dynamic American common stock without providing the extensive disclosure required for penny stocks.

FN10. The notion that Pero owned such highly desirable assets that he could dictate take-it-or-leave - it terms strains belief. Samsung, a Korean company that was Dynamic American's competitor for Pero's properties, offered Pero only modest royalty payments after production commenced (Tr. 1493-94). As Turner well knew, H.T. Heard (Heard), a mining engineer, had issued a report on November 15, 1993, stating that reserves were "nil" and describing Pero's properties as "poor boy" (RX 25, Appendix 1). Heard wrote that "any well capitalized group which might be interested in this area could find any number of more attractive alternatives" (RX 25, Appendix 1).

FN11. An "affiliate" of a specified person is a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, the specified person. See, e.g., Exchange Act Rule 12b-2. "Control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise. See id.

FN12. At the hearing, Robert Weeks denied ownership or control of BT&S (Tr. 39-44). He admitted that he said what Barlow had recorded in his diary, denied that his statement to Barlow was true, and explained that he made the statement to keep Barlow from terminating Dynamic American's contract with BT&S. Based on the entire record, I reject this testimony as incredible. I find that Robert Weeks was telling the truth to Barlow in October 1996 and that he was not telling the truth at the hearing.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                                  Page 48

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

FN13.  Turner is not a respondent in this proceeding, and no liability would attach to him as a result of such a finding. The issue would be important only insofar as might reflect on Turner's credibility as a witness. Turner insisted that the three Respondents were not shareholders, officers, or directors of BT&S (Tr. 1376, 1382-83). When asked to name the actual owners, Turner refused, citing Bolivian attorney-client privilege (Tr. 1476-77).

FN14.  The date of execution of the Pero-BT&S contract is unclear. The only copy of the contract in the record is undated (RX 133, Appendix A). Turner's September 13, 1995, letter to Burton states that the contract was signed on June 30, 1995 (RX 133 at 2). At the hearing, the Division based its questions to Robert Weeks and Burton on a version of the contract that was apparently dated July 15, 1995 (Tr. 48, 54-56, 59, 81-82, 84, 92, 101, 103, 283, 497). However, the Division never offered that version of the contract into evidence (prospective DX 47). Burton testified credibly that he had already left Bolivia, and that he had never seen that contract (Tr. 497).

FN15.  The date of execution of the BT&S-Dynamic American contract is also unclear. While DX 5 recites that this contract was signed on July 18, 1995, Turner's September 13, 1995, letter to Burton states that it was executed on July 5, 1995 (RX 133 at 2). Turner insisted that Burton negotiated the terms on behalf of Dynamic American and that he, Turner, signed the contract in La Paz (Tr. 1387-88). In fact, Burton had no authority to act for Dynamic American at the time. Barlow testified that Turner was in Robert Weeks's office in Salt Lake City when the parties signed the contract (Tr. 400).

Turner was anxious to start Dynamic American's sixty-day due diligence period running, and his use of the earlier date is best understood in that light. The sooner the shares could be released from escrow, the sooner the forty-day Regulation S holding period could start to run. Although Dynamic American considered the due diligence period to close on September 18, 1995, Burton completed his report on September 5, 1995 (DX 3 at 5617, DX 16). I credit Barlow's testimony and

reject Turner's conflicting testimony. Finally, I note that the only copy of the contract in the record is incomplete: exhibits A and B are not attached.

FN16.  Dynamic American did not file its quarterly report for the period ending September 30, 1995, until April 2, 1996 (DX 18, DX 170). It did not file its amended annual report for fiscal year 1995 until late in 1996 (DX 21, DX 48, DX 170).

FN17.  Dynamic American's quarterly report for the period ending June 30, 1995, did not include the value of the Bolivian mineral properties on the company's unaudited financial statements (DX 16). However, that quarterly report did discuss the Bolivian acquisition in a narrative section entitled " Other Information." The narrative stated that, after the end of the quarter, Dynamic American had closed a transaction to acquire the Bolivian assets from BT&S for $40 million. It also stated:
    Included as an exhibit hereto is a pro-forma/post-escrow closing balance sheet reflecting the acquisition as of June 30, 1995. Management believes that this pro-forma balance sheet closely resembles the way the balance sheet would appear as of September 18, 1995, the date of conclusion of the acquisition.The unaudited <u>pro forma</u> post-escrow balance sheet valued the Bolivian mineral properties at $40 million.

Dynamic American's annual report for the fiscal year ending September 30, 1995, filed on August 9, 1996, did not include the value of the Bolivian mineral properties as an asset on the balance sheet (DX 20). However, the narrative portion of the annual report discussed the Bolivian transaction at some length (DX 20 at 4-6).

It is insignificant that this information appeared in a <u>pro forma</u> balance sheet and in the narrative section of the annual report, as distinguished from the balance sheets identified in the amended OIP. The three Respondents have not pressed the point.

FN18.  Dynamic American did not authorize its transfer agent to issue these shares to BT&S until November 16, 1995, and the transfer agent did not do so until November 27, 1995. Although both dates were well after the close of fiscal year 1995,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release    Page 49
No.)

(Cite as:   Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

Dynamic American reported the transaction as a fiscal year 1995 transaction (DX 1 at DA 72, DX 177 at 27). A Dynamic American resolution reflects BT&S's demand to convert its convertible preferred shares to common shares on September 18, 1995. However, Burton's facsimile trailer on that document is dated November 22, 1995 (DX 1 at 4552). I infer that Burton signed the document in November 1995 and that the document was backdated to September 1995. The corporate resolution authorizing the issuance of Class B shares was not signed until December 15, 1995. Dynamic American reported it, too, as a fiscal year 1995 transaction.

FN19. Geoffrey G. Snow (Snow), Ph.D., the Division's expert geologist, opined that the Pioche tailings had a gross value of no more than $45.94 per ton (DX 180 at 3-5). Under his analysis, the maximum value of 35,000 tons of tailings would be approximately $1.6 million. Leslie A. Patten (Patten), CPA, the Division's expert accountant, opined that Dynamic American's financial statements consistently failed to value the Pioche tailings in accordance with generally accepted accounting principles (GAAP) (DX 178 at 5-7). I credit this testimony, which Respondents did not attempt to rebut.

FN20. A transfer agent is defined in Section 3(a)(25) of the Exchange Act as a person who engages on behalf of an issuer of securities in countersigning such securities upon issuance; monitoring the issuance of such securities with a view to preventing unauthorized issuance; registering the transfer of such securities; exchanging or converting such securities; or transferring record ownership of securities by bookkeeping entry without physical issuance of securities certificates. Dynamic American's transfer agent was I-Data, Inc., of Dallas, Texas (Tr. 632-33). Robert Bogutski (Bogutski), an associated person of the transfer agent, testified for the Division.

FN21. The July 1, 1996, corporate resolution was either backdated or prepared by someone with advance knowledge of NCM's name change: NCM did not become Hamilton until August 7, 1996. Moreover, Dynamic American's transfer agent did

not receive a copy of the July 1, 1996, corporate resolution until August 21, 1996 (DX 177 at 1121).

FN22. For reasons that are unclear, the Division elected not to question Turner about Cordero. But see Annual Report of Golden Eagle International, Inc. (Form 10-K, filed with the Commission on April 2, 2001) (containing Turner's executive biography and stating: "During the entire period of 1983 through 1997, Mr. Turner was affiliated with and 'of counsel' to Cordero and Cordero, a La Paz, Bolivia, law firm, dealing with mineral and international law.") (official notice).

FN23. One of Dynamic American's creditors was responsible for some of the short sales (DX 169 at 1, DX 185 at 253). Although Turner accused Robert Weeks and Hesterman of selling Dynamic American short, Robert Weeks denied an understanding of short sales (Tr. 131-32; DX 25 at 220).

FN24. The most the Division can offer on this subject is a mixture of conjecture and surmise (Div. Br. at 14):

A reasonable inference from the evidence is that respondents retained control over some of the [twenty] million Dynamic American shares transferred to BT&S. It was the groups' intention to sell all of this stock by illegally using Regulation S. Respondents … would not have given all of the stock to Pero and Turner, the only other participants in the deal.

FN25. La Jolla had received $5,000 from Dynamic American to market its stock (DX 10).

FN26. Dynamic American's quarterly report for the period ending September 30, 1995, stated that the company spent $100,000 on legal work, title research, and professional fees (DX 18 at 7). It mentioned nothing about using any funds to complete the smelter or reopen the mines. Turner characterized the funds Dynamic American sent to Bolivia as "meager" (DX 48 at 2).

FN27. Consistent with Rule 323 of the Commission's Rules of Practice, I advised the parties of my intent to consider cases involving Bogutski and Cordes. See Posthearing Conference

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                    Page 50

(Cite as:   Release No. 199,   Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

of April 11, 2001, at 7-9. No party objected.

FN28. The Division argues that Turner's invocation of the Bolivian attorney-client privilege should not be allowed to frustrate meaningful cross-examination. See United States v. Bilzerian, 926 F.2d 1285, 1292 (2d Cir. 1991); In re von Bulow, 828 F.2d 94, 103 (2d Cir. 1987). As a remedy, it asks me to give no weight to Turner's testimony (Tr. 1376-82, 1463; Div. Reply Br. at 13). This is an interesting argument, coming from the party that offered Cordes's investigative testimony. Respondents had no opportunity to cross-examine Cordes, and the Division has not addressed its inconsistent positions. See also Adrian Antoniu, 48 S.E.C. 909, 913 (1987), aff'd in part and rev'd in part, 877 F.2d 721, 724 n.4 (8th Cir. 1989). In Antoniu, Respondent argued that his cross-examination of certain of the Division's witnesses had been improperly curtailed when the witnesses invoked the grand jury secrecy rule. The Commission found that the witnesses' refusal to disclose matters occurring before the grand jury was entirely proper. It further found that there had been no prejudice because the testimony was irrelevant. Finally, it did not rely on the disputed testimony in resolving the case. See 48 S.E.C. at 913.

FN29. If a communication to a foreign attorney has nothing to do with the United States or has only an incidental connection to this country, a privilege issue should be determined by the law of the foreign nation; however, if the communication has more than an incidental connection to the United States, a court should undertake a traditional choice-of-law analysis and defer to the law of privilege of the nation having the most direct and compelling interest in the communication. See VLT Corp. v. Unitrode Corp., 194 F.R.D. 8, 15-16 (D. Mass. 2000); Golden Trade S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 520-23 (S.D.N.Y. 1992). Such an interest will be determined after considering the parties and the substance of the communication, the place where the relationship was centered at the time of the communication, the needs of the international system, and whether the application of foreign privilege law would be clearly inconsistent with important policies embedded in federal law. See VLT, 194 F.R.D. at 16. The attorney-client privilege applicable under the laws of the United

States had the more direct and compelling interest here.

The proponent of the privilege must establish not merely the privileged relationship, but all essential elements to the privilege. Golden Trade, 143 F.R.D. at 523. The proponent of the privilege must present affidavits or other competent evidence to establish sufficient facts to prove applicability of the privilege; conclusory or ipse dixit assertions are not enough. See Saxholm AS v. Dynal, Inc., 164 F.R.D. 331, 333, 337 (E.D.N.Y. 1996); Burroughs Wellcome Co. v. Barr Labs., Inc., 143 F.R.D. 611, 621 (E.D.N.C. 1992). Robert Weeks, who sponsored Turner's testimony, failed to offer such competent evidence at the hearing, and the affidavit appended to his brief lacks the necessary specificity. See Scutillo, 74 SEC Docket at 2532-34 (holding that it is fundamentally unfair to admit testimony on foreign law (here, Turner's testimony about Bolivian law on attorney-client privilege) without reasonable written notice and without affording opposing counsel an opportunity to cross-examine on the scope of the foreign law). Turner did not substantiate his claim of Bolivian attorney-client privilege at the hearing.

FN30. Items 401 (e) and 401 (f) of Exchange Act Regulation S-K describe the sort of information that directors and officers must disclose as to their business experience and employment and their involvement in legal proceedings during the past five years. If the three Respondents had acknowledged their roles as de facto directors and officers of Dynamic American, Robert Weeks's employment by Pan World would have been reportable. The Commission's determination to suspend trading in Pan World stock in May 1995 and the district court order enjoining Pan World from the sale of unregistered securities in August 1995 would not have been reportable. The ongoing grand jury and Commission investigations of Pan World and Robert Weeks also would not have been reportable at the times relevant to this case. Hesterman's criminal conviction would not have been reportable because it was over five years old. Under Items 403 and 404 of Exchange Act Regulation S-K, the three Respondents' beneficial ownership of Dynamic American stock and related-party transactions would have been

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)
Page 51

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

reportable.

FN31.  Other Dynamic American documents, including the quarterly and annual reports, the August 10, 1995, press release, and the fact sheets contained disclaimers stating that Dynamic American had no firm plans as to how it would obtain sufficient capital to fund its Bolivian tin venture (DX 3, DX 8, DX 9, DX 16 at 6, DX 18 at 7, DX 20 at 10, DX 21 at 10).

FN32.  At the hearing, the Division focused on Dynamic American's representations about reserves in documents filed with the Commission (Tr. 1069). It now pursues relief for representations about reserves in Dynamic American's informal communications, as well (Div. Br. at 22).

FN33.  If Industry Guide 7 were applied to the disclosure in the fact sheets, Dynamic American's discussion of "possible" and "prospective" reserves would have been permissible under the proviso to Instruction 3 for Industry Guide 7 ¶ (b)(5). Those estimates previously had been provided to a firm that was offering to consolidate with Dynamic American (namely, BT&S). The material omission arises from the fact that Dynamic American did not explain, or explain adequately, the limitations of the terms "possible" and "prospective."

FN34.  Even if this did not demonstrate scienter, the outcome would not change. In that event, the three Respondents could not be held liable under Section 17(a)(1) of the Securities Act, Section 10(b) of the Exchange Act, or Rule 10b-5. However, their failure to correct Barlow's valuation of the Pioche tailings would still rise to the level of negligence, and liability would be sustained under Sections 17(a)(2) and 17(a)(3) of the Securities Act. Negligence is a failure to exercise reasonable care or competence. See SEC v. Hughes Capital Corp., 124 F.3d 449, 453-54 (3d Cir. 1997).

FN35.  See e.g., JG Indus., Inc., 2001 SEC No-Act. LEXIS 622 (June 18, 2001); Sierra Real Estate Equity Trust & Co., 1995 SEC No-Act. LEXIS 832 (Nov. 22, 1995).

FN36.  The Division's argument finds no support in Matt Matson, 65 SEC Docket 1458, 1459 (Initial

Decision) (Sept. 25, 1997) (imposing a penny stock bar, even though the stock in question traded above $5.00 per share for several weeks immediately after the respondent made fraudulent statements to the investing public), final, 65 SEC Docket 2418 (Oct. 30, 1997); or New Allied Dev. Corp., 60 SEC Docket 339, 348, 369 (Initial Decision) (Aug. 31, 1995) (imposing a penny stock bar, although the stock in question traded at $7.00 per share for a brief time), reviewed de novo, 63 SEC Docket 807, 811, 824 (Nov. 26, 1996). Those Initial Decisions support the proposition that a penny stock bar is not precluded because the price of the security went above $5.00 per share at some point during the relevant time period. They do not support the proposition that a penny stock bar would be warranted if the Division could prove violations of the federal securities laws only while the security traded at or above $5.00 per share.

FN37.  Testimony of SEC Chairman Arthur Levitt before the Committee on Governmental Affairs, Permanent Subcommittee on Investigations, United States Senate, Concerning Fraud in the "Micro Cap" Market at 11, 26 (Sept. 22, 1997), available at http://www.sec.gov/news/testimon y/testarchive/1997/tsty1497.txt.

FN38.  This represents a minor reduction from the Division's prehearing request for disgorgement of " at least" $3,794,604 (Division's Supplemental Prehearing Brief, dated June 28, 2000).

FN39.  If the Discover Card payment came from another Kenneth Weeks-controlled entity that had an account at CIBC (such as Washington National, Ltd.), an order to disgorge would involve double counting. If the Discover Card payment came from Kenneth Weeks's involvement in other businesses (perhaps relating to the unproven charges in the Pan World injunctive and criminal cases), there would be no basis for ordering disgorgement in this case, which is confined to illicit benefits obtained in transactions involving Dynamic American. Cordes made this point in his affidavit (RX 135 at ¶ 6).

FN40.  The record shows transfers of $16,294 from Stockton and NCM/Hamilton to the nursing home that cared for the father of Robert and Kenneth Weeks, to the mortuary that made

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)                                      Page 52

(Cite as:  Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.))

arrangements for their father's funeral, and to their sister, Kay Wyler (Tr. 192, 234, 1113-16; DX 181, DX 182). It is undisputed that Robert and Kenneth Weeks benefited equally from these payments, and that Hesterman did not benefit at all. I will order Robert and Kenneth Weeks to disgorge that amount, jointly and severally. Hesterman and Kenneth Weeks will be jointly and severally liable for the remaining $273,513, because they controlled the Stockton and NCM/Hamilton accounts. Robert Weeks will not be liable for that sum because he did not control the Bahamian accounts.

FN41. The Commission increased the amounts for violations occurring after December 9, 1996, and, again, for violations occurring after February 2, 2001. See 17 C.F.R. §§ 201.1001 and 201.1002. Those increases are not relevant here.

FN42. This represents a major reduction from the Division's prehearing request for civil penalties of " at least" $3,794,604 as to each Respondent (Division's Supplemental Prehearing Brief, dated June 28, 2000).

FN43. Section 21B(c) does not limit the age of prior violations, and Hesterman's prior conviction makes him a greater danger to the investing public. Even if there were some Exchange Act policy against considering "stale" prior convictions, Hesterman's conviction was not stale. By analogy to the federal sentencing guidelines in criminal cases, sentences exceeding thirteen months are excluded from the defendant's criminal history calculation only if they were imposed more than fifteen years before the commencement of the instant offense. See U.S. Sentencing Guidelines Manual § 4Aa.2(e)(1) (2001). While the federal sentencing guidelines do not control the imposition of sanctions in administrative enforcement proceedings, they are instructive as to the type of conduct that might warrant stiffer administrative sanctions.

FN44. See, e.g., SEC v. Members Serv. Corp., No. 97 CV 1146 (HHK) (D.D.C. Oct. 4, 2000), SEC Litig. Rel. No. 16775 (Oct. 19, 2000) (default order as to Philip Sung) (imposing permanent injunction, disgorgement, and $100,000 civil penalty for securities registration and antifraud

violations); SEC v. Jui-Teng Lin, No. 1:98 CV 2123 (D.D.C. Sept. 3, 1998), SEC Litig. Rel. No. 15870 (Sept. 3, 1998) (settled case) (imposing permanent injunctions, disgorgement, $100,000 and $50,000 civil penalties against two defendants for securities registration and antifraud violations, and for filing false beneficial ownership reports).

Release No. 199,  Release No. ID - 199, 2002 WL 169185 (S.E.C. Release No.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.