1   LESLIE J. HUGHES (CO Bar No. 15043)
    hugheslj@sec.gov
2   LEE C. ROBINSON (CO Bar No. 32734)
3   robinsonlc@sec.gov
    Attorneys for Plaintiff
4   U.S. Securities and Exchange Commission
    1801 California Street, Suite 1500
5   Denver, Colorado 80202-2656
    Telephone: (303) 844-1000
6   Fax: (303) 844-1068

7

8                        UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10                        SAN FRANCISCO DIVISION

11  _____

12  SECURITIES AND EXCHANGE                    Case No. C 06-6384 CRB
    COMMISSION,

13                        Plaintiff,

14          v.                                 **FIRST AMENDED COMPLAINT**

15  ROMULUS S. PEREIRA,
    ROBERT B. STANTON,
16  L. JOHN KERN,
    ANDREW D. FELDMAN,
17  WILLIAM F. McFARLAND,
18  LORI H. CORNMESSER,

19                        Defendants.

20  _____

21          Plaintiff, Securities and Exchange Commission ("SEC"), alleges:

    **I. SUMMARY**

22          1.      From June 2001 through June 2002 (the "relevant period"), **Romulus S. Pereira**,

23  chief executive officer, **Robert B. Stanton**, chief financial officer, **L. John Kern**, executive vice

24  president of worldwide sales, **Andrew D. Feldman**, vice president of marketing and corporate

25  development, and **William F. McFarland**, vice president of finance, engaged in a scheme that

26  defrauded investors by improperly inflating the reported net revenues ("revenues") and earnings

27  of Riverstone Networks, Inc. ("Riverstone"), a public company whose securities were traded on

28  the NASDAQ national market.

2. During the relevant period, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** negotiated, reviewed, approved, or were otherwise aware of sales transactions that involved side agreements with customers, under which the customer's payment for Riverstone product was contingent upon resale or the purchaser was granted full return, exchange, or cancellation rights and for which Riverstone improperly recognized revenues under Generally Accepted Accounting Principles ("GAAP") and its own revenue recognition policy.

3. As a direct result of these Defendants' actions or reckless inaction, Riverstone falsely reported at least $19.1 million of revenues in its financial statements from contingent sales, causing revenue overstatements for each of the four quarters in the relevant period ranging between approximately 8.24% and 14.17%.

4. **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** knew, or were reckless in not knowing, that it was improper for Riverstone to recognize revenues on the contingent sales under GAAP and Riverstone's revenue recognition policy, and that Riverstone's financial statements during the relevant period contained materially false and misleading information regarding its revenues and earnings.

5. The materially false and misleading information regarding Riverstone's revenues and earnings was conveyed to the public through Riverstone's periodic filings with the SEC, press releases, and earnings conference calls, which either **Pereira**, **Stanton**, **Kern**, **Feldman**, or **McFarland** signed, spoke, drafted, edited, approved, or were substantially or intricately involved in creating.

6. **Pereira**, **Stanton**, and **McFarland**, who were responsible for Riverstone's accounting department and policies, also failed to devise, implement, and maintain an adequate system of internal accounting controls at Riverstone.

7. During the relevant period, **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and Riverstone's director of sales operations, **Lori H. Cornmesser**, circumvented the internal accounting controls that Riverstone had in place or falsified Riverstone's books, records, and accounts.

FIRST AMENDED COMPLAINT                              Case No. C 06-6384

8. **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland**, aided and abetted by **Cornmesser**, made or caused misstatements and omissions to Riverstone's outside accountants concerning the true nature of certain sales transactions.

## II. JURISDICTION AND VENUE

9. The SEC brings this action to enforce the federal securities law pursuant to Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d) and 78u(e)].

10. This Court has jurisdiction over this action pursuant to Sections 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(e) and 78aa].

11. The Defendants, directly or indirectly, have made use of the means or instrumentalities of interstate commerce, or of the mails in connection with the transactions, acts, practices, and courses of business described in this Complaint.

12. This district is appropriate for venue under Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the transactions, acts, practices, and courses of business constituting the violations of law alleged in this Complaint occurred within the Northern District of California. The Defendants worked in Riverstone's principle office in Santa Clara, California. The Defendants also reside within this district in Santa Clara or San Mateo counties.

## III. INTRA-DISTRICT ASSIGNMENT

13. Although assignment to the San Jose Division is appropriate pursuant to Civil Local Rule 3-2(e) because a substantial part of the events that give rise to the Commission's claims occurred in Santa Clara County, when the case was originally filed it was assigned to the San Francisco Division.

## IV. DEFENDANTS

14. <u>**Romulus S. Pereira**</u>, age 55, a resident of Saratoga, California, served as chief executive officer, president, and as a director of Riverstone from March 2000 until December 2003. **Pereira** was responsible for the day-to-day business operations of the company, and prepared and signed Riverstone's reports filed with the SEC. During the period March 4, 2001 to October 31, 2001, **Pereira** was also the executive at Riverstone in charge of worldwide sales. Prior to his employment at Riverstone, **Pereira** was chief operating officer of Cabletron Systems

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

Inc. ("Cabletron"), which later changed its name to Enterasys Networks, Inc. ("Enterasys").

15. **Robert B. Stanton**, age 54, a resident of Palo Alto, California, served as Riverstone's chief financial officer and executive vice president of finance from August 2000 until October 2003. **Stanton** oversaw Riverstone's finance department, which included credit and collections, prepared and signed Riverstone's reports filed with the SEC, and reported directly to **Pereira**.

16. **L. John Kern**, age 39, a resident of Burlingame, California, served as Riverstone's executive vice president of worldwide sales from November 2001 until October 2002. **Kern** was Riverstone's vice president of sales from January 2001 to November 2001 and its vice president of worldwide sales operations from April 2000 to January 2001. **Kern** reported directly to **Pereira**.

17. **Andrew D. Feldman**, age 37, a resident of Portola Valley, California, served as Riverstone's vice president of marketing and corporate development from March 2000 until July 2003. Prior to his employment at Riverstone, **Feldman** worked for Cabletron in a marketing capacity. **Feldman** reported directly to **Pereira**.

18. **William F. McFarland**, age 55, a resident of Campbell, California, served as Riverstone's vice president of finance from August 2001 until June 2003. **McFarland** was in charge of Riverstone's accounting function, including the preparation of its financial statements and reports filed with the SEC. **McFarland** reported directly to **Stanton**.

19. **Lori H. Cornmesser**, age 35, a resident of San Jose, California, served as Riverstone's director of sales operations from November 2001 to October 2002, and as senior manager of sales operations from December 2000 to October 2001. **Cornmesser** reported directly to **Kern**.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

## V.  RELATED ENTITY – RIVERSTONE NETWORKS, INC.

20.    Riverstone was a Delaware corporation with its principal office in Santa Clara, California.  Prior to August 6, 2001, Riverstone was a majority-owned subsidiary of Enterasys

21.    Riverstone designed and sold routers, which are devices for making or transferring connections between communication circuits carrying voice or data transmissions.

22.    Riverstone registered its common shares with the SEC pursuant to Section 12(g) of the Exchange Act [15 U.S.C. § 78*l*(g)] and made an initial public offering of common stock at $12 per share on February 15, 2001.  At that time, its shares began trading on the NASDAQ national market under the symbol RSTN.

23.    After Riverstone registered its common stock, it was required under the federal securities laws, among other things, to file quarterly reports (known as Forms 10-Q) and annual reports (known as Forms 10-K) that included accurate and reliable financial statements prepared in accordance with GAAP.

24.    Prior to the August 6, 2001 spin off, Riverstone's financial statements were included in Enterasys' consolidated financial statements and reports filed with the SEC.

25.    On September 19, 2001, the closing price for Riverstone's stock was $9.39.

26.    The next day **Pereira** and **Stanton** announced Riverstone's financial results for its first quarter as an independent company.  They represented in a September 20, 2001 press release and earnings conference call that Riverstone had revenues of $55.3 million, pro forma net income of $1.6 million and earnings of $0.01 per share.  **Pereira** announced, "We are very pleased with our financial results.  Not only did we turn profitable a full quarter ahead of expectations, we grew revenue 169 percent on a year over year basis."  **Pereira** emphasized that "profitability for us was a very important milestone to hit as a leading indicator for us of long term sustainability."

27.    On December 19, 2001, **Pereira** and **Stanton** announced Riverstone had posted a another quarter of profits.  They represented in a December 19, 2001 press release and earnings conference call that Riverstone had $60.1 million in revenues for its fiscal third quarter of 2002, pro forma net income of $3.6 million and earnings of $0.03 per share.

28.    Over the four months, during which Riverstone announced it had met its Wall Street analysts' earnings expectations and posted profits during two fiscal quarters, the closing price of its stock rose from its September 19, 2001 level to a high of $20.55 on January 11, 2002.

29.    During this period, while **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** were engaged in the scheme to improperly inflate Riverstone's revenues and earnings by recognizing revenues from contingent sales, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **Cornmesser** realized substantial profits from stock sales, bonuses, and/or other forms of compensation linked to sales while Riverstone's stock price was artificially inflated. Without the revenues from the contingent sales, Riverstone would not have met its Wall Street analysts' expectations or posted profits.

30.    On February 1, 2002, Riverstone's stock closed at $15.72 per share. After the close of trading, Enterasys, the former parent corporation of Riverstone, announced that it was the subject of a formal SEC investigation and that it was reviewing its sales and revenue recognition practices and would be delaying the release of its fourth quarter financial results. Within two weeks after Enterasys' announcement, Riverstone's stock was trading at $7.70 per share, a decline of over 50 percent. This represents a change in the value of the shareholders' stock of approximately $984 million.

31.    On February 28, 2002, Riverstone announced in a press release that it was cutting its revenue expectations for the fourth quarter ending March 2, 2002 to approximately $50 million to $54 million and that the company anticipated that it would break even or have a slight loss on a pro forma basis. After this announcement, Riverstone's stock closed at $3.82 down from the closing price of $7.59 the prior day.

32.    On August 27, 2003, Riverstone filed an amended current report with the SEC on Form 8-K, which **Stanton** signed, announcing the company had overstated its previously reported revenues for the fiscal year ending March 2, 2002 ("Fiscal Year 2002") by as much as $85.5 million and for the nine months ended November 30, 2002, by as much as $12.7 million. In the press release, Riverstone and **Stanton** reported that "[t]hese overstatements are primarily related to revenue recognized on sales to customers in which we made investments and sales that

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

were subject to rights of return, pricing discounts and other contingencies that were not accounted for at the time the transactions were originally recorded. As a result, based on our accounting policies, revenue related to these sales either should not have been recognized or should have been recognized in a different period."

### VI. RIVERSTONE'S SALES AND REVENUE RECOGNITION PRACTICES DURING THE RELEVANT PERIOD

33. Prior to Riverstone becoming a public company in February 2001, **Pereira Stanton**, and others developed a business model that projected quarterly revenue growth for Riverstone (the "Revenue Plan") based on an analysis of historic revenue growth of its industry competitors. The purpose of the Revenue Plan was to provide consistent revenue growth so that the company's stock price would increase.

34. **Pereira** and **Stanton** executed the Revenue Plan by setting quarterly projected revenues targets and sales quotas based on the desired revenue growth rates in the Revenue Plan. They told **Kern**, **Feldman**, and others the amount of revenues that must be recognized each quarter in order for the company to reach its goal of becoming a successful public company.

a) **Pereira** and **Stanton** set a revenue target of $57,500,000 for the quarter ending September 1, 2001.

b) **Pereira** and **Stanton** set a revenue target of $60,000,000 for the quarter ending December 1, 2001.

c) **Pereira** and **Stanton** set a revenue target of $66,000,000 for the quarter ending March 2, 2002.

d) **Pereira** and **Stanton** set a revenue target of $49,000,000 for the quarter ending June 1, 2002.

35. Throughout the relevant period, **Stanton** provided guidance regarding Riverstone's revenues target to Wall Street analysts during quarterly earnings and mid-quarter update conference calls.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

a) In a June 20, 2001 earnings conference call, **Stanton** stated "For second quarter revenues we are comfortable with the current consensus growth rate in the low to mid 20 percent range building upon our new revenue sales base of $44.2 million."

b) In an October 30, 2001 conference call to provide a mid-quarter update, **Stanton** said "In the near term, we expect to continue to out perform the market with quarter to quarter growth in the mid to high single digits."

c) In a December 19, 2001 earnings conference call, **Stanton** said "We expect revenues to grow between 6 and 10 percent. . . . We remain absolutely committed to profitability and are comfortable with the current consensus EPS estimates of 4 cents for the fourth quarter based on a share count of approximately 142 million shares."

d) On February 28, 2002, **Pereira** and **Stanton** issued a press release revising Riverstone's expected earnings for the fourth quarter to a range of approximately $50 million to $54 million with earnings at break even or a slight loss.

e) In a March 26, 2002, earnings conference call, **Stanton** said, "Riverstone believes revenues for the first quarter of fiscal 2003 will be flat to slightly down."

36. **Pereira** and **Stanton** conducted regular meetings to monitor Riverstone's sales and the amount of revenues that could be recognized from those sales ("Revenue Meetings"). In the last few weeks of Riverstone's fiscal quarters, the Revenue Meetings were held on a daily basis. **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser** regularly attended the Revenue Meetings.

37. The purpose of the Revenue Meetings was to compare Riverstone's revenues to date versus the targeted revenues **Stanton** had communicated to the Wall Street analysts and discuss what sales could be consummated to "close the gap" and thus meet the revenue target.

38. During the Revenue Meetings, specific sales opportunities and collection issues were discussed, as well as the sales terms associated with those transactions. These discussions encompassed revenue recognition generally and included references to sales contingencies that prohibited revenue recognition under GAAP.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

39.     At the Revenue Meetings that occurred in the last weeks of each quarter, **Pereira** directed **Kern**, **Feldman**, and others to find sales transactions to "close the gap."

40.     One method Riverstone personnel employed to "close the gap" was using Riverstone's resellers to "pull deals forward," meaning to take product in advance of a sale to an end user so that Riverstone could recognize revenues in an earlier quarter and thereby meet its targeted revenues. This practice was known to **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser**.

41.     When the end user sale was connected to a commitment by Riverstone to make an equity investment in the customer in an amount equivalent to the sale, the investment transactions were discussed at executive sessions that followed the Revenue Meetings, which **Pereira, Stanton, Kern, Feldman**, and **McFarland** attended.

42.     Riverstone's standard terms and conditions of sale provided that all sales were final with no return rights and payment would be made on fixed payment terms (typically net 30 days).

43.     Riverstone's revenue recognition policy, which **Stanton** and **McFarland** helped create, also prohibited granting return or cancellation rights to customers.

44.     However, in order to "pull deals forward" through transactions with resellers, Riverstone personnel granted non-standard sales terms including various sales contingencies, such as return, exchange, or cancellation rights or that the customer did not have to pay for the Riverstone product until it was resold to the end user ("sell-through payment term").

45.     In order for the transactions to pass audit by Riverstone's outside accountants, Riverstone personnel asked customers to remove non-standard terms from purchase orders and instead provide "clean" purchase orders (a purchase order with Riverstone's standard sales terms) and Riverstone personnel, in turn, committed to the non-standard terms in a side letter or verbal agreement.

46.     Sales at Riverstone were booked into Riverstone's Oracle accounting system ("Oracle") by Riverstone's order management group, a division of the sales operations department, for which **Kern** and **Cornmesser** had managerial responsibility.

9

47. Riverstone's policy required **Kern** to approve the entry of any sale greater than $500,000 into Oracle. In addition, any non-standard sales terms required review from the legal department and approval of the vice president who made the commitment. In the case of the sales department, that approval would come from **Kern**.

48. The order management group entered sales into Oracle generally based upon the written purchase orders, which were then placed in the customer sales files maintained by the sales operation department.

49. The sales operation department prepared a purchase order validation form at the time the sale was booked into Oracle, which required: "The info must match the customer PO or supporting documents."

50. Riverstone's purchase order validation form process was designed to validate only the terms set forth on the written documentation received by the order management group, not to verify any additional terms that were not included on the purchase orders.

51. Riverstone's order management checklist also stated that "if any of the above Info [on the purchase order] is Dirty, then you need to give back to CSS until order's [sic] <u>CLEAN</u>."

52. Neither Riverstone's purchase order validation form nor its order management checklist required approval for, or set forth a procedure to identify, document, or communicate, return or exchange rights in Riverstone's books and records at the time a sale was booked into Oracle.

53. **Kern** and **Feldman** did not submit written side letters to the order management group for entry into Oracle or for filing in the customer sales files, but instead kept them in their personal files or e-mail.

54. In addition, Riverstone's written sales and collection process had no procedure to ensure that return or exchange rights were communicated to members of the finance department who entered sales into Riverstone's general ledger, over whom **McFarland** had managerial responsibility.

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

55.     As part of their quarterly review and audit procedures, Riverstone's outside accountants requested documents from Riverstone's customer files to test the revenue recognition process the company applied to various sales transactions.

56.     **Kern** instructed **Cornmesser** to check the customer sales files before Riverstone's outside accountants came to perform their field work and remove any written side agreements that had been submitted to the order management group by other persons.  In such instances, **Cornmesser** would deliver the removed written side agreements to **Kern**.

57.     When booking a sale into Oracle, **Cornmesser** routinely ignored any terms she was informed of that contradicted the written purchase order.  She was instructed to do this by **Kern**.

58.     **Kern**, **Feldman**, and **Cornmesser** knew that the reason for getting a "clean" purchase order from a customer was so that the sale would pass through the audit process without any questions about non-standard terms which might void the revenues recognized on that transaction.

59.     After a sale was booked, an invoice was generated by Oracle after the order management group was notified that the order had shipped from Riverstone's contract manufacturer.

60.     The invoice contained the same payment terms that were previously entered into Oracle by the order management group at the time the sale was booked.  Moreover, the generation of the invoice in Oracle automatically caused the sale to be credited to Riverstone's sales account in its general ledger.

61.     The sales account in Riverstone's general ledger flowed through to the revenues reported in Riverstone's financial statements, which were reproduced in Riverstone's filings with the SEC and other in public announcements.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

**VII. PEREIRA, STANTON, KERN, FELDMAN, AND MCFARLAND CAUSED RIVERSTONE TO REPORT IMPROPER REVENUES FROM CONTINGENT SALES**

62.    Between June 2001 and June 2002, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** engaged in a scheme to cause Riverstone to improperly recognize at least $19.1 million in revenues from sales transactions involving rights of return, exchange, and cancellation, and other material contingencies such as sell-through payment terms, which were not accounted for at the time the transactions were originally recorded.  As a result, revenues related to these contingent sales either should not have been recognized or should have been recognized in a different period.

63.    Instead of including the foregoing contingencies in its reseller agreements or the customers' purchase orders, Riverstone agreed to these contingencies in side agreements that, due to the acts or omissions of **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser**, were not recorded in Riverstone's books, records, and accounts, or disclosed to the company's outside accountants.

64.    The contingent sales were typically consummated within the last two weeks of a reporting period when Riverstone was struggling to meet its Wall Street analysts' estimates.

65.    In furtherance of the scheme, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** knowingly or recklessly made false and misleading statements or omitted material facts necessary to make statements made not misleading by materially inflating Riverstone's reported revenues and earnings through negotiating, reviewing, approving, or causing revenues to be recorded on contingent sales and concealing the sales contingencies from Riverstone's outside accountants.

66.    **Pereira**, **Stanton**, and **McFarland** also knowingly or recklessly participated in Riverstone's material misstatements of revenues and earnings by failing to implement procedures to identify, document, and properly account for contingent sales after gaining knowledge that millions of dollars of contingent sales had occurred at Riverstone.

FIRST AMENDED COMPLAINT                                  Case No. C 06-6384

67.     As a direct result of the actions of **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** their reckless inaction, Riverstone materially overstated its revenues for each quarter during the relevant period by approximately: $5,377,000 or 10.78% for Riverstone's second fiscal quarter ending September 1, 2001 ("Q2 2002"); $4,570,000 or 8.24% for Riverstone's third fiscal quarter ending December 1, 2001 ("Q3 2002"); $5,479,000 or 11.96% Riverstone's fourth fiscal quarter ending March 2, 2002 ("Q4 2002"); and $3,736,000 or 14.17% for Riverstone's first fiscal quarter ending ended June 1, 2002 ("Q1 2003").

68.     As a direct result of the actions of **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** their reckless inaction, Riverstone also materially overstated its earnings, allowing it to meet its Wall Street analysts' estimates and post a profit for Q2 2002 and Q3 2002.

69.     **Pereira**, **Stanton**, **Kern**, **Feldman**, and/or **McFarland** caused Riverstone to file three quarterly reports and one annual report with the SEC that contained false and misleading financial statements that were not prepared in accordance with GAAP.

70.     **Pereira's**, **Stanton's**, **Kern's**, **Feldman's**, and **McFarland's** actions or reckless inaction resulted in various materially false or misleading statements to the investing public contained in SEC filings and other documents, including: Riverstone's annual report on Form 10-K for Riverstone's Fiscal Year 2002; Riverstone's quarterly reports on Forms 10-Q for Q2 2002, Q3 2002, and Q1 2003; and earnings press releases and conference calls during the relevant period.

**A.      False and Misleading Statements in Q2 2002 Form 10-Q**

71.     On or about October 15, 2001, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** caused Riverstone to file with the SEC a Form 10-Q which stated Riverstone had revenues of $55,250,000, net income of $64,000, and earnings per share of $0.00 for Q2 2002.

72.     The defendants' statements in the Form 10-Q were false and misleading because the defendants caused Riverstone to materially overstate is revenues by at least $5,377,000 or 10.78% as a result of improperly recognizing revenues from sales transactions discussed below involving rights of return, exchange, and cancellation, and other material contingencies such as sell-through payment terms, which were not accounted for at the time the transactions were

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

originally recorded. As a result, revenues related to these contingent sales either should not have been recognized or should have been recognized in a different period under Riverstone's revenue recognition policy and GAAP.

73. **Feldman** caused Riverstone to improperly recognize revenues of approximately $2.8 million from a transaction with World Wide Technologies, Inc. ("WWT"), which revenues were included in the revenues and earnings reported in the Q2 2002 Form 10-Q.

74. **Kern** caused Riverstone to improperly recognize revenues of approximately $2.577 million from transactions with Beijing Ever Bright Innovation Technologies Co., Ltd. ("Everbright"), Keytron S.A. ("Keytron"), Trispec Communications, Inc. ("Trispec"), and Smartnet Technology, Inc. ("Smartnet"), which revenues were included in the revenues and earnings reported in the Q2 2002 Form 10-Q.

75. **Kern** and **Feldman** made the false statements in the Q2 2002 Form 10-Q because each was involved substantially or intricately in the creation of the misstatements of revenues and earnings by knowingly procuring false and/or incomplete written sales documentation that was submitted to the order management group or instructing the order management group to enter inaccurate sales terms into Oracle, which, in turn, directly caused the revenues from the transactions to be improperly recorded into Riverstone's accounting books, records, and accounts and which were in turn reported in the financial statements included in the Q2 2002 Form 10-Q.

76. **McFarland** made the false statements in the Q2 2002 Form 10-Q because he created the misstatements of revenues and earnings by failing to properly account for these transactions under GAAP and Riverstone's revenue recognition policy after learning of sales contingencies, and by drafting and editing Riverstone's financial statements, which he knew would be reproduced in Riverstone's public filings with the SEC.

77. **Pereira** and **Stanton** made the false statements in the Q2 2002 Form 10-Q because each signed the Form 10-Q despite their knowledge that, or reckless indifference as to whether, the amount of revenues and earnings listed in the report was materially overstated.

**B.** **Contingent Sales for Which Revenues Were Improperly Recognized in Q2 2002**

*1.* *The World Wide Technology Side Agreement*

78. In August 2001, to meet the gap in Riverstone's Revenue Plan for the quarter, **Feldman** approached WWT, a Missouri-based reseller, about placing a $2.8 million purchase order with Riverstone.

79. During the prior quarter, **Feldman** had been asked by Piyush Patel ("Patel"), chairman of Riverstone's board of directors, and **Pereira** to get WWT to take a large order of Riverstone product. At that time, **Feldman** informed **Pereira** and **Stanton** that WWT would not pay for such an order until the Riverstone product was sold-through to an end user.

80. To induce the $2.8 million sale to WWT in Q2 2002, **Feldman** agreed in an e-mail with WWT to a sell-through payment term and full exchange rights on the order.

81. **Feldman** informed both **Pereira** and **Stanton** about the sell-through payment term prior to accepting the WWT order and **Pereira** specifically approved the term and instructed **Feldman** to close the WWT transaction.

82. At the time **Feldman** entered into the side agreement with WWT, he was aware from discussions at the Revenue Meetings that Riverstone intended to recognize revenues on the WWT transaction, that the sale contingencies prevented revenue recognition under GAAP, and that WWT's purchase order needed to omit any references to the contingencies if revenue was to be recognized.

83. **Feldman** knew about revenue recognition principles under GAAP and the need to omit any written sales contingencies from the WWT purchase order based on his education and business experience. For example, in early May 2001, **Feldman** had sent an e-mail to a Riverstone customer regarding stock rotation rights stating: "Please also be aware of the revenue recognition rules . . . that limit our ability to recognize revenue when this [exchange right] is in the contract/on the PO."

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

84. On August 28, 2001, four days before the close of Q2 2002, WWT faxed a $2.8 million purchase order to **Feldman** that made reference to the sale contingencies contained in **Feldman's** e-mail.

85. **Feldman** took the WWT purchase order to **Stanton** and **Cornmesser**, who instructed him to contact WWT and obtain a purchase order without the note referencing Feldman's e-mail.

86. **Feldman** subsequently told WWT via e-mail on the evening of August 28th that he could provide a side agreement with the sale contingencies, but instructed WWT to remove the note referencing them from the purchase order. **Feldman** also requested that WWT change the shipping term on the purchase order so that Riverstone could recognize revenues on the WWT transaction upon shipment of the ordered products. In his e-mail, **Feldman** requested WWT fax him a revised first page of the purchase order.

87. In response to **Feldman's** request, WWT faxed **Feldman** a revised first page of its purchase order deleting the reference to the side agreement in **Feldman's** e-mail and falsely stating a net 90 days payment term instead of the sell-through payment term contained in the side agreement. The revised purchase order also changed the shipping term per **Feldman's** request.

88. **Feldman** delivered the false and misleading revised purchase order to **Cornmesser**. The order management group, in turn, booked the sale into Oracle with the false net 90 days payment term. The sell-through payment term granted by **Feldman** in the side letter was not recorded in Riverstone's Oracle system or its other books and records.

89. **Feldman** did not forward his e-mail side agreement with WWT to the order management group and it was not kept in Riverstone's customer sales files.

90. In spite of their knowledge of the sell-through payment terms, **Pereira** and **Stanton** included revenue from the transaction in Riverstone's financial statements for Q2 2002 contrary to the company's revenue recognition policy and GAAP.

91. On or about September 19, 2001, **Pereira, Stanton, McFarland, Feldman, Kern** and others in management received a document titled "Riverstone Networks, Inc. Quarter in Review Second Fiscal Quarter 2002, September 1, 2001." This report included financial

16

statements showing that Riverstone intended to report $55,250,000 in revenues, which included revenues from transactions with WWT, Everbright, and Smartnet, which were among the company's top ten customers.

92.    A month after the WWT sale, Riverstone's director of credit and collections, Kathy Alvendia, informed **Stanton**, **Feldman**, and **McFarland** on October 2, 2001, that the inability to collect the amount owed by WWT at the time would have a major impact on the aging of Riverstone's receivables.

93.    On October 11, 2001, Alvendia met with **Feldman** and **McFarland**, at which time **Feldman** confirmed the existence of the sell-through payment term granted to WWT.

94.    The next day, Alvendia sent an e-mail to **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** stating that Riverstone gave WWT a sell-through payment term "[a]s part of shipping $3M in revenue for the qtr."

95.    Soon after **Pereira** and **Stanton** were told by Alvendia of the sell-through payment term given to WWT, they both had conversations with her in which they acknowledged that the WWT transaction was a problem.

96.    Three days later, on October 15, 2001, **Pereira** and **Stanton** signed Riverstone's Form 10-Q for Q2 2002, which inlcuded revenues from the WWT transaction.

97.    At the time **Pereira**, **Stanton**, and **McFarland** learned of the sales contingency associated with the WWT transaction, they knew that such sales contingency prohibited revenue recognition under GAAP.  For example, Riverstone's SEC Form 10-Q for the quarter ending June 1, 2001, which **Pereira** and **Stanton** signed, explained that: "[Riverstone] generally recognizes revenue upon shipment of products provided there are no uncertainties regarding customer acceptance, persuasive evidence of an arrangement exists, the sales price is fixed and determinable and collectibility is deemed probable.  If uncertainties exist, revenue is recognized when such uncertainties are resolved."  **McFarland** knew about revenue recognition principles under GAAP based on, among other things, his prior accounting work experience, his discussion with accountants, and his review of revenue recognition accounting literature.

98.     **Pereira**, **Stanton**, and **McFarland** knowingly failed to book and reserve against the revenue from the WWT transaction during Q2 2002.

99.     **Pereira**, **Stanton**, **McFarland**, and **Feldman** caused Riverstone to improperly recognize approximately $2.8 million of revenues for Q2 2002 from the WWT sale.

100.    The improper revenues from the WWT transaction were included in Riverstone's financial statements for Q2 2002 and Fiscal Year 2002, and resulted in misstatements of revenues in Riverstone's Form 10-Q for Q2 2002 and Form 10-K for Fiscal Year 2002.

101.    The improper revenues from the WWT transaction alone inflated Riverstone's revenues for Q2 2002 by approximately 5.3%.

102.    Based on its reported revenues, WWT was Riverstone's fifth largest customer in Q2 2002.

103.    Absent the WWT transaction, Riverstone would not have posted a profit for Q2 2002.

104.    Consistent with the terms granted in **Feldman's** side agreement, WWT returned most of its August 2001 order in or about October 2002.

### 2.     *The Everbright Side Agreement*

105.    In August 2001, Riverstone sales personnel approached Ever Bright Innovation Technologies Co. Ltd. ("Everbright"), a Chinese reseller, to order approximately $2.0 million of Riverstone product in contemplation of Riverstone making a $2.0 million equity investment in Everbright.

106.    To secure the purchase order from Everbright in Q2 2002, Riverstone agreed to allow Everbright to have rotation rights for up to 50% of its order until November 30, 2002.

107.    **Kern** knew and approved of the side agreement with Everbright.  On August 24, 2001, a Riverstone salesperson informed **Kern** and **Cornmesser** that Everbright would be placing a $2.0 million order in the next few days, but that Everbright wanted exchange rights for the order.  **Kern** responded via e-mail "that rotation rights cannot be in writing.  Needs to be verbal only."

18

108. On August 27, 2001, five days before the close of Q2 2002, Everbright faxed a "clean" $2.1 million purchase order to Riverstone. In the e-mail forwarding the purchase order to **Kern**, the Riverstone salesperson informed him that "[t]he rotation rights . . . will be on a separate mail to [Everbright] (will talk to you on this)."

109. At the time **Kern** approved the side agreement with Everbright, he was aware from discussions at Revenue Meetings that Riverstone intended to recognize revenues on the Everbright transaction, that the sale contingency would prevent revenue recognition under GAAP, and that Everbright's purchase order needed to omit any references to the sales contingency if revenue was to be recognized.

110. **Kern** knew of revenue recognition principles under GAAP and the need to omit any written sales contingency from the Everbright purchase order, from his discussions with Riverstone's controller, discussions at Revenue Meetings, and his business experience. For example, in May 2001, **Kern** sent an e-mail addressing exchange rights that had been granted to a Riverstone customer and cautioning the Riverstone salesperson that "you must ensure this [the exchange right] is not on the P.O. Auditors will flag this." In addition, just days before the Everbright transaction, **Kern** sent another Riverstone customer an e-mail granting exchange rights and stating: "[**Feldman's** request for a written confirmation waiving the exchange rights] is for our revenue recognition issues. Obviously this is sensitive, so please keep this email secure."

111. Riverstone's order management group booked the Everbright sale into Oracle with terms consistent with Everbright's incomplete purchase order. The 50% rotation rights granted to Everbright in the side agreement were not recorded in Riverstone's Oracle system or its other books and records.

112. **Kern** did not forward any written documentation of the side agreement with Everbright to Riverstone's order management group and none was kept in Riverstone's customer sales files.

113. A few weeks later, on September 11, 2001, **Kern** sent an e-mail to a Riverstone salesperson stating that the Everbright transaction was a sham to boost revenue. Specifically,

**Kern** wrote: "Understand that $2M of this [revenues contributed by the Riverstone salesperson] was due to desparate [sic] investment to Everbright, which had nothing to do with sales, just throwing money to waste to get revenue. Your job must be to assist Everbright in selling this gear to an end user . . . ."

114. Investment transactions were regularly discussed at Revenue Meetings and approved by **Pereira** and **Stanton.**

115. Everbright was a transaction the defendants used to "close the gap" to meet the Q2 2002 Revenue Plan and it was an investment transaction. **Pereira**, **Stanton**, **McFarland**, and **Kern** either knew of, or were reckless in not discovering, the sales contingency granted to Everbright before the filing of Riverstone's Form 10-Q for Q2 2002.

116. When **Pereira**, **Stanton**, **and McFarland** learned about the sales contingency granted in the WWT transaction, they were reckless in not determining if other transactions, such as Everbright, which were used to "close the gap" for Q2 2002 contained sales contingencies that prevented revenue recognition. They knew that the company's internal control procedures did not assure that Riverstone's books and records accurately reflected its business transactions or enable the company to prepare its financial statements in accordance with GAAP.

117. **Pereira**, **Stanton**, and **McFarland** knew from their business experience or education that exchange rights such as those granted in the Everbright transaction prohibited revenue recognition under GAAP and Riverstone's revenue recognition policy.

118. **Pereira**, **Stanton**, and **McFarland** either knowingly or recklessly failed to book a reserve against the revenues from the Everbright transaction during Q2 2002.

119. **Pereira**, **Stanton**, **Kern**, and **McFarland** caused Riverstone to improperly recognize at least $1.0 million of revenues for Q2 2002 relating to the Everbright transaction.

120. The improper revenues from the Everbright transaction were included in Riverstone's financial statements for Q2 2002, and resulted in misstatements of revenues in Riverstone's Form 10-Q for Q2 2002 and Form 10-K for Fiscal Year 2002.

121. Based on its reported revenues, Everbright was Riverstone's seventh largest customer in Q2 2002.

FIRST AMENDED COMPLAINT                                     Case No. C 06-6384

122.    Absent the Everbright transaction, Riverstone would not have posted a profit for Q2 2002.

123.    In November 2002, Everbright notified Riverstone that it wanted to rotate its inventory of Riverstone product from the August 2001 order.  In connection with this exchange request, Riverstone's sales manager in China confirmed to **Cornmesser** that Everbright was given the right to exchange $1.0 million of its August 2001 order.

### *3.    The Keytron Side Agreement*

124.    In August 2001, Riverstone sales personnel approached Keytron S.A. ("Keytron"), a Spanish reseller, to order Riverstone product for resale to the Spanish telecommunications company, Telefonica S.A. ("Telefonica").

125.    On August 14, 2001, **Kern** was informed via e-mail by a Riverstone salesperson that to induce the Keytron sale in Q2 2002, Keytron was given a side letter granting it extended payment terms and full return rights if the Telefonica deal did not occur.  The e-mail goes on to state: "Nevertheless, the PO will be a standard PO."

126.    **Kern** knew and approved of the sales contingency granted to Keytron.

127.    At the time **Kern** approved the side agreement with Keytron, he was aware that Riverstone intended to recognize revenues on the Keytron transaction, that the sale contingency would prevent revenue recognition under GAAP, and that Keytron's purchase order needed to omit any references to the contingency if revenue was to be recognized.

128.    **Pereira**, who was in charge of world wide sales and had been directly involved in the negotiations surrounding the Telefonica deal, knew, before the end of Q2 2002, that Riverstone would not be paid by Keytron until the Telefonica deal was completed.

129.    On August 16, 2001, Keytron submitted a purchase order for €958,000 to Riverstone's sales management group stating payment terms were net 120 days and omitting any reference to the return rights it had been granted for the order.

130.    Riverstone's order management group booked the Keytron sale into Oracle consistent with the information contained in Keytron's incomplete purchase order.

131.    **Kern** did not forward any written documentation of the side agreement with Keytron to Riverstone's order management group and none was kept in Riverstone's customer sales files.

132.    That same day on August 16, 2002, **Kern** sent an e-mail to Alvendia in the credit and collections department indicating that the Keytron sale was contingent upon the Telefonica deal and referencing that the "ugly" transaction was discussed at a Revenue Meeting.

133.    On or about August 16, 2002, **Pereira**, **Stanton**, **McFarland**, and **Kern** either knew, or were reckless in not knowing, from either their participation in negotiations or discussions at Revenue Meetings, that the sales contingencies granted to Keytron prohibited recognition of revenue from this transaction under Riverstone's revenue recognition policy and GAAP.

134.    **Pereira**, **Stanton**, and **McFarland** either knowingly or recklessly failed to book a reserve against the revenues from the Keytron transaction during Q2 2002 or Q4 2002.

135.    **Pereira**, **Stanton**, **McFarland**, and **Kern** caused Riverstone to improperly recognize approximately $825,000 of revenues for Q2 2002 relating to the Keytron transaction.

136.    Absent the Keytron transaction, Riverstone would not have posted a profit for Q2 2002.

137.    On December 9, 2001, Riverstone's European sales personnel provided written letters to Keytron extending time for payment of the invoices relating to the August 2001 purchase order (which would have been due on December 15, 2001 per the net 120 days payment term on the invoices). **Kern** was informed of the payment extension by e-mail in January 2002, after Alvendia inquired as to when Keytron would begin making payments on its past due invoices.

138.    An internal accounts receivable analysis dated April 23, 2002, created by Riverstone's credit and collections department, states that Keytron had not paid its past due invoices by that date and that Riverstone would only be paid when Keytron received payment from Telefonica. The accounts receivable analysis was presented at a Revenue Meeting on or near that date.

22

139. **Pereira**, **Stanton**, and **McFarland** were informed of a payment contingency relating to Keytron at Revenue Meetings on or near April 23, 2002, prior to the filing of Riverstone's Form 10-K for Fiscal Year 2002.

140. The improper revenues from the Keytron transaction were included in Riverstone's financial statements for Q2 2002, and resulted in misstatements of revenues in Riverstone's Form 10-Q for Q2 2002 and its Form 10-K for Fiscal Year 2002.

141. The Telefonica project was delayed and Keytron's invoices were written off in April 2003.

### 4.    The Trispec Side Agreement

142. On August 15, 2001, Riverstone sales personnel met with representatives of Trispec Communications Inc. ("Trispec"), a Canadian reseller, to discuss Trispec placing orders with Riverstone in advance of sales to some potential end users in Canada that Riverstone would "funnel" through Trispec.

143. Following that meeting, Trispec agreed to place approximately $1.0 million of orders with Riverstone over several quarters.  To induce this agreement, **Kern** verbally promised Trispec that they would not have to pay for any Riverstone product until it was resold to an end user and that Trispec would be able to return the remainder of its inventory of Riverstone products that Trispec did not resell by mid-April 2002.

144. At the time **Kern** entered into the side agreement with Trispec, he was aware that Riverstone intended to recognize revenues on the Trispec transaction, that the sale contingencies would prevent revenue recognition under GAAP, and that Trispec's purchase order needed to omit any references to the contingencies if revenue was to be recognized.

145. Pursuant to the understanding, Trispec placed a "clean" $250,000 purchase with Riverstone on August 31, 2001, one day before the end of Q2 2002.  The purchase order inaccurately stated net 60 days payment terms and it made no reference to the return rights or sell- through payment term **Kern** granted to Trispec.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

146.    Riverstone's order management group booked Trispec's August 2001 order into Oracle consistent with the information contained in Trispec's inaccurate and incomplete purchase order.

147.    **Kern** did not forward any written documentation of the side agreement with Trispec to Riverstone's order management group, and none was kept in Riverstone's customer sales files.

148.    **Pereira**, **Stanton**, and **McFarland** knew from discussions at Revenue Meetings that the Trispec order was being entered at the end of the quarter to meet the Q2 2002 revenue target.

149.    When **Pereira**, **Stanton**, and **McFarland** learned about the contingent sales terms granted in the WWT transaction, they were reckless in not determining if other transactions, such as Trispec, used to "close the gap" for Q2 2002 contained sales contingencies that prevented revenue recognition.  They knew that the company's internal control procedures did not assure that Riverstone's books and records accurately reflected its business transactions or enable the company to prepare its financial statements in accordance with GAAP.

150.    **Pereira, Stanton**, and **McFarland** either knowingly or recklessly failed to book a reserve against the revenues from the Trispec transaction in Q2 2002.

151.    On November 29, 2001, two days before the end of Q3 2002, Trispec ordered the additional $750,000 of Riverstone product on "clean" purchase orders stating net 30 days payment terms and making no reference to the return rights or sell-through payment terms **Kern** granted to Trispec.

152.    Riverstone's order management group booked Trispec's November 2001 orders into Oracle consistent with on the information contained in Trispec's inaccurate and incomplete purchase orders.

153.    **Kern** did not forward any written documentation of his side agreement with Trispec to order entry personnel in Riverstone's order management group and none was kept in Riverstone's customer sales files.

154.    On February 13, 2002, Trispec sent **Kern** an e-mail stating that if Riverstone did

not provide Trispec with a plan to move Trispec's inventory of Riverstone products by the end of the quarter, it would take **Kern** up on his original offer to return Trispec's inventory of Riverstone product.

155.    On March 13, 2002, Trispec sent another e-mail to **Kern** stating: "Weekly calls from your accounts receivable department asking for payment of the outstanding $501,056.65 are frustrating when we have an agreement with you for extended terms." The e-mail further states that: "In the event we are unable to reach a satisfactory agreement, we will have no choice but to return our Riverstone inventory."

156.    **Kern** sent an e-mail to Riverstone's credit and collections department the next day asking them to hold off on collection efforts regarding Trispec because "we know this will not be paid unless we bring them a deal." In his e-mail, **Kern** confirmed that: "Our agreement [with Trispec] is that by mid-April, we will either help them sell this [inventory] out or we will RMA all of this gear back." This e-mail was forwarded to **McFarland** on May 1, 2002, before Riverstone's Form 10-K for Fiscal Year 2002 was filed.

157.    Consistent with **Kern**'s verbal agreement, Trispec returned all unsold Riverstone inventory in February 2003 and its receivable was written off.

158.    At the time, **Pereira**, **Stanton**, and **McFarland** learned of the sales contingencies granted in the Trispec transaction, or would have discovered them but for their recklessness, they knew that such sales contingencies prohibited revenue recognition under GAAP and Riverstone's revenue recognition policy.

159.    **Pereira**, **Stanton**, **McFarland**, and **Kern** caused Riverstone to improperly recognize approximately $250,000 of revenues for Q2 2002, $25,000 in Q3 2002, and $225,000 in Q4 2002 relating to the Trispec transaction.

160.    The improper revenues from the Trispec transaction were included in Riverstone's financial statements for Q2 2002, Q3 2002, and Fiscal Year 2002, and resulted in misstatements of revenues in Riverstone's Forms 10-Q for Q2 2002 and Q3 2002 and Form 10-K for Fiscal Year 2002.

FIRST AMENDED COMPLAINT                     Case No. C 06-6384

161.     Absent the Trispec transaction, Riverstone would not have posted a profit for Q2 2002.

**5.      *The Smartnet Side Agreement***

162.     In August 2001, Riverstone sales personnel approached Korean reseller Smartnet Technology, Inc. ("Smartnet") about placing an order for Riverstone product to be resold to end user Korea Telecom.

163.     To induce the sale in Q2 2002, **Kern** agreed via e-mail on August 20, 2001, that if Smartnet did not resell the Riverstone product ordered to Korea Telecom within 120 days, it could return the unsold inventory.

164.     At the time **Kern** entered into the side agreement with Smartnet, he was aware that Riverstone intended to recognize revenues on the Smartnet transaction, that the sale contingency would prevent revenue recognition under GAAP, and that Smartnet's purchase order needed to omit any references to the contingency if revenue was to be recognized.

165.     The same day, **Kern** instructed the Riverstone salesperson negotiating with Smartnet that: "[S]entence about if KT will not be able to place P.O., Smartnet can return[] – this cannot be in writing for revenue.  If included, we might as well not bother with the order.  I need you to agree to this verbally with Smartnet based on your word."

166.     Per **Kern's** request, on August 21, 2001, Smartnet submitted a "clean" $501,000 purchase order to Riverstone that omitted any reference to the return rights that **Kern** had granted.

167.     Riverstone's order management group booked the Smartnet sale into Oracle consistent with the information contained in Smartnet's incomplete purchase order.

168.     **Pereira**, **Stanton**, and **McFarland** knew from discussions at Revenue Meetings that the Smartnet transaction was being entered into to meet Q2 2002 revenue goals.

169.     When **Pereira**, **Stanton**, and **McFarland** learned about the contingent sales terms granted in the WWT transaction, they were reckless in not determining if other transactions used to "close the gap" for Q2 2002 contained sales contingencies that prevented revenue recognition.

FIRST AMENDED COMPLAINT                                              Case No. C 06-6384

They knew that the company's internal control procedures did not assure that Riverstone's books and records accurately reflected its business transactions or enable the company to prepare its financial statements in accordance with GAAP.

170.    At the time **Pereira**, **Stanton**, and **McFarland** learned of the sales contingency associated with the Smartnet transaction or would have discovered it but for their recklessness they knew such sales contingency prohibited revenue recognition under GAAP and Riverstone's own revenue recognition polity.

171.    **Pereira**, **Stanton**, and **McFarland** knowingly or recklessley took no action to book a reserve against the revenues from the Smartnet transaction in Q2 2002.

172.    **Pereira**, **Stanton**, **McFarland**, and **Kern** caused Riverstone to improperly recognize approximately $500,000 of revenues for Q2 2002 relating to the Smartnet transaction.

173.    The improper revenues from the Smartnet transaction were included in Riverstone's financial statements for Q2 2002 and resulted in misstatements of revenues in Riverstone's Form 10-Q for Q2 2002.

174.    Based on its reported revenues, Smartnet was Riverstone's tenth largest customer for Q2 2002.

175.    Absent the Smartnet transaction, Riverstone would not have posted a profit for Q2 2002.

176.    Smartnet did not pay for its August 2001 order until Q4 2002.

C.    <u>False and Misleading Statements in Q3 2002 Form 10-Q</u>

177.    On or about January 15, 2002, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** caused Riverstone to file with the SEC a Form 10-Q which stated Riverstone had revenues of $60,056,000, net income of $2,156,000, and earnings per share of $0.02 for the third fiscal quarter of 2002, which ended on December 1, 2001 ("Q3 2002").

178.    The defendants' statements in the Form 10-Q were false and misleading because the defendants caused Riverstone to materially overstate is revenues by at least $4,570,000 or 8.24% as a result of improperly recognizing revenues from sales transactions involving rights of

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

return, exchange, and cancellation, and other material contingencies such as sell-through payment terms, which were not accounted for at the time the transactions were originally recorded.  As a result, revenues related to these contingent sales either should not have been recognized or should have been recognized in a different period under Riverstone's revenue recognition policy and GAAP.

179.    **Feldman** caused Riverstone to improperly recognize revenues of approximately $1.5 million from a transaction with Vnetek Communications, Inc. ("Vnetek"), which revenues were included in the revenues and earnings reported in the Q3 2002 Form 10-Q.

180.    **Kern** caused Riverstone to improperly recognize revenues of approximately $3.077 million from transactions with All Networks, Inc. ("All Networks"), Landata Payma, S.A. ("Landata"), and Servicios Profesionales Para Ambientes Corporativos, S.A. C.V. ("Spacenet"),  which revenues were included in the revenues and earnings reported in the Q3 2002 Form 10-Q.

181.    **Kern** and **Feldman** made the false statements in the Q3 2002 Form 10-Q because each was involved substantially or intricately in the creation of the misstatements of revenues and earnings by knowingly procuring false and/or incomplete written sales documentation that was submitted to the order management group or instructing the order management group to enter inaccurate sales terms into Oracle, which, in turn, directly caused the revenues from the transactions to be improperly recorded into Riverstone's accounting books, records, and accounts.

182.    **McFarland** made the false statements in the Q3 2002 Form 10-Q because he created the misstatements of revenues and earnings by failing to properly account for these transactions under GAAP and Riverstone's revenue recognition policy after learning of sales contingencies, and by drafting and editing Riverstone's financial statements, which he knew would be reproduced in Riverstone's public filings with the SEC.

183.    **Pereira** and **Stanton** made the statements in the Q3 2002 Form 10-Q because each signed the Form 10-Q despite their knowledge that, or reckless indifference as to whether, the amount of revenues and earnings listed in the report was materially overstated.

**D.** **Contingent Sales for Which Revenues Were Improperly Recognized in Q3 2002**

*1.* *The Vnetek Side Agreement*

184.    In November 2001, Riverstone's chairman Patel instructed **Feldman** to negotiate a sales transaction with Vnetek Communications, Inc. ("Vnetek"), a New Hampshire-based reseller.

185.    On November 29, 2001, two days before the end of Q3 2002, Vnetek faxed **Feldman** a "clean" $2.0 million purchase order reflecting net 30 days payment terms.

186.    However, to induce the sale in Q3 2002, **Feldman** signed a side agreement with Vnetek giving it full return rights and a sell-through payment term for the order.

187.    At the time **Feldman** entered into the side agreement with Vnetek, he was aware that Riverstone intended to recognize revenues on the Vnetek transaction, that the sale contingencies would prevent revenue recognition under GAAP, and that Vnetek's purchase order needed to omit any references to the contingencies if revenue was to be recognized.

188.    The sale contingencies granted to Vnetek by **Feldman** were approved by **Pereira**, **Stanton**, and **McFarland** before the end of the quarter..

189.    **Feldman** delivered the false and incomplete purchase order to Riverstone's order management group, who, in turn, booked the sale into Oracle with the false net 30 days payment term.

190.    **Feldman** did not forward his side agreement with Vnetek to Riverstone's order management group and it was not included the Riverstone's customer sales files.

191.    At the time **Pereira**, **Stanton**, and **McFarland** learned of the sales contingencies associated with the Vnetek transaction, they knew that such sales contingencies prohibited revenue recognition under GAAP.

192.    **Pereira**, **Stanton**, and **McFarland** did not book a full reserve against the revenues from the Vnetek transaction in Q3 2002.

193.    **Pereira**, **Stanton**, **Feldman**, and **McFarland** caused Riverstone to recognize approximately $1.5 million of revenues for Q3 2002 from the Vnetek transaction.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

194.    The improper revenues from the Vnetek transaction were included in Riverstone's financial statements for Q3 2002, and resulted in misstatements of revenues in Riverstone's Form 10-Q for Q3 2002.

195.    Absent the Vnetek transaction, Riverstone would not have met its Wall Street analysts' estimates for Q3 2002.

196.    Consistent with the sale contingencies given to Vnetek, Vnetek returned all of its Riverstone inventory in January 2002 (Q4 2002).

197.    As part of the Fiscal Year 2002 audit, Vnetek was sent an accounts receivable confirmation by Riverstone's outside accountants.  Upon receiving the confirmation, Vnetek's chief executive officer sent **Feldman** an e-mail on February 20, 2002, explaining that Vnetek could not sign the audit confirmation and stating: "Keep in mind that we did do actually what was ask[ed] of us from the beginning, which was to put up the po, take the material and hold it until week one in January, all of this we did."

198.    When Riverstone's outside accountants inquired further about the Vnetek return, **McFarland** told them on or about March 2, 2002, that the product had been returned by Vnetek because it was shipped to the wrong location.  This information was false.

### 2.    *The All Networks Side Agreement*

199.    In November 2001, Riverstone sales personnel approached All Networks, Inc. ("All Networks"), a Brazilian reseller, to order Riverstone product in contemplation of an end user sale to Way Brazil, Inc. ("Way Brazil").

200.    In an e-mail dated November 5, 2001, **Kern** was informed by a Riverstone sales manager that All Networks was promised that it could return all of the Riverstone products it ordered if the Way Brazil deal fell through.  **Kern** responded "P.O. cannot state anything about the return rights.  This needs to be a verbal between you and them, nothing more."

201.    On November 13, 2001, **Kern** sent an e-mail side letter to All Networks granting it full return rights and a sell-through payment term.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

202. At the time **Kern** entered into the side agreement with All Networks, he was aware that Riverstone intended to recognize revenues on the All Networks transaction, that the sale contingencies would prevent revenue recognition under GAAP, and that All Networks' purchase order needed to omit any references to the contingencies if revenue was to be recognized.

203. The next day, All Networks faxed a "clean" $945,000 purchase order to Riverstone that did not reference the sales contingencies in **Kern's** e-mail and incorrectly stated a net 30 days payment term.

204. Riverstone's order management group booked the All Networks sale into Oracle consistent with the information contained in All Networks' inaccurate and incomplete purchase order.

205. **Kern** did not forward his e-mail side agreement with All Networks to Riverstone's order management group and it was not included in Riverstone's customer sales files.

206. After All Networks' invoice was not paid on the net 30 days payment term recorded in Oracle, **Kern** sent an e-mail to Alvendia on December 18, 2001, confirming that All Networks was granted a sell-through payment term and that Riverstone's credit and collections department should not press All Networks for payment. Alvendia responded: "Yes, this [the failure to tell the credit and collections department of extended payment terms] fell through the cracks once again."

207. Upon receiving **Kern's** December 18th e-mail, Alvendia informed **Stanton** and **McFarland** on approximately the same date, and prior to the filing of Riverstone's Form 10-Q for Q3 2002, that Riverstone had given All Networks a sell-through payment term. She did so because she had sold the All Networks receivable to a third party and Riverstone would thus incur interest costs because the sold receivable would not be collected on the net 30 days payment term.

208. When **Pereira** learned about the sell-through payment terms granted in the WWT and Vnetek transactions in August and November 2001, and in light of his direct supervision of

**Kern** and **Stanton**, **Stanton** was reckless in not discovering the sales contingencies granted to All Networks prior to the filing of Riverstone's Form 10-Q for Q3 2002.

209. At the time **Pereira**, **Stanton**, and **McFarland** learned of the sales contingencies associated with the All Networks transaction or would have discovered them absent their recklessness, they knew that such sales contingencies prohibited revenue recognition under GAAP.

210. **Pereira**, **Stanton**, and **McFarland** either knowingly or recklessly failed to book a reserve against the revenues from the All Networks transaction in Q3 2002.

211. **Pereira**, **Stanton**, **McFarland**, and **Kern** caused Riverstone to improperly recognize approximately $945,000 of revenues for Q3 2002 relating to the All Networks transaction.

212. The improper revenues from the All Networks transaction were included in Riverstone's financial statements for Q3 2002, and resulted in misstatements of revenues in Riverstone's Form 10-Q for Q3 2002 and Form 10-K for Fiscal Year 2002.

213. On March 11, 2002, All Networks sent an e-mail to **Kern** confirming that, as per the agreement with Riverstone, All Networks would not be paying for the Riverstone product it had ordered until it was resold.

214. The Way Brazil deal was not completed as expected and, consistent with the sale contingencies given to All Networks, the company returned its Riverstone inventory in approximately August 2002.

### 3. *The Landata Side Agreement*

215. In approximately September 2001, Riverstone sales personnel approached Landata Payma, S.A. ("Landata"), a Spanish reseller, to order Riverstone product to be resold to the Spanish telecommunications company Telefonica. The Landata transaction was similar in nature to the Keytron transaction in Q2 2002.

216. On September 24, 2001, Riverstone and Landata prepared a memorandum of understanding ("MOU") stating that Landata could purchase the products for the Telefonica deal

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

on a "sale or return" basis.

217. **Kern** received an e-mail from a Riverstone salesperson on November 13, 2001, stating that as a condition for Landata placing a $1.5 million purchase order with Riverstone, they would be given return rights and a sell-through payment term, which would be placed in a MOU. Specifically, **Kern** was informed that Landata will make a return of its Telefonica order in December 2001 and submit a replacement order in February 2002 subject to the same sell-through payment term.

218. **Kern** approved granting the sale contingencies to Landata, and he instructed the Riverstone salesperson to sign the MOU.

219. At the time **Kern** approved the side agreement with Landata for the November 2001 order, he was aware that Riverstone intended to recognize revenues on the Landata transaction, that the sale contingencies would prevent revenue recognition under GAAP, and that Landata's purchase order needed to omit any references to the contingencies if revenue was to be recognized.

220. **Pereira** had also been directly involved in the negotiations surrounding the Telefonica deal and knew, before the end of Q3 2002, that Landata would not pay Riverstone until the Telefonica deal was completed.

221. On November 21, 2001, **Kern** received an e-mail from a Riverstone salesperson informing him that Landata will be submitting a purchase order making reference to the MOU. That same day, **Kern** forwarded the e-mail to **Cornmesser** stating: "I know you cannot book this, but here is the final config again. Please do not forward this email, due to reference of the MOU."

222. The next day, Landata faxed a "clean" $2.0 million purchase order reflecting a net 60 days payment term instead of the sell-through payment term that was granted for the order and omitting any reference to the MOU.

223. **Kern** instructed **Cornmesser** to enter the Landata sale into Oracle with a net 30 days payment term even though Landata had a sell-through payment term and Landata's purchase order reflected a net 60 days payment term. As a result, the invoice for the Landata

order falsely stated a net 30 days payment term.

224. The side agreement with Landata relating to the November 2001 order was not kept in Riverstone's customer sales files.

225. Consistent with the MOU and November 13th e-mail, Landata informed Riverstone on December 19, 2001, that it intended to return all of its order.

226. In response to Landata's return request, **Cornmesser** sent a letter to a Riverstone sales manager stating that the return was limited to ten percent of the order unless there was an offsetting purchase order.

227. Four days later, **Kern** responded to **Cornmesser**: "Landatta [sic] is a special case. If David [Riverstone salesperson] can insure we are made whole, so we don't take a negative revenue hit, that would be ideal. But if Landata wanted to return a large amount of product, we would really have no choice to accept." **Kern** further stated in his January 26th e-mail: "This is a case of me not communicating properly with Lori. Lori, we should sit down and go through all of the 'deals' we have done in the last few quarters, so you get a list of exceptions . . . . So, in other words, a list of official legal agreements and a list of the 'unofficial' verbals." **Kern's** January 26th e-mail was consistent with his practice of keeping side agreements containing sales contingencies separate from the customer sales files maintained by the sales operations department.

228. **Pereira**, **Stanton**, **McFarland**, **Kern**, **Feldman** and **Cornmesser** discussed Landata's return request at Revenue Meetings.

229. On February 26, 2002, Landata faxed a $2.4 million purchase order to replace its original November 2001 order. Landata was given a sell-through payment term for the February 2002 order, but it was not reflected on the purchase order that was provided to Riverstone's order management group, nor was the side agreement kept in Riverstone's customer sales file.

230. **Kern** knew of and approved the sales contingency granted to Landata regarding the February 2002 order.

231. At the time **Kern** approved the side agreement with Landata for the February 2002 order, he was aware that Riverstone intended to recognize revenues on the Landata

transaction, that the sale contingency would prevent revenue recognition under GAAP, and that Landata's purchase order needed to omit any references to the contingency if revenue was to be recognized.

232.     Landata's February 2002 order was booked into Oracle with a net 30 days payment term consistent with Landata's inaccurate and incomplete purchase order.

233.     An internal accounts receivable analysis dated April 23, 2002 created by Riverstone's credit and collections department, stated that Landata had not paid its past due invoices by that date and confirmed the sell-through payment term granted to Landata (i.e., that Riverstone would only be paid when Landata receives payment from Telefonica). The accounts receivable analysis was presented at a Revenue Meeting on or near that date.

234.     **Pereira**, **Stanton**, and **McFarland** were informed of the sales contingencies granted to Landata during Revenue Meetings on or near April 23, 2002, prior to the filing of Riverstone's Form 10-K for Fiscal Year 2002.

235.     In light of **Pereira's**, **Stanton's**, and **McFarland's** knowledge that Riverstone had granted sell-through payment terms on other large quarter-end reseller transactions, such as WWT, Vnetek, and/or All Networks, they were reckless in not discovering the sales contingencies granted to Landata prior to the filing of Riverstone's Form 10-Q for Q3 2002.

236.     At the time **Pereira, Stanton,** and **McFarland** learned of the sales contingencies associated with the Landata transaction or would have discovered them absent their recklessness, they knew that such sales contingencies prohibited revenue recognition under GAAP.

237.     **Pereira**, **Stanton**, and **McFarland** knowingly or recklessly failed to book a reserve against the revenues from the Landata transaction in either Q3 2002 or Q4 2002.

238.     **Pereira**, **Stanton**, **McFarland**, and **Kern** caused Riverstone to improperly recognize approximately $1.8 million of revenues for Q3 2002 and approximately $300,000 of revenues for Q4 2002, relating to the Landata transaction.

239.     The improper revenues from the Landata transaction were included in Riverstone's financial statements for Q3 2002 and Q4 2002, and resulted in misstatements of revenues in Riverstone's Form 10-Q for Q3 2002 and Form 10-K for Fiscal Year 2002.

240. Absent the improper Landata revenues, Riverstone would not have met its Wall Street analysts' estimates for Q3 2002.

241. The Telefonica project was delayed and, consistent with its agreement with Riverstone, Landata did not pay its invoices relating to the Telefonica project during the relevant period.

### 4. The Spacnet Side Agreement

242. In November 2001, Riverstone sales personnel approached Servicios Profesionales Para Ambientes Corporativos, S.A. de C.V. ("Spacnet"), a Mexican reseller, about placing an order for Riverstone product to be resold to end user Petróleos Mexicanos ("Pemex"), Mexico's state-owned petroleum company.

243. To induce the Spacnet order in Q3 2002, **Kern** approved granting Spacnet full return rights for the order if the Pemex project did not happen.

244. At the time **Kern** approved the side agreement with Spacnet, he was aware that Riverstone intended to recognize revenues on the Spacnet transaction, that the sale contingency would prevent revenue recognition under GAAP, and that Spacnet's purchase order needed to omit any references to the contingency if revenue was to be recognized.

245. On November 30, 2001, one day before the end of Q3 2002, Spacnet faxed a "clean" $270,000 purchase order to Riverstone that did not reference the return rights that had been granted to Spacnet.

246. Riverstone's order management group entered the Spacnet order into Oracle with a net 30 days payment term, even though Spacnet had been given 90 days to pay.

247. **Kern** did not forward any written documentation of the side agreement with Spacnet to Riverstone's order management group and none was kept in Riverstone's customer sales files.

248. In an e-mail dated December 13, 2001, the Riverstone sales manager handling the Spacnet account informed Tulsi Swamy, Riverstone's treasurer who reported to **Stanton**, that **Kern** had approved the return rights for the Spacnet order.

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

249. In light of **Pereira's, Stanton's**, and **McFarland's** knowledge that Riverstone had granted sell-through payment terms on other large sales transactions, such as WWT, Vnetek, and/or All Networks, they were reckless in not discovering the sales contingency granted to Spacnet prior to the filing of Riverstone's Form 10-Q for Q3 2002.

250. At the time **Pereira**, **Stanton**, and **McFarland** learned of the sales contingency associated with the Spacnet transaction or would have discovered it absent their recklessness, they knew that such sales contingency prohibited revenue recognition under GAAP.

251. **Pereira**, **Stanton**, and **McFarland** either knowingly or recklessly failed to book a reserve against the revenues from the Spacnet transaction in Q3 2002 or Q4 2002.

252. **Pereira**, **Stanton**, **McFarland**, and **Kern** caused Riverstone to improperly recognize approximately $270,000 of revenues for Q3 2002, relating to the Spacnet transaction.

253. An internal accounts receivable analysis dated April 23, 2002, created by Riverstone's credit and collections department, stated that Spacnet had not paid its past due invoices by that date and that Riverstone would only be paid when Spacnet received payment from Pemex. The accounts receivable analysis was presented at a Revenue Meeting on or near that date.

254. **Pereira**, **Stanton**, and **McFarland** learned that Spacnet would not pay until sell-through at Revenue Meetings on or near in April 23, 2002, prior to the filing of Riverstone's Form 10-K for Fiscal Year 2002, and were therefore reckless in not discovering the return rights.

255. On May 14, 2002, prior to the filing of Riverstone's Form 10-K for Fiscal Year 2002, **Cornmesser** forwarded **McFarland** an e-mail stating that Spacnet would not pay for the Pemex order until sell-through. **Cornmesser** further said in her e-mail that she discussed the matter with **McFarland** and "he has a clear understanding as a result of the Pemex deal."

256. The improper revenues from the Spacnet transaction were included in Riverstone's financial statements for Q3 2002, and resulted in misstatements of revenues in Riverstone's Form 10-Q for Q3 2002 and Form 10-K for Fiscal Year 2002.

257. The Pemex deal was delayed and Spacnet did not pay for the Riverstone product it had ordered until December 2002.

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

## E.   False and Misleading Statements in Form 10-K

258.   On or about May 30, 2002, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** caused Riverstone to file with the SEC a Form 10-K which reported Riverstone had revenues of $51.3 million for Q4 2002 and $211 million for fiscal year 2002.

259.   The defendants' statements in the Form 10-K were false and misleading because the defendants caused Riverstone to materially overstate its revenues by at least $5,479,000 or 11.96% as a result of improperly recognizing revenues from sales transactions discussed below involving rights of return, exchange, and cancellation, and other material contingencies such as sell-through payment terms, which were not accounted for at the time the transactions were originally recorded.  As a result, revenues related to these contingent sales either should not have been recognized or should have been recognized in a different period under Riverstone's revenue recognition policy and GAAP.

260.   **Kern** caused Riverstone to improperly recognize revenues of approximately $2.577 million from transactions with Beijing Ever Bright Innovation Technologies Co., Ltd. ("Everbright"), Keytron S.A. ("Keytron"), Trispec Communications, Inc. ("Trispec"), and Smartnet Technology, Inc. ("Smartnet"), which revenues were included in the revenues and earnings reported in the Q2 2002 Form 10-Q.

261.   **Kern** made the false statements in the Q4 2002 Form 10-K because each was involved substantially or intricately in the creation of the misstatements of revenues and earnings by knowingly procuring false and/or incomplete written sales documentation that was submitted to the order management group or instructing the order management group to enter inaccurate sales terms into Oracle, which, in turn, directly caused the revenues from the transactions to be improperly recorded into Riverstone's accounting books, records, and accounts and which were in turn reported in the financial statements included in the Q4 2002 Form 10-K.

262.   **McFarland** made the false statements in the Q4 2002 Form 10-K because he created the misstatements of revenues and earnings by failing to properly account for these transactions under GAAP and Riverstone's revenue recognition policy after learning of sales

contingencies, and by drafting and editing Riverstone's financial statements, which he knew would be reproduced in Riverstone's public filings with the SEC.

263. **Pereira** and **Stanton** made the false statements in the Q4 2002 Form 10-K because each signed the Form 10-Q despite their knowledge that, or reckless indifference as to whether, the amount of revenues and earnings listed in the report was materially overstated.

**F.** **Contingent Sales for Which Revenues Were Improperly Recognized in Q4 2002**

*1.* *The Technica Side Agreements*

264. In late 2001 and early 2002, Riverstone was pursuing an opportunity for a large sale to the Defense Information Systems Agency ("DISA"), a branch of the United States Department of Defense.

265. Because DISA was not ready to deploy the Riverstone product before the end of Q4 2002, Periera asked Kern at a Revenue Meeting in early 2001 to find a reseller to take the transaction for a few points. Riverstone's sales personnel approached Technica Corporation ("Technica"), a Virginia-based reseller, about purchasing the DISA inventory to "pull the deal forward."

266. To induce the sale in the Q4 2002, **Kern** approved a side agreement granting Technica a sell-through payment term and unlimited exchange rights for the order. Riverstone's Vice President of Sales Americas, Lisa Adams signed and faxed the letter on February 19, 2002.

267. At the time **Kern** approved the side agreement with Technica, he was aware that Riverstone intended to recognize revenues on the Technica transaction, that the sale contingencies would prevent revenue recognition under GAAP, and that Technica's purchase order needed to omit any references to the contingencies if revenue was to be recognized.

268. On February 22, 2002, Technica faxed a "clean" $2.0 million purchase order to Riverstone that did not reference the sales contingencies and stated a net 30 days payment term rather than the sell-through payment term that had been granted.

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

269. Riverstone's order management group booked the February 2002 Technica sale into Oracle consistent with the information contained in Technica's inaccurate and incomplete purchase order.

270. **Kern** did not forward any written documentation of the February 2002 side agreement with Technica to order Riverstone's order management group and none was kept in Riverstone's customer sales files.

271. **Pereira** and **Stanton** were informed of a sales contingency granted to Technica for the February 2002 order during Revenue Meetings on or near April 23, 2002, prior to the filing of Riverstone's Form 10-K for Fiscal Year 2002.

272. At the time **Pereira**, **Stanton**, and **McFarland** learned of the sales contingencies associated with the Technica transaction, they knew that such sales contingencies prohibited revenue recognition under GAAP.

273. **Pereira**, **Stanton**, and **McFarland** failed to book a reserve against the revenues to account for the sales contingencies in the Technica transaction in Q4 2002.

274. **Pereira**, **Stanton**, **Kern**, and **McFarland** caused Riverstone improperly to record approximately $2.0 million of revenues in Q4 2002 from the Technica transaction.

275. An internal accounts receivable analysis dated April 23, 2002, created by Riverstone's credit and collections department, stated that, upon certain circumstances, Technica had the right to return its inventory of Riverstone product without cause. The accounts receivable analysis was presented at a Revenue Meeting on or near that date.

276. On May 1, 2002, a month before Riverstone filed its Form 10-K for Fiscal Year 2002, **Cornmesser** received an e-mail from the Riverstone salesperson for the Technica account informing her of the side agreement and the sell-through payment term, which she forwarded to **McFarland**.

277. **McFarland** took no action on **Cornmesser's** e-mail and did not request a copy of the side agreement.

278. **McFarland** also did not bring the Technica side agreement to the attention of Riverstone's outside accountants.

279. Just days after **McFarland** was informed of the February 2002 Technica side agreement, Riverstone's sales personnel approached Technica about taking additional product for the DISA deal in Q1 2003.

280. On May 23, 2002, **Kern** approved a second side agreement granting Technica a sell-through payment term and unlimited stock rotation rights with respect to an additional $2.8 million purchase order, which was again signed by Adams.

281. At the time **Kern** approved the May 2002 side agreement with Technica, he was aware that Riverstone intended to recognize revenues on the Technica transaction, that the sale contingencies would prevent revenue recognition under GAAP, and that Technica's purchase order needed to omit any references to the contingencies if revenue was to be recognized.

282. On May 24, 2002, Technica faxed a "clean" $2.8 million purchase order to Riverstone that did not reference the sales contingencies and stated a net 30 days payment term rather than the sell-through payment term that had been granted.

283. Riverstone's order management group department booked the May 2002 Technica sale into Oracle consistent with the information contained in Technica's inaccurate and incomplete purchase order.

284. **Kern** did not forward any written documentation of the May 2002 side agreement with Technica to Riverstone's order management group and none was kept in Riverstone's customer sales files.

285. In light of **Pereira's**, **Stanton's**, **McFarland's** knowledge that Riverstone had granted sell-through payment terms on other large quarter-end reseller transactions, such as WWT, Keytron, Vnetek, All Networks, Landata, Trispec, and/or the February 2002 Technica order, they were reckless in not discovering the sales contingencies granted to Technica for the May 2002 order prior to the filing of Riverstone's Form 10-Q for Q1 2003.

286. At the time **Pereira**, **Stanton**, and **McFarland** learned of the sales contingencies associated with the May 2002 Technica order or would have discovered them absent their recklessness, they knew that such sales contingencies prohibited revenue recognition under GAAP.

287.    **Pereira**, **Stanton**, and **McFarland** either knowingly or recklessly failed to book a reserve against the revenues to account for the sales contingencies in the May 2002 Technica transaction in Q1 2003.

288.    **Pereira**, **Stanton**, **McFarland**, and **Kern** caused Riverstone improperly to record approximately $2.8 million of revenues in Q1 2003 from the Technica transaction.

289.    The improper revenues from the Technica transactions flowed through to Riverstone's financial statements for Q4 2002 and Q1 2003, and resulted in misstatements of revenues in Riverstone's Form 10-K for Fiscal Year 2002 and Form 10-Q for Q1 2003.

290.    The improper revenues from the Technica transactions alone inflated Riverstone's revenues for Q4 2002 by approximately 4.2%, and its revenues for Q1 2003 by approximately 10.3%.

291.    Based on its reported revenues, Technica was Riverstone's tenth largest customer in Q4 2002 and its third largest customer in Q1 2003.

292.    Consistent with the side agreements with Technica, approximately a year after the Technica orders, Riverstone allowed Technica to return all of its inventory of Riverstone product to clear Technica's $4.4 million in past due invoices.

### 2.    *The Commverge Side Agreement*

293.    In February 2002, Riverstone was negotiating an investment transaction in which Riverstone would invest $2.0 million in Far East Gateway Limited ("FEG") in return for FEG's commitment to purchase $2.0 million in Riverstone product through Riverstone's Chinese reseller CommVerge Solutions (Asia), Inc. ("Commverge").

294.    In connection with the FEG investment proposal, Riverstone sales personnel approached Commverge about placing a purchase order for product to be resold to FEG.

295.    On February 21, 2002, **Kern** sent an e-mail authorizing a Riverstone salesperson in China to grant Commverge a sell-through payment term to obtain the order in Q4 2002. In the same e-mail, **Kern** reminds the salesperson that, as to the related purchase order from FEG: "PO cannot state any contingency. You need to have a side understanding with FEG."

296.    On February 27, 2002, **Kern** received an e-mail asking him to sign a MOU granting Commverge a sell-through payment term and full return rights.  The e-mail explained: "As the clause states very clearly, Commverge is protected if Far East Gateway does not issue a purchase order to Commverge . . . ."

297.    **Kern** approved of the MOU terms and the MOU with Commverge was signed by a Riverstone salesperson in China.

298.    At the time **Kern** approved the side agreement with Commverge, he was aware that Riverstone intended to recognize revenues on the Commverge transaction, that the sale contingency would prevent revenue recognition under GAAP, and that Commverge's purchase order needed to omit any references to the contingency if revenue was to be recognized.

299.    On February 28, 2002, two days before the end of Q4 2002, Commverge submitted a revised purchase order to Riverstone that stated that the order was "subject to the terms and conditions offered by Riverstone Networks to Commverge Solutions," but it did not state what those terms were or that they involved a sales contingency.

300.    On February 26, 2002, **Kern** had requested that five sales terms be removed from Commverge's purchase order, which Commverge agreed to do.

301.    Consistent with Commverge's inaccurate reseller agreement with Riverstone and its incomplete purchase order, Riverstone's order management group entered the Commverge sale into Oracle with a false net 30 days payment term.

302.    **Kern** did not forward any written documentation of the side agreement with Commverge to order entry personnel in Riverstone's order management group and none was kept in Riverstone's customer sales files.

303.    On March 21, 2002, Commverge requested a return of some of its February 2002 order via e-mail to the sales operation department, making reference to the MOU.  The e-mail was forwarded to **Kern** by the sales operation department and he was asked whether he had agreed to the return, to which **Kern** responded: "let's talk live."

304.    Consistent with the agreement with Commverge, **Cornmesser** was informed via e-mail from the credit and collections department on May 17, 2002, that Riverstone will isolate

43

and not seek to collect the Commverge invoices associated with the $2 million FEG investment deal. A similar e-mail was sent from the credit and collections department to **Stanton** on the same day, which was prior to the filing of Riverstone's Form 10-K for Fiscal Year 2002.

305. In light of **Pereira's**, **Stanton's**, and **McFarland's** knowledge that Riverstone had granted sell-through payment terms on other large quarter-end transactions, such as WWT, Keytron, Vnetek, All Networks, Landata, Trispec, and/or Technica and Stanton's knowledge that Riverstone was not seeking to collect from Comverge on the $2 million order related to the FEG investment deal, they were reckless in not discovering the sales contingency granted to Commverge prior to the filing of Riverstone's Form 10-K for Fiscal Year 2002.

306. At the time **Pereira**, **Stanton**, and **McFarland** learned of the sales contingency associated with the Commverge transaction or would have discovered it absent their recklessness, they knew that such sales contingency prohibited revenue recognition under GAAP.

307. **Pereira**, **Stanton**, and **McFarland** either knowingly or recklessly failed to book a reserve against the revenues to account for the Commverge transaction in Q4 2002.

308. **Pereira**, **Stanton**, **McFarland**, and **Kern** caused Riverstone to improperly recognize approximately $2.0 million of revenues for Q4 2002, relating to the Commverge transaction.

309. The improper revenues from the Commverge transaction flowed through to Riverstone's financial statements for Q4 2004, and resulted in misstatements of revenues in Riverstone's Form 10-K for Fiscal Year 2002.

310. The improper revenues from the Commverge transaction alone inflated Riverstone's revenues for Q4 2002 by approximately 4.1%.

311. Based on its reported revenues, Commverge was Riverstone's third largest customer in Q4 2002.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

### 3. The Vodatel Side Agreement

312. In February 2002, Riverstone was considering an investment deal with a Chinese reseller called Photonic Bridges Inc. ("PBI"), whereby Riverstone would invest $3 million in PBI in return for PBI's commitment to purchase approximately $3 million of Riverstone product.

313. Riverstone sales personnel approached Chinese reseller Vodatel Networks Holdings Limited ("Vodatel") to place an order of Riverstone product for resale to PBI.

314. On February 24, 2002, **Kern** sent an e-mail to a Riverstone sales manager in China indicating that he thought it was a very good idea to insert Vodatel in the PBI investment deal.

315. To induce the sale in Q4 2002, the Riverstone sales manager in China entered into a side agreement with Vodatel that it did not have to pay Riverstone for the order until it received payment from PBI.

316. On March 1, 2002, one day before the end of Q4 2002, Vodatel faxed a "clean" $2.8 million purchase order to Riverstone that stated a net 90 days payment term instead of the sell-through payment term that had been granted.

317. Riverstone's order management group booked the Vodatel sale into Oracle consistent with the information contained in Vodatel's inaccurate purchase order.

318. Less than a week before the March 1, 2002 Vodatel order, **McFarland** was informed by a member of the finance department that Riverstone had erroneously failed to reserve against revenues for Vodatel's 20% rotation rights for its $5 million order in November 2001 because Riverstone's finance department was not aware that rotation rights had been granted to Vodatel.

319. On May 2, 2002, **McFarland** instructed a member of the credit and collections department to try and obtain payment for Vodatel's March 1, 2002 order.

320. As a result of the credit and collections department's inquiries regarding payment from Vodatel, on May 7, 2002, prior to the date Riverstone filed its Form 10-K for Fiscal Year 2002, **Kern** and the credit and collections department member received an e-mail from the

45

Riverstone sales manager in China confirming that Vodatel had been granted a sell-through payment term in connection with the March 1, 2002 order.

321.   At the time **Kern** learned of or approved the side agreement with Vodatel, he was aware that Riverstone intended to recognize revenues on the Vodatel transaction, that the sales contingency would prevent revenue recognition under GAAP, and that Vodatel's purchase order needed to omit any references to the contingency if revenue was to be recognized.

322.   **Kern** did not forward the May 7th e-mail to the sales operation department and it was not included in Riverstone's customer sales files.

323.   **Kern** also failed to disclose the Vodatel side agreement to Riverstone' outside accountants.   To the contrary, **Kern** told Riverstone's outside accountants that no such side agreement existed.

324.   At the time, **Kern** concealed the Vodatel side letter from Riverstone's outside accountants, he knew that had he disclosed the side agreement, Riverstone's outside accountants would have prevented revenues from being recognized on the Vodatel transaction.

325.   The investment deal with PBI was never consummated and Riverstone wrote-off the Vodatel account receivable for the Q4 2002 sale in April 2003.

326.   In light of **Pereira's**, **Stanton's**, and **McFarland's** knowledge that Riverstone had granted sell-through payment terms on other large quarter-end reseller transactions, such as WWT, Keytron, Vnetek, All Networks, Landata, Trispec, and/or Technica and McFarland's knowledge that Riverstone had failed to reserve for a sales contingency granted to Vodatel in the prior quarter, they were reckless in not discovering the sales contingency granted to Vodatel prior to the filing of Riverstone's Form 10-K for Fiscal Year 2002.

327.   At the time **Pereira**, **Stanton**, and **McFarland** learned of the sales contingency associated with the Vodatel transaction or would have discovered it absent their recklessness, they knew that such sales contingency prohibited revenue recognition under GAAP.

328.   **Pereira**, **Stanton**, and **McFarland** either knowingly or recklessly failed to book a reserve against the revenues from the Vodatel transaction in Q4 2002.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

329.   **Pereira**, **Stanton**, **McFarland**, and **Kern** caused Riverstone to improperly recognize approximately $2.8 million of revenues for Q4 2002, relating to the Vodatel transaction.

330.   The improper revenues from the Vodatel transaction flowed through to Riverstone's financial statements for Q4 2004, and resulted in misstatements of revenues in Riverstone's Form 10-K for Fiscal Year 2002.

331.   The improper revenues from the Vodatel transaction alone inflated Riverstone's revenues for Q4 2002 by approximately 5.9%.

332.   Based on its reported revenues, Vodatel was Riverstone's fifth largest customer in Q4 2002.

**G.     False and Misleading Statements in From 10-Q for Q1 2003**

333.   On or about June 25, 2002, **Pereira**, **Stanton**, **Kern**, and **McFarland** caused Riverstone to file with the SEC a Form 10-Q which reported Riverstone had revenues of $30.1 million for the first fiscal quarter of 2003 which ended on June 1, 2002 ("Q1 2003").

334.   The defendants' statements in the Form 10-Q were false and misleading because the defendants caused Riverstone to materially overstate is revenues by at least $3,736,000 or 10.79% as a result of improperly recognizing revenues from sales transactions discussed below involving rights of return, exchange, and cancellation, and other material contingencies such as sell-through payment terms, which were not accounted for at the time the transactions were originally recorded.  As a result, revenues related to these contingent sales either should not have been recognized or should have been recognized in a different period under Riverstone's revenue recognition policy and GAAP.

335.   **Kern** caused Riverstone to improperly recognize revenues of approximately $2.577 million from transactions with Beijing Ever Bright Innovation Technologies Co., Ltd. ("Everbright"), Keytron S.A. ("Keytron"), Trispec Communications, Inc. ("Trispec"), and Smartnet Technology, Inc. ("Smartnet"), which revenues were included in the revenues and earnings reported in the Q2 2002 Form 10-Q.

336.    **Kern** made the false statements in the Q1 2003 Form 10-Q because he was involved substantially or intricately in the creation of the misstatements of revenues and earnings by knowingly procuring false and/or incomplete written sales documentation that was submitted to the order management group or instructing the order management group to enter inaccurate sales terms into Oracle, which, in turn, directly caused the revenues from the transactions to be improperly recorded into Riverstone's accounting books, records, and accounts and which were in turn reported in the financial statements included in the Q1 2003 Form 10-Q.

337.    **McFarland** made the false statements in the Q1 2003 Form 10-Q because he created the misstatements of revenues and earnings by failing to properly account for these transactions under GAAP and Riverstone's revenue recognition policy after learning of sales contingencies, and by drafting and editing Riverstone's financial statements, which he knew would be reproduced in Riverstone's public filings with the SEC.

338.    **Pereira** and **Stanton** made the false statements in the Q1 2003 Form 10-Q because each signed the Form 10-Q despite their knowledge that, or reckless indifference as to whether, the amount of revenues and earnings listed in the report was materially overstated.

**H.    Contingent Sales for Which Revenues Were Improperly Recognized in Q1 2003**

*1.    The TM Telecom Side Agreement*

339.    In May 2002, Riverstone was working on a potential investment transaction involving a Brazilian end-user called Intelig Telecom ("Intelig").

340.    Because the Intelig investment deal could not be completed in Q1 2003, Riverstone sales personnel engaged in discussions with Florida-based reseller TM Telecom, Inc. ("TM Telecom") about submitting a $1.0 million purchase order prior to the end of Q1 2003 to purchase the product Riverstone intended to sell to Intelig, to pull the revenue from the deal forward into the current quarter.

341.    To induce the sale in Q1 2003, **Kern** approved granting TM Telecom a sell-through payment term for the order, which was conveyed to TM Telecom verbally by a Riverstone sales manager.  TM Telecom was also given full return rights for the May 2002 order.

48

342. At the time **Kern** approved the side agreement with TM Telecom, he was aware that Riverstone intended to recognize revenues on the TM Telecom transaction, that the sale contingencies would prevent revenue recognition under GAAP, and that TM Telecom's purchase order needed to omit any references to the contingencies if revenue was to be recognized.

343. **Kern** informed **McFarland** of the sales contingencies granted to TM Telecom prior to the filing of Riverstone's Form 10-Q for Q1 2003.

344. On May 24, 2002, in the last week of the quarter, TM Telecom submitted the purchase order to Riverstone for approximately $1.0 million of product. The purchase order stated only that the payment terms were "As Per Agreement" and it omitted any reference to the return rights.

345. Riverstone's order management group entered the TM Telecom transaction into Oracle with a net 30 days payment term although **Kern** had approved a sell-through payment term.

346. **Kern** did not forward any written documentation of the side agreement with TM Telecom to order entry personnel in Riverstone's order management group and none was kept in Riverstone's customer sales files.

347. In light of **Pereira's** and **Stanton's** knowledge that Riverstone had granted sell-through payment terms on other large quarter-end reseller transactions, such as WWT, Keytron, Vnetek, All Networks, Landata, and/or Technica, they were reckless in not discovering the sales contingencies granted to TM Telecom prior to the filing of Riverstone's Form 10-Q for Q1 2003.

348. At the time **Pereira**, **Stanton**, and **McFarland** learned of the sales contingencies associated with the TM Telecom transaction or would have discovered them absent their recklessness, they knew that such sales contingencies prohibited revenue recognition under GAAP.

349. **Pereira**, **Stanton**, and **McFarland** either knowingly or recklessly failed to book a full reserve against the revenues from the TM Telecom transaction in Q1 2003.

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

350.	**Pereira**, **Stanton**, **McFarland**, and **Kern** caused Riverstone to improperly recognize approximately $600,000 of revenues for Q1 2003, relating to the TM Telecom transaction.

351.	The improper revenues from the TM Telecom transaction flowed through to Riverstone's financial statements for Q1 2003, and resulted in misstatements of revenues in Riverstone's Form 10-Q for Q1 2003.

352.	Based on its reported revenues, TM Telecom was Riverstone's sixth largest customer for Q1 2003.

353.	On July 22, 2002, **Kern** sent an e-mail to **Cornmesser** confirming that TM Telecom did not have to pay for the May 2002 order until the Intelig investment deal was closed.

354.	The investment deal with Intelig was never consummated and, consistent with its side agreement with Riverstone, TM Telecom returned all its inventory of Riverstone product nine months later.

### 2.	*The KDC Side Agreement*

355.	In May 2002, Riverstone sale personnel approached Korean reseller KDC Corporation ("KDC") to place an order for Riverstone product to be resold to end user PowerComm Corp. ("PowerComm"), a subsidiary of Korea's National Electric Power Corp.

356.	On May 16, 2002, a Riverstone sales manager in Korea informed **Kern** and **Cornmesser** by e-mail that Riverstone had agreed that KDC would have a net 120 days payment term for the order and could return any part of it that was not sold to PowerComm within 120 days.

357.	On May 17, 2002, Riverstone's revenue recognition manager informed **McFarland** and **Cornmesser** by e-mail that Riverstone's outside accountants would not let them recognize revenues on sales with payment terms beyond 90 days. Later that day, **McFarland** sent **Cornmesser** an e-mail telling her that, based on the extended payment term, the KDC sale may not count as revenue.

FIRST AMENDED COMPLAINT	Case No. C 06-6384

358.     Two days later, **Cornmesser** sent an e-mail to **Kern** and the Riverstone sales manager in Korea stating: "I need the terms and conditions removed from this PO.  Item 3 states Equipment not sold within 120 days can be shipped back with credit.  This impacts revenue recognition."  The Korean sales manager replied to **Cornmesser** and **Kern** stating that, per his discussion with **Kern**, he would get the term removed from the purchase order and send a side letter committing to the return rights.  **Kern** subsequently responds: "please delete these e-mails."

359.     On May 20, 2002, **Cornmesser** and **Kern** receive another e-mail from the Korean sales manager stating that the purchase order has been corrected to delete reference to any sales contingencies, but that KDC still needs a written commitment that it has net 120 days payment terms and return rights for all Riverstone products that remain unsold after 120 days.  **Kern** approved the net 120 days extended payment term for KDC and approved granting KDC full exchange rights for the order.

360.     At the time **Kern** approved the side agreement with KDC, he was aware that Riverstone intended to recognize revenues on the KDC transaction, that the sale contingency would prevent revenue recognition under GAAP, and that KDC's purchase order needed to omit any references to the contingency if revenue was to be recognized.

361.     **Cornmesser** sent **McFarland** an e-mail on May 20, 2002, telling him that she received a purchase order from KDC with a net 90 days payment term.  However, around the same time, **Cornmesser** verbally informed **McFarland** that KDC actually had a net 120 days term and that the revised purchase order was obtained so that the transaction would pass audit.

362.     On May 21, 2002, KDC faxed a revised $1.5 million purchase order not referencing any sales contingency and stating a net 90 days payment term.

363.     Riverstone's order management group revised the KDC order in Oracle to reflect a net 90 days payment term consistent with the inaccurate and incomplete KDC purchase order.

364.     **Kern** did not forward any written documentation of the side agreement with KDC to order entry personnel in Riverstone's order management group and none was kept in Riverstone's customer sales files.

365.    In light of **Pereira's**, **Stanton's**, and **McFarland's** knowledge that Riverstone had granted sell-through payment terms on other large quarter-end reseller transactions, such as WWT, Keytron, Vnetek, All Networks, Landata, Trispec, and/or Technica, and **McFarland's** knowledge that KDC had a side agreement for its order, they were reckless in not discovering the sales contingency granted to KDC prior to the filing of Riverstone's Form 10-Q for Q1 2003.

366.    At the time **Pereira**, **Stanton**, and **McFarland** learned of the sales contingency associated with the KDC transaction or would have discovered it absent their recklessness, they knew that such sales contingency and/or the extended net 120 days payment term prohibited revenue recognition under GAAP.

367.    **Pereira**, **Stanton**, and **McFarland** either knowingly or recklessly failed to book a reserve against the revenues from the KDC transaction in Q1 2003.

368.    **Pereira**, **Stanton**, **McFarland**, and **Kern** caused Riverstone to improperly recognize approximately $1.5 million of revenues for Q1 2003 relating to the KDC transaction.

369.    The improper revenues from the KDC transaction flowed through to Riverstone's financial statements for Q1 2003, and resulted in misstatements of revenues in Riverstone's Form 10-Q for Q1 2003.

370.    The improper revenues from the KDC transaction alone inflated Riverstone's revenues for Q1 2003 by approximately 5.1%.

371.    Based on its reported revenues, KDC was Riverstone's largest customer in Q1 2003.

## VIII. PUBLIC MISSTATEMENTS RESULTING FROM RIVERSTONE'S REVENUE RECOGNITION ON CONTINGENT SALES

372.    As a result of **Pereira's** intentional conduct or reckless inaction as reflected herein, he knowingly or recklessly made the following misstatements regarding Riverstone's revenues and earnings:

a)    Riverstone's Form 10-Q for the period Q2 2002, which **Pereira** signed, states that Riverstone's revenues for Q2 2002 were $55,250,000, and that it net income was $64,000, resulting in a $0.00 earnings per share.  These statements were false

because they included revenues and earnings on contingent sales for which **Pereira** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q2 2002 under GAAP.

b) Riverstone's Form 10-Q for the period Q3 2002, which **Pereira** signed, states that Riverstone's revenues for Q3 2002 were $60,056,000 and that it net income was $2,156,000, resulting in a $0.02 earnings per share. These statements were false because they included revenues and earnings on contingent sales for which **Pereira** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q3 2002 under GAAP.

c) On December 19, 2001, **Pereira** verbally stated during a quarterly earnings conference call that Riverstone's revenues for Q3 2002 were $60.1 million and that its pro forma earnings were $3.6 million or $0.03 per share. These statements were false because they included revenues and earnings on contingent sales for which **Pereira** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q3 2002 under GAAP.

d) On December 19, 2001, Riverstone issued an earnings press release, which **Pereira** edited and approved, that stated that Riverstone made record financial results for Q3 2002 of $60.1 million in revenues and GAAP net income of $2.2 million or $0.02 earnings per share. **Pereira** was specifically quoted in the press release as stating: "We are pleased to deliver another record quarter of increasing revenue, profit and market share." These statements were false because they included revenues and earnings on contingent sales for which **Pereira** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q3 2002 under GAAP.

e) On March 26, 2002, **Pereira** verbally stated that Riverstone's revenues for Q4 2002 were within Riverstone's revised expected range of $51.3 million, producing a pro forma loss of $0.01 per share. **Pereira** also stated that Riverstone's Q4 2002 revenues represented a 46% increase over the prior year's revenues for the

same period.  **Pereira** also stated that Fiscal Year 2002 was a year of tremendous growth for Riverstone as Riverstone's revenues grew by 114% in Fiscal Year 2002 to $211 million.  These statements were false because they included revenues and earnings on contingent sales for which **Pereira** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q4 2002 and Fiscal Year 2002 under GAAP.

f)    On March 26, 2002, Riverstone issued an earnings press release, which **Pereira** edited and approved, that stated that Riverstone's revenues for Q4 2002 were $51.3 million and were up 114% for Fiscal Year 2002 to $210.8 million, and that its pro forma net loss from Q4 2002 was $1.7 million or $0.01 per share and for Fiscal Year 2002 was $252,000 or break-even on a per share basis.  **Pereira** was specifically quoted in the press release as stating: "Despite a challenging environment, Riverstone achieve several significant milestones last year, including industry-leading growth of more than 100 percent over the previous year."  These statements were false because they included revenues and earnings on contingent sales for which **Pereira** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q4 2002 and Fiscal Year 2002 under GAAP.

g)    Riverstone's Form 10-K for Fiscal Year 2002, which **Pereira** signed, states that Riverstone's revenues for Q4 2002 were $51,285,000 and for Fiscal Year 2002 were $210,758,000, and that it net loss from Q4 2002 was $28,197,000 and for Fiscal Year 2002 was $30,687,000.  These statements were false because they included revenues and earnings on contingent sales for which **Pereira** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q4 2002 and Fiscal Year 2002 under GAAP.

h)    On June 19, 2002, **Pereira** verbally stated during a quarterly earnings conference call that Riverstone's revenues for Q1 2003 were within its revised expected range of $30.1 million, resulting in a pro forma net loss of $0.12 per share.  These

54

statements were false because they included revenues and earnings on contingent sales for which **Pereira** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q1 2003 under GAAP.

i)   On June 19, 2002, Riverstone issued an earnings press release which, **Pereira** edited and approved, that stated that Riverstone's revenues for Q1 2003 were $30.1 million and that its pro forma net loss was $0.12 per share. These statements were false because they included revenues and earnings on contingent sales for which **Pereira** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q1 2003 under GAAP.

j)   Riverstone's Form 10-Q for the period Q1 2003, which **Pereira** signed, states that Riverstone's revenues for Q1 2003 were $30,100,000 and that its net loss was $15,949,000, or $0.13 per share. These statements were false because they included revenues and earnings on contingent sales for which **Pereira** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q1 2003 under GAAP.

373.   As a result of **Stanton's** intentional conduct or reckless inaction as reflected herein, he knowingly or recklessly made the following misstatements regarding Riverstone's revenues and earnings:

a)   Riverstone's Form 10-Q for the period Q2 2002, which **Stanton** signed, states that Riverstone's revenues for Q2 2002 were $55,250,000, and that its net income was $64,000, resulting in $0.00 earnings per share. These statements were false because they included revenues and earnings on contingent sales for which **Stanton** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q2 2002 under GAAP.

b)   Riverstone's Form 10-Q for the period Q3 2002, which **Stanton** signed, states that Riverstone's revenues for Q3 2002 were $60,056,000 and that its net income was $2,156,000, resulting in $0.02 earnings per share. These statements were false because they included revenues and earnings on contingent sales for which

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

**Stanton** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q3 2002 under GAAP.

c)   On December 19, 2001, **Stanton** verbally stated during a quarterly earnings conference call that Riverstone's revenues for Q3 2002 were $60.1 million and were up from $55.3 million in the prior quarter. **Stanton** also stated that Riverstone's pro forma earnings were $3.6 million or $0.03 per share. These statements were false because they included revenues and earnings on contingent sales for which **Stanton** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q3 2002 under GAAP.

d)   On December 19, 2001, Riverstone issued an earnings press release, which **Stanton** edited and approved, that stated that Riverstone made record financial results for Q3 2002 of $60.1 million in revenues and GAAP net income of $2.2 million or $.02 earnings per share. These statements were false because they included revenues and earnings on contingent sales for which **Stanton** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q3 2002 under GAAP.

e)   On March 26, 2002, **Stanton** verbally stated during a quarterly earnings conference call that Riverstone's revenues for Q4 2002 were within Riverstone's revised expected range or $51.3 million, producing a pro forma loss of $1.7 million or $.01 per share and a GAAP net loss of $28.2 million or $.23 per share. **Stanton** also stated that revenues for Fiscal Year 2002 increased 114% from the prior year to $210.8 million, and that Riverstone's pro forma net loss for Fiscal Year 2002 was $252,000 or break-even on a per share basis and GAAP net loss for Fiscal Year 2002 was $30.7 million or $.27 per share. These statements were false because they included revenues and earnings on contingent sales for which **Stanton** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q4 2002 and Fiscal Year 2002 under GAAP.

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

f)    On March 26, 2002, Riverstone issued an earnings press release, which **Stanton** edited and approved, that stated that Riverstone's revenues for Q4 2002 were $51.3 million and were up 114% for Fiscal Year 2002 to $210.8 million, and that its pro forma net loss from Q4 2002 was $1.7 million or $0.01 per share and for Fiscal Year 2002 was $252,000 or break-even on a per share basis. These statements were false because they included revenues and earnings on contingent sales for which **Stanton** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q2 2002 and Fiscal Year 2002 under GAAP.

g)    Riverstone's Form 10-K for Fiscal Year 2002, which **Stanton** signed, states that Riverstone's revenues for Q4 2002 were $51,285,000 and for Fiscal Year 2002 were $210,758,000, and that its net loss from Q4 2002 was $28,197,000 and for Fiscal Year 2002 was $30,687,000. These statements were false because they included revenues and earnings on contingent sales for which **Stanton** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q4 2002 and Fiscal Year 2002 under GAAP.

h)    Riverstone's Form 10-Q for the period Q1 2003, which **Stanton** signed, states that Riverstone's revenues for Q1 2003 were $30,100,000 and that its net loss was $15,949,000, or $.13 per share. These statements were false because they included revenues and earnings on contingent sales for which **Stanton** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q1 2003 under GAAP.

i)    On June 19, 2002, **Stanton** verbally stated during a quarterly earnings conference call that Riverstone's revenues for Q1 2003 were $30.1 million, and that Riverstone's GAAP net loss for Q1 2003 was $15.9 million or $.13 per share. **Stanton** also stated that Riverstone's Korea market was strong with KDC accounting for slightly more than 10% of Riverstone's revenues. These statements were false because they included revenues and earnings on contingent

57

sales, in particular the KDC transaction, for which **Stanton** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q1 2003 under GAAP.

j)   On June 19, 2002, Riverstone issued an earnings press release, which **Stanton** edited and approved, that stated that Riverstone's revenues for Q1 2003 were $30.1 million and that its pro forma net loss was $.12 per share. These statements were false because they included revenues and earnings on contingent sales for which **Stanton** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q1 2003 under GAAP.

374.   As a result of **McFarland's** intentional conduct or reckless inaction as reflected herein, he knowingly or recklessly made the following misstatements regarding Riverstone's revenues and earnings:

a)   Riverstone's Form 10-Q for the period Q2 2002, which **McFarland** drafted and edited, states that Riverstone's revenues for Q2 2002 were $55,250,000, and that its net income was $64,000, resulting in a $.00 earnings per share. These statements were false because they included revenues and earnings on contingent sales for which **McFarland** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q2 2002 under GAAP.

b)   Riverstone's Form 10-Q for the period Q3 2002, which **McFarland** drafted and edited, states that Riverstone's revenues for Q3 2002 were $60,056,000 and that its net income was $2,156,000, resulting in a $.02 earnings per share. These statements were false because they included revenues and earnings on contingent sales for which **McFarland** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q3 2002 under GAAP.

c)   On December 19, 2001, Riverstone issued an earnings press release, which **McFarland** edited, that stated that Riverstone made record financial results for

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

1     Q3 2002 of $60.1 million in revenues and GAAP net income of $2.2 million or
2     $.02 earnings per share. These statements were false because they included
3     revenues and earnings on contingent sales for which **McFarland** knew, or was
4     reckless in not knowing, should not have been included in Riverstone's financial
5     statements for Q3 2002 under GAAP.

6     d)     On March 26, 2002, Riverstone issued an earnings press release, which
7     **McFarland** edited, that stated that Riverstone's revenues for Q4 2002 were $51.3
8     million and were up 114% for Fiscal Year 2002 to $210.8 million, and that its pro
9     forma net loss from Q4 2002 was $1.7 million or $.01 per share and for Fiscal
10     Year 2002 was $252,000 or break-even on a per share basis. These statements
11     were false because they included revenues and earnings on contingent sales for
12     which **McFarland** knew, or was reckless in not knowing, should not have been
13     included in Riverstone's financial statements for Q4 2002 and Fiscal Year 2002
14     under GAAP.

15     e)     Riverstone's Form 10-K for Fiscal Year 2002, which **McFarland** drafted and
16     edited, states that Riverstone's revenues for Q4 2002 were $51,285,000 and for
17     Fiscal Year 2002 were $210,758,000, and that its net loss from Q4 2002 was
18     $28,197,000 and for Fiscal Year 2002 was $30,687,000. These statements were
19     false because they included revenues and earnings on contingent sales for which
20     **McFarland** knew, or was reckless in not knowing, should not have been included
21     in Riverstone's financial statements for Q4 2002 or Fiscal Year 2002 under
22     GAAP.

23     f)     Riverstone's Form 10-Q for the period Q1 2003, which **McFarland** drafted and
24     edited, states that Riverstone's revenues for Q1 2003 were $30,100,000 and that
25     its net loss was $15,949,000, or $.13 per share. These statements were false
26     because they included revenues and earnings on contingent sales for which
27     **McFarland** knew, or was reckless in not knowing, should not have been included
28     in Riverstone's financial statements for Q1 2003 under GAAP.

FIRST AMENDED COMPLAINT               Case No. C 06-6384

g)     On June 19, 2002, Riverstone issued an earnings press release, which **McFarland** edited, that stated that Riverstone's revenues for Q1 2003 were $30.1 million and that its pro forma net loss was $.12 per share.  These statements were false because they included revenues and earnings on contingent sales for which **McFarland** knew, or was reckless in not knowing, should not have been included in Riverstone's financial statements for Q1 2003 under GAAP.

375.  As a result of **Kern's** intentional conduct as reflected herein, he knowingly or recklessly made the following misstatements regarding Riverstone's revenues and earnings:

a)     Riverstone's Form 10-Q for the period Q2 2002 states that Riverstone's revenues for Q2 2002 were $55,250,000, and that its net income was $64,000, resulting in a $.00 earnings per share.  **Kern** was substantially or intricately involved in the preparation of the statements of revenues and earnings that he knew would be reported in Riverstone's Form 10-Q for the period Q2 2002.  These statements were false because they included revenues and earnings on contingent sales that **Kern** knew should not have been included in Riverstone's financial statements for Q2 2002 under GAAP.

b)     Riverstone's Form 10-Q for the period Q3 2002 states that Riverstone's revenues for Q3 2002 were $60,056,000 and that its net income was $2,156,000, resulting in $.02 earnings per share.  **Kern** was substantially or intricately involved in the preparation of the statements of revenues and earnings that he knew would be reported in Riverstone's Form 10-Q for the period Q3 2002. These statements were false because they included revenues and earnings on contingent sales that **Kern** knew should not have been included in Riverstone's financial statements for Q3 2002 under GAAP.

c)     Riverstone's Form 10-K for Fiscal Year 2002 states that Riverstone's revenues for Q4 2002 were $51,285,000 and for Fiscal Year 2002 were $210,758,000, and that its net loss from Q4 2002 was $28,197,000 and for Fiscal Year 2002 was $30,687,000.  **Kern** was substantially or intricately involved in the preparation of

60

the statements of revenues and earnings that he knew would be reported in Riverstone's Form 10-K for Fiscal Year 2002. These statements were false because they included revenues and earnings on contingent sales that **Kern** knew should not have been included in Riverstone's financial statements for Q4 2002 or Fiscal Year 2002 under GAAP.

d)  Riverstone's Form 10-Q for the period Q1 2003 states that Riverstone's revenues for Q1 2003 were $30,100,000 and that its net loss was $15,949,000, or $.13 per share. **Kern** was substantially or intricately involved in the preparation of the statements of revenues and earnings that he knew would be reported in Riverstone's Form 10-Q for the periods Q1 2003. These statements were false because they included revenues and earnings on contingent sales that **Kern** knew should not have been included in Riverstone's financial statements for Q1 2003 under GAAP.

376.  As a result of **Feldman's** intentional conduct as reflected herein, he knowingly or recklessly made the following misstatements regarding Riverstone's revenues and earnings:

a)  Riverstone's Form 10-Q for the period Q2 2002 states that Riverstone's revenues for Q2 2002 were $55,250,000, and that its net income was $64,000, resulting in a $.00 earnings per share. **Feldman** was substantially or intricately involved in the preparation of the statements of revenues and earnings that he knew would be reported in Riverstone's Form 10-Q for the period Q2 2002. These statements were false because they included revenues and earnings on contingent sales that **Feldman** knew should not have been included in Riverstone's financial statements for Q2 2002 under GAAP.

b)  Riverstone's Form 10-Q for the period Q3 2002 states that Riverstone's revenues for Q3 2002 were $60,056,000 and that its net income was $2,156,000, resulting in $.02 earnings per share. **Feldman** was substantially or intricately involved in the preparation of the statements of revenues and earnings that he knew would be reported in Riverstone's Form 10-Q for the period Q3 2002. These statements

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

were false because they included revenues and earnings on contingent sales that **Feldman** knew should not have been included in Riverstone's financial statements for Q3 2002 under GAAP.

c)    Riverstone's Form 10-K for Fiscal Year 2002 states that Riverstone's revenues for Q4 2002 were $51,285,000 and for Fiscal Year 2002 were $210,758,000, and that its net loss from Q4 2002 was $28,197,000 and for Fiscal Year 2002 was $30,687,000.    **Feldman** was substantially or intricately involved in the preparation of the statements of revenues and earnings that he knew would be reported in Riverstone's Form 10-K for Fiscal Year 2002.  These statements were false because they included revenues and earnings on contingent sales that **Feldman** knew should not have been included in Riverstone's financial statements for Q4 2002 or Fiscal Year 2002 under GAAP.

## IX.  PEREIRA, STANTON, AND MCFARLAND FAILED TO ESTABLISH AN ADEQUATE SYSTEM OF INTERNAL ACCOUNTING CONTROLS AT RIVERSTONE

377.    Under the federal securities laws and regulations, Riverstone was required, among other things, to devise and maintain a system of internal accounting controls that provided reasonable assurances that the company's financial transactions were recorded in a manner that would permit the preparation of financial statements in conformity with GAAP.

378.    As officers of Riverstone with responsibility over its accounting function, **Pereira**, **Stanton**, and **McFarland**, were prohibited under the federal securities laws and regulations, from knowingly failing to implement a system of internal accounting controls that provided reasonable assurances that the company's financial transactions were recorded in a manner that would permit the preparation of financial statements in conformity with GAAP.

379.    Riverstone did not devise or maintain a system of internal accounting controls that provided reasonable assurances that the company's financial transactions were recorded in a manner that would permit the preparation of financial statements in conformity with GAAP.

380.    Specifically, in some instances, non-standard sales terms, including sell-through payment terms, were not properly documented and were not communicated from the sales

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

department to members of the credit and collections department, a subdivision of the finance department.

381.    The sales contingencies needed to be properly documented and communicated to provide reasonable assurances that the company's financial transactions were recorded in a manner that would permit the preparation of financial statements in conformity with GAAP.

382.    Alvendia informed **Pereira**, **Stanton**, and **McFarland** that members of the sales department were granting payment terms in side agreements that differed from the terms set forth on the customer purchase order or invoice and the Oracle system on several occasions. For example, Alvendia specifically did so in with respect to the WWT transaction via e-mail on October 11, 2001.

383.    In addition, on October 9, 2001, before Riverstone filed its Form 10-Q for Q2 2002, Alvendia sent **McFarland** and **Kern** an e-mail stating "[t]here is a reluctance from you [the sales department] to come back to Credit of any deals made outside of normal credit terms. This is just one of the many deals made of this nature." In the same e-mail, Alvendia specifically requested that **McFarland** create "a firm written policy and procedure . . . that addresses payment terms/credit limits and credit approvals."

384.    On October 22, 2001, **Kern** forwarded Alvendia's October 9th e-mail to **McFarland** with a response that: "I do not want credit/finance to feel we are shooting from the hip, but I do need some flexibility when I run into revenue vs terms issues." **Kern** further added that: "I need your help to insure that Kathy works back through sales/sales ops, vs calling customers directly on the 'deal making' side."

385.    Moreover, as early as September 2000, **Stanton** had warned a member of the finance department that **Kern** and **Feldman** would aggressively enter into transactions for revenue and might not inform the finance department of all the terms they had negotiated.

386.    During the relevant period, **Pereira**, **Stanton**, and **McFarland**, never instituted a policy or a system of internal accounting controls to ensure that all non-standard sales terms were properly documented in Riverstone's books, records, and accounts, and communicated to order entry personnel in Riverstone's order management group at the time the sale was booked

63

into Oracle and to personnel in Riverstone's finance department in charge of booking sales credit reserves in Oracle or collections.

387. **Pereira's**, **Stanton's**, and **McFarland's** failure to implement such a policy or system of internal accounting controls contributed to Riverstone's misreporting of financial transactions that prevented the preparation of financial statements in conformity with GAAP.

388. **Pereira**, **Stanton**, and **McFarland** also did not perform any investigation and failed to correct Riverstone's books, records, and accounts when sales contingencies were brought to their attention.

389. For example, none of these individuals took corrective action based on Alvendia's October 11th e-mail regarding WWT, nor did **McFarland** take corrective action after being informed via e-mail in early May 2002 that Technica and Trispec were granted sales contingencies.

390. **Pereira's**, **Stanton's**, and **McFarland's** failure to investigate or correct improper revenues on contingent sales prevented Riverstone from preparing financial statements in conformity with GAAP.

## X. PEREIRA, STANTON, MCFARLAND, KERN, FELDMAN, AND CORNMESSER CIRCUMVENTED RIVERSTONE'S ACCOUNTING POLICIES

391. Under the federal securities laws and regulations, Riverstone's employees are prohibited from directly or indirectly circumventing a system of internal accounting controls.

392. **Pereira**, **Stanton**, **McFarland**, **Kern**, **Feldman**, and **Cornmesser** knew, or were reckless in not knowing, Riverstone's revenue recognition policy as it was reflected in Riverstone's public filings with the SEC, its management representation letters to Riverstone's outside accountants, and in its internal written revenue recognition policy.

393. Under Riverstone's revenue recognition policy:

a) Riverstone recognizes revenues in accordance with SEC Staff Accounting Bulletin No. 101 ("SAB 101"). Under SAB 101, revenue is recognized when four criteria are met: (1) persuasive evidence of an arrangement exists; (2)

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

delivery has occurred or services have been rendered; (3) the seller's price is fixed or determinable; and (4) collectibility is reasonably assured.

b)      Riverstone does not recognize revenues on transactions where uncertainties exist until such uncertainties are resolved.

c)      For a sale to take place, there must be a written sales agreement, such as a purchase order. MOUs and verbal understandings are not acceptable.

d)      Side agreements subsequent to the original agreement indicate that an agreement was not final, and may preclude revenue recognition.

e)      Riverstone does not offer the right of returns to customers. All sales are considered final and non-refundable.

f)      Prices are not "fixed and determinable," and thus revenue recognition is inappropriate, when there are varied payment terms for the same customer. Riverstone does not grant concessions to customer with longer payment terms.

g)      Revenues cannot be recognized when cancellation provisions exist. Riverstone does not give cancellation provisions to its customers.

h)      Shipments will be allowed once the credit and collections department has performed a credit check for new customers and determined that collection is probable.

394.    **Pereira**, **Stanton**, and **McFarland** violated Riverstone's revenue recognition policy by knowingly failing to reserve against revenues from contingent sales of which they had knowledge (or were reckless in not discovering) in the fiscal quarter in which the transaction occurred, including the WWT, Everbright, Keytron, Trispec, Smartnet, Vnetek, All Networks, Landata, Spacnet, Technica, Commverge, Vodatel, TM Telecom and/or KDC transactions.

395.    **Pereira**, **Stanton**, and **McFarland** also violated Riverstone's revenue recognition policy by knowingly approving return rights, variable extended payment terms, and/or cancellation provisions in verbal or informal written side agreements negotiated by **Kern** or **Feldman**, such as in the WWT and Vnetek transactions.

FIRST AMENDED COMPLAINT                                          Case No. C 06-6384

396. **Kern** violated Riverstone's revenue recognition policy by knowingly granting or approving return rights, variable extended payment terms, and/or cancellation provisions in verbal or informal written side agreements to Everbright, Keytron, Trispec, Smartnet, All Networks, Landata, Spacnet, Technica, Commverge, Vodatel, TM Telecom and/or KDC.

397. **Kern** also violated Riverstone's revenue recognition policy by causing Riverstone to recognize revenues on contingent sales by knowingly submitting false and incomplete written sales documentation to Riverstone's order management group for entry into Oracle.

398. **Feldman** violated Riverstone's revenue recognition policy by knowingly granting return rights, variable extended payment terms, and/or cancellation provisions in informal written side agreements to WWT and Vnetek.

399. **Feldman** also violated Riverstone's revenue recognition policy by knowingly causing Riverstone to recognize revenues on contingent sales by knowingly submitting false and incomplete written sales documentation to Riverstone's order management group for entry into Oracle.

400. **Cornmesser** violated Riverstone's revenue recognition policy by causing Riverstone to recognize revenues on contingent sales by knowingly entering false sales terms into Oracle, directly or indirectly.

401. **Cornmesser** also violated Riverstone's revenue recognition policy by circumventing Riverstone's credit approval process through manually shipping products outside of Oracle or shipping goods as evaluation units rather than as a purchase.

## XI. PEREIRA, STANTON, MCFARLAND, KERN, FELDMAN AND CORNMESSER FALSIFIED RIVERSTONE'S BOOKS, RECORDS AND ACCOUNTS

402. Under the federal securities laws and regulations, Riverstone was required, among other things, to make and keep books, records, and accounts that accurately and fairly reflected the company's business transactions.

403. Under the federal securities laws and regulations, Riverstone's employees were prohibited from directly or indirectly falsifying or causing to be falsified any of Riverstone's books, records, or accounts that reflect its business transactions.

66

404.    In a collaborative effort to conceal sales contingencies or other revenue obstacles from Riverstone's outside accountants, **Pereira**, **Stanton**, **McFarland**, **Kern**, **Feldman**, and **Cornmesser** were responsible for the falsification of Riverstone's books, records, and/or accounts.

405.    Riverstone's customer purchase orders, customer sales files, Oracle entries, and invoices are all records of Riverstone that reflect its business transactions and provide evidentiary support for the accounting treatment of those transactions.

406.    Riverstone's general ledger and financial statements are books and accounts of Riverstone that reflect its business transactions.

407.    **Kern**, **Feldman**, and **Cornmesser** directly or indirectly encouraged others to remove, omit, or misstate non-standard sales terms on purchase orders, making them inaccurate or incomplete records of Riverstone.  For example, such conduct is reflected in transactions such as WWT (**Feldman**), Everbright (**Kern**), Keytron (**Kern**), Smartnet (**Kern**), All Networks (**Kern**), Commverge (**Kern**), and KDC (**Kern** and **Cornmesser**).

408.    By procuring inaccurate or incomplete purchase orders that were directly or indirectly delivered to Riverstone's order management group while failing to deliver written copies or documentation of any side agreements containing sale contingencies, **Kern** and **Feldman** caused false payment terms to be entered into Oracle, which, in turn, directly resulted in false payment terms being generated on Riverstone's invoices, improper revenues being booked on contingent sales in Riverstone's general ledger, and improper revenues on contingent sales being presented in Riverstone's financial statements.  For example, such conduct is reflected in transactions such as WWT (**Feldman**), Trispec (**Kern**), Vnetek (**Feldman**), All Networks (**Kern**), Landata (**Kern**), Technica (**Kern**), Commverge (**Kern**), Vodatel (**Kern**), TM Telecom (**Kern**), and KDC (**Kern**).  This conduct by **Kern** and **Feldman** also caused Riverstone's customer sales files, which are records of Riverstone, to be inaccurate and incomplete.

409.    **Cornmesser,** directly or indirectly, entered false payment terms into Oracle, which, in turn, caused the false payment terms to be generated on Riverstone's invoices.  She did

so with the approval or at the direction of **Kern**. For example, such conduct is reflected in transactions such as Landata and KDC.

410. **Kern** also directed **Cornmesser** to remove side agreements from Riverstone's customer files thereby rendering them incomplete and spoiling their integrity.

411. By failing to record full reserves against revenues for known sales contingencies for the quarter or fiscal year in which the transactions occurred, **Pereira**, **Stanton**, and **McFarland**, falsified or caused to be falsified Riverstone's general ledger, and Riverstone's quarterly or annual financial statements. For example, such conduct is reflected in transactions such as WWT (**Pereira**, **Stanton**, and **McFarland**), Keytron (**Pereira**, **Stanton**, and **McFarland**), Trispec (**McFarland**), Vnetek (**Pereira**, **Stanton**, and **McFarland**), All Networks (**Stanton** and **McFarland**), Landata (**Pereira**, **Stanton**, and **McFarland**), Spacnet (**Pereira**, **Stanton**, and **McFarland**) and Technica (**Pereira**, **Stanton**, and **McFarland**).

**XII. PEREIRA, STANTON, MCFARLAND, KERN, AND FELDMAN MADE INACCURATE STATEMENTS AND/OR CONCEALED INFORMATION FROM RIVERSTONE'S OUTSIDE ACCOUNTANTS REGARDING THE TRUE NATURE OF RIVERSTONE'S CONTINGENCY SALES AND CORNMESSER AIDED AND ABETTED SUCH CONDUCT BY KERN AND FELDMAN**

412. As a public company, Riverstone was required to retain accountants to review and audit its financial statements for compliance with GAAP.

413. Under the federal securities laws and regulations, officers and directors of public companies are required to provide accountants with information that is not false or misleading.

414. On September 20, 2001, in connection with the quarterly review by Riverstone's outside accountant, KPMG LLP ("KPMG"), **Pereira** and **Stanton** signed a representation letter indicating that, among other things, all of Riverstone's sales transactions were final, there existed no side agreements involving return rights, and that revenues were reserved to the extent significant future obligations exist. **Pereira** and **Stanton** omitted to state in the September 20th letter to KPMG that Riverstone has granted sales contingencies to certain customers.

415. Based on **Pereira's** and **Stanton's** knowledge of the sales contingencies connected with the WWT transaction, their representations and omissions to Riverstone outside

accountant as set forth in the September 20th management letter to KPMG were false and misleading.

416. On May 28, 2002, **Pereira**, **Stanton**, and **McFarland** signed a representation letter to Riverstone's outside accountant, Ernst & Young LLP ("E&Y"), in connection with the year-end audit for Fiscal Year 2002, stating that none of Riverstone's resellers had sell-through payment terms. **Pereira**, **Stanton**, and **McFarland** omitted to state in the May 28th letter to E&Y that Riverstone had granted sell-through payment terms to certain resellers.

417. Based on **Pereira's**, **Stanton's**, **McFarland's** knowledge of sell-through payment terms granted to WWT, Keytron, Trispec, Vnetek, Landata, Technica, and / or TM Telecom, their representations and omissions to Riverstone's outside accountant as set forth in the May 28th management letter to E&Y were false and misleading.

418. **McFarland** signed the May 28, 2002 representation letter less than a month after being informed in writing of the sell-through payment terms associated with the Trispec, Spacnet, and February 2002 Technica transactions.

419. On May 30, 2002, **Pereira** signed a separate representation letter to E&Y stating that he had no knowledge of any side agreements for the period March 4, 2001, to October 31, 2001. **Pereira** omitted to state in the May 30th letter to E&Y that Riverstone had entered into side agreements with certain Riverstone customers.

420. Based on **Pereira**'s knowledge of the side agreements with WWT and Keytron, his representations and omissions to Riverstone outside accountant as set forth in his May 30th letter to E&Y were false and misleading.

421. On May 30, 2002, **Kern** signed a representation letter to E&Y stating that he had no knowledge of any side agreements with Riverstone's customers. **Kern** omitted to state in the May 30th letter to E&Y that Riverstone had entered into side agreements with certain Riverstone customers.

422. Based on **Kern's** knowledge of the side agreements with WWT, Everbright, Keytron, Trispec, Smartnet, All Networks, Landata, Spacnet, Technica, Commverge, Vodatel,

TM Telecom and/or KDC, his representations and omissions to Riverstone outside accountant as set forth in his May 30th letter to E&Y were false and misleading.

423.    **Kern** signed the May 30th representation letter to E&Y within days of granting or approving side agreements with Technica, TM Telecom, and KDC.

424.    On June 15, 2002, **Pereira**, **Stanton**, and **McFarland** signed a representation letter to E&Y in connection with the quarterly review for Q1 2003, stating that the representations made to E&Y in connection with the May 28th management letter, including that none of Riverstone's resellers had sell-through payment terms, remained current.  Conversely, **Pereira's**, **Stanton's**, and **McFarland's** June 15th letter to E&Y omitted to state that Riverstone had granted sell-through payment terms to certain resellers.

425.    Based on **Pereira's**, **Stanton's**, **McFarland's** knowledge of sell-through payment terms granted to WWT, Keytron, Trispec, Vnetek, Landata, Technica and/or TM Telecom, their representations and omissions to Riverstone outside accountant as set forth in the June 15th management letter to E&Y were false and misleading.

426.    On June 15, 2002, **Kern** signed a representation letter to E&Y in connection with its quarterly review of Q1 2003 stating that he had no knowledge of any side agreements with Riverstone's customers.  Conversely, **Kern's** June 15th letter to E&Y omitted to state that Riverstone had entered into side agreements with certain Riverstone customers.

427.    Based on **Kern's** knowledge of the side agreements with WWT, Everbright, Keytron, Trispec, Smartnet, All Networks, Landata, Spacnet, Technica, Commverge, Vodatel, TM Telecom and/or KDC, his representations and omissions to Riverstone outside accountant as set forth in his June 15th letter to E&Y were false and misleading.

428.    In connection with the Fiscal Year 2002 audit, **McFarland** also gave Riverstone's outside accountant a false explanation for why Vnetek returned its $2.0 million November 2001 order in January 2002.

429.    **Cornmesser** and **Feldman** knew that Riverstone had outside accountants who performed quarterly reviews and annual audits of Riverstone's books, records, and accounts.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

430.    **Cornmesser** and **Feldman** knew that the practice of removing non-standard terms from purchase orders submitted to the order management group and placing them in side agreements that were not provided to the order management group was undertaken to conceal terms that would prohibit revenue recognition from Riverstone's outside accountants so that the auditors would not raise problems with the transactions.

431.    **Feldman** knew that if the sales contingencies contained in his side agreements had been disclosed to Riverstone are outside accountants, they would not have permitted revenues to be recognized on these transactions.

432.    In connection with the WWT transaction in late August 2001 and the Vnetek transaction in late November 2001, **Feldman** agreed to sales contingencies that prohibited revenue recognition on those transactions under GAAP.  **Feldman** directed WWT on August 28, 2001, to remove from its purchase order any reference to the sales contingencies that **Feldman** had granted to WWT.

433.    On or near August 29, 2001, **Feldman** received a revised "clean" purchase order from WWT with a net 90 days payment term.  At the time **Feldman** received the revised purchase order from WWT, he knew that the net 90 days payment term was false and that the purchase order was incomplete by omitting the sales contingencies.

434.    Likewise, on November 29, 2001, **Feldman** received a "clean" purchase order from Vnetek with a net 30 days payment term.  At the time **Feldman** received the "clean" purchase order from Vnetek, he knew that the net 30 days payment term was false and that the purchase order was incomplete.

435.    **Feldman**, directly or indirectly, delivered the inaccurate and incomplete WWT and Vnetek purchase orders to the order management group, but he did not provide copies of the written side agreements with WWT and Vnetek to Riverstone's order management group and they were not included in Riverstone's customer sales files.

436.    Instead, **Feldman** retained copies of the side agreements with WWT and Vnetek in his personal files or e-mails.

437. By providing, directly or indirectly, false purchase orders to the order management group while retaining the side letters containing sales contingencies granted to WWT and Vnetek, **Feldman**, an officer of the Riverstone, had a duty to reveal to Riverstone's outside accountants that he had agreed to sales contingencies in connection with the WWT and Vnetek transactions that were inconsistent with terms in Oracle supporting the booked revenues and in Riverstone's written sales documentation in the customer sales files.

438. **Feldman** never informed Riverstone's outside accountants that he had granted sales contingencies to WWT and Vnetek that prohibited revenue recognition on those large transactions.

439. Instead, **Feldman** knowingly concealed the sales contingencies granted to WWT and Vnetek from Riverstone's outside accountants through his side agreements.

440. **Cornmesser** knew that **Kern** and **Feldman** were concealing side agreements with non-standard sales terms from Riverstone's outside accountants.

441. **Cornmesser** substantially assisted **Kern** and **Feldman** in their omissions to Riverstone's outside accountants by:

    a) Encouraging others to remove or misstate sales terms on purchase orders received by Riverstone. Such conduct is present, for example, in the WWT and KDC transactions.

    b) Entering false information regarding sales terms into Oracle. Such conduct is present, for example, in the Landata and KDC transactions.

    c) Removing side agreements from Riverstone's customer sales files at **Kern's** request prior to the field work by Riverstone's outside accountants.

## XIII. DEFENDANTS RECEIVED ILL-GOTTEN GAINS AS A RESULT OF THEIR CONDUCT

442. While the Defendants knowingly or recklessly caused Riverstone to falsely overstate revenues and earnings in financial statements that were reported to the SEC and investors, or falsified Riverstone's accounting records, each of the Defendants, except

FIRST AMENDED COMPLAINT            Case No. C 06-6384

**McFarland**, sold Riverstone stock at artificially inflated prices or received additional compensation as a result of their illegal conduct.

443.   The Defendants received at least the following estimated amounts of compensation and other financial gains:

    a)    During the relevant period, **Pereira** received at least $1,236,712 in gains from stock sales.

    b)    During the relevant period, **Stanton** received at least $533,273 in gains from stock sales.

    c)    During the relevant period, **Kern** received at least $503,410 in gains from stock sales, and $154,324 in sales commissions.

    d)    During the relevant period, **Feldman** received at least $998,499 in gains from stock sales, and $3,808 in bonuses.

    e)    During the relevant period, **Cornmesser** at least received $57,726 in gains from stock sales, and $4,000 in bonuses.

**FIRST CLAIM FOR RELIEF**
**Fraud – Violations of Exchange Act Section 10(b) and Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Against Defendants Pereira, Stanton, Kern, Feldman, and McFarland)**

444.   The SEC realleges paragraphs 1 through 443 above.

445.   Based on the conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland**, directly or indirectly, with scienter, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, the mails, or any facility of a national securities exchange, employed devices, schemes, or artifices to defraud; made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person; in violation of Section 10(b) of the Exchange Act and Rule 10b-5. [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5].

FIRST AMENDED COMPLAINT            Case No. C 06-6384

446.    **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** violated, and unless restrained and enjoined will in the future violate, Section 10(b) of the Exchange Act and Rule 10b-5.

**SECOND CLAIM FOR RELIEF (ALTERNATIVE)**
**Aiding and Abetting Fraud – Violations of Exchange Act Section 10(b) and Rule 10b-5**
**[15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]**
**(Against Defendants Kern and Feldman)**

447.    The SEC realleges paragraphs 1 through 443 above.

448.    Based on the conduct alleged above, Riverstone violated Section 10(b) of the Exchange Act and Rule 10b-5.

449.    **Kern** and **Feldman** knowingly provided substantial assistance to Riverstone in its violations of Section 10(b) of the Exchange Act and Rule 10b-5, and therefore each is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

450.    **Kern's** substantial assistance included, among other things: (1) granting or approving contingencies on sales transactions for which revenues were improperly recognized; (2) violating Riverstone's own revenue recognition policy; (3) procuring inaccurate and incomplete sales documentation and failing to provide documentation of side agreements for placement in Riverstone's customer sales files; and (4) providing false management representation letters to Riverstone's outside accountants and omitting to disclose sales contingencies of which he had knowledge.

451.    **Feldman's** substantial assistance included, among other things: (1) granting or approving contingencies on sales transactions for which revenues were improperly recognized; (2) violating Riverstone's own revenue recognition policy; (3) procuring inaccurate and incomplete sales documentation and failing to provide documentation of side agreements for placement in Riverstone's customer sales files; and (4) omitting to disclose sales contingencies to Riverstone's outside accountants of which he had knowledge.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

452. **Kern** and **Feldman** aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 10(b) of the Exchange Act and Rule 10b-5 [15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5]

**THIRD CLAIM FOR RELIEF**
**False SEC Filings - Exchange Act Section 13(a) and**
**Rules 12b-20, 13a-1, and 13a-13**
**[15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20,**
**240.13a-1, and 240.13a-13]**
**(Against Defendants Pereira, Stanton, Kern, Feldman, and McFarland)**

453. The SEC realleges paragraphs 1 through 443 above.

454. Riverstone filed with the SEC three quarterly reports on Forms 10-Q and one annual report on Form 10-K that contained materially false and misleading information in violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13. [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

455. Based on the conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** knowingly provided substantial assistance to Riverstone in its violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13, and therefore each is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

456. **Pereira's** substantial assistance included, among other things: (1) failing to properly account for sales transactions after gaining knowledge that Defendants **Feldman** or **Kern** had granted a sales contingency, which resulted in overstated revenues; (2) approving contingencies on sales transactions for which revenues were improperly recognized; (3) reckless indifference as to whether improper revenues were being recorded for contingent sales after being specifically informed that such conduct had occurred at Riverstone; (4) failing to implement a system of internal accounting controls to prevent improper revenue recognition that he knew had occurred; (5) violating Riverstone's own revenue recognition policy; (6) providing false management representation letters to Riverstone's outside accountants and omitting to disclose sales contingencies of which he had knowledge; and (7) signing the four periodic reports

FIRST AMENDED COMPLAINT                    Case No. C 06-6384

filed with the SEC that contained the misstated revenues and earnings in Riverstone's financial statements.

457. **Stanton's** substantial assistance included, among other things: (1) failing to properly account for sales transactions after gaining knowledge that Defendants **Feldman** or **Kern** had granted a sales contingency, which resulted in overstated revenues; (2) approving contingencies on sales transactions for which revenues were improperly recognized; (3) reckless indifference as to whether improper revenues were being recorded for contingent sales after being specifically informed that such conduct had occurred at Riverstone; (4) failing to implement a system of internal accounting controls to prevent improper revenue recognition that he knew had occurred; (5) violating Riverstone's own revenue recognition policy; (6) providing false management representation letters to Riverstone's outside accountants and omitting to disclose sales contingencies of which he had knowledge; and (7) signing the four periodic reports filed with the SEC that contained the misstated revenues and earnings in Riverstone's financial statements.

458. **Kern's** substantial assistance included among other things: (1) granting or approving contingencies on sales transactions for which revenues were improperly recognized; (2) violating Riverstone's own revenue recognition policy; (3) procuring inaccurate and incomplete sales documentation and failing to provide documentation of side agreements for placement in Riverstone's customer sales files; and (4) providing false management representation letters to Riverstone's outside accountants and omitting to disclose sales contingencies of which he had knowledge.

459. **Feldman's** substantial assistance included, among other things: (1) granting or approving contingencies on sales transactions for which revenues were improperly recognized; (2) violating Riverstone's own revenue recognition policy; (3) procuring inaccurate and incomplete sales documentation and failing to provide documentation of side agreements for placement in Riverstone's customer sales files; and (4) omitting to disclose sales contingencies to Riverstone's outside accountants of which he had knowledge.

460.   **McFarland's** substantial assistance included, among other things: 1) failing to properly account for sales transactions after gaining knowledge that Defendants **Feldman** or **Kern** had granted a sales contingency, which resulted in overstated revenues; (2) approving contingencies on sales transactions for which revenues were improperly recognized; (3) reckless indifference as to whether improper revenues were being recorded for contingent sales after being specifically informed that such conduct had occurred at Riverstone; (4) failing to implement a system of internal accounting controls to prevent improper revenue recognition that he knew had occurred; (5) violating Riverstone's own revenue recognition policy; (6) providing false management representation letters to Riverstone's outside accountants and omitting to disclose sales contingencies of which he had knowledge; and (7) drafting and editing relevant portions of four periodic reports filed with the SEC that contained the misstated revenues and earnings in Riverstone's financial statements.

461.   **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

**FOURTH CLAIM FOR RELIEF**
**False Books and Records - Exchange Act Section 13(b)(5) and Rule 13b2-1**
**[15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1]**
**(Against All Defendants)**

462.   The SEC realleges paragraphs 1 through 443 above.

463.   Based on the conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser** knowingly circumvented Riverstone's system of internal accounting controls, knowingly falsified Riverstone's books, records, or accounts, and/or directly or indirectly falsified or caused to be falsified books, records, or accounts described in Section 13(b)(2) of the Exchange Act [15 U.S.C. § 78m(b)(2)].

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

464.    **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser**, violated, and unless restrained and enjoined will continue to violate, Section 13(b)(5) of the Exchange Act and Rule 13b2-1 [15 U.S.C. § 78m(b)(5) and 17 C.F.R. § 240.13b2-1].

**FIFTH CLAIM FOR RELIEF**
**False Books and Records - Exchange Act Section 13(b)(2)(A)**
**[15 U.S.C. § 78m(b)(2)(A)]**
**(Against All Defendants)**

465.    The SEC realleges paragraphs 1 through 443 above.

466.    Based on the conduct alleged above, Riverstone violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] which requires issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to make and keep books, records, and accounts which in reasonable detail accurately and fairly reflect its transactions and disposition of assets.

467.    Based on the conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser** knowingly provided substantial assistance to Riverstone in its violations of Section 13(b)(2)(A) of the Exchange Act, and therefore each is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

468.    **Pereira's** substantial assistance included, among other things, failing to properly account for sales transactions after gaining knowledge that Defendants **Feldman** or **Kern** had granted a sales contingency, which resulted in overstated revenues in Riverstone's general ledger and financial statements.

469.    **Stanton's** substantial assistance included, among other things, failing to properly account for sales transactions after gaining knowledge that Defendants **Feldman** or **Kern** had granted a sales contingency, which resulted in overstated revenues in Riverstone's general ledger and financial statements.

470.    **Kern's** substantial assistance included, among other things: (1) directly or indirectly encouraging others to remove, omit, or misstate non-standard sales terms on purchase

orders; (2) procuring inaccurate or incomplete purchase orders that were directly or indirectly delivered to Riverstone's order management group while failing to deliver written copies or documentation of any side agreements containing sale contingencies for filing in Riverstone's customer sales files, (3) directly or indirectly instructing members of the sales operation department to enter false payment terms into Oracle; and (4) instructing **Cornmesser** to remove side agreements from Riverstone's customer sales files.

471.     **Feldman's** substantial assistance included, among other things, (1) directly or indirectly encouraging others to remove, omit, or misstate non-standard sales terms on purchase orders and (2) procuring inaccurate or incomplete purchase orders that were directly or indirectly delivered to Riverstone's order management group while failing to deliver written copies or documentation of any side agreements containing sale contingencies for filing in Riverstone's customer sales files.

472.     **McFarland's** substantial assistance included, among other things, failing to properly account for a sales transactions after gaining knowledge that Defendants **Feldman** or **Kern** had granted a sales contingency, which resulted in overstated revenues in Riverstone's general ledger and financial statements.

473.     **Cornmesser's** substantial assistance included, among other things: (1) directly or indirectly encouraged others to remove, omit, or misstate non-standard sales terms on purchase orders; (2) procuring inaccurate or incomplete purchase orders that were directly or indirectly delivered to Riverstone's order management group while failing to file written copies or documentation of any side agreements containing sale contingencies in Riverstone's customer sales files, (3) directly or indirectly entering false payment terms into Oracle; and (4) removing side agreements from Riverstone's customer sales files.

474.     **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser** aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

**SIXTH CLAIM FOR RELIEF**

**False Books and Records - Exchange Act Section 13(b)(2)(B)(ii)**
**[15 U.S.C. § 78m(b)(2)(B)(ii)]**
**(Against Defendants Pereira, Stanton, and McFarland)**

475.     The SEC realleges paragraphs 1 through 443 above.

476.     Based on the conduct alleged above, Riverstone violated Section 13(b)(2)(B)(ii) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)(ii)], which obligates issuers of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] to devise and maintain a system of internal accounting controls sufficient to provide reasonable assure that its transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP or other criteria applicable to the statements.

477.     Based on the conduct alleged above, **Pereira**, **Stanton**, and **McFarland** knowingly provided substantial assistance to Riverstone in its violations of Section 13(b)(2)(B)(ii), and therefore each of them liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

478.     **Pereira's** substantial assistance included, among other things: (1) failing to implement a policy or a system of internal controls to ensure that all non-standard sales terms were properly documented in Riverstone's books, records, and accounts, communicated to order entry personnel in Riverstone's order management group at the time the sale was booked into Oracle and personnel in Riverstone's finance department in charge of booking sales credit reserves in Oracle or collections; and (2) failing to perform any investigation and failing to correct Riverstone's books, records, and accounts when sales contingencies were brought to their attention.

479.     **Stanton's** substantial assistance included, among other things: (1) failing to implement a policy or a system of internal controls to ensure that all non-standard sales terms were properly documented in Riverstone's books, records, and accounts, communicated to order entry personnel in Riverstone's order management group at the time the sale was booked into Oracle and personnel in Riverstone's finance department in charge of booking sales credit reserves in Oracle or collections; and (2) failing to perform any investigation and failing to

FIRST AMENDED COMPLAINT                                Case No. C 06-6384

correct Riverstone's books, records, and accounts when sales contingencies were brought to their attention.

480.    **McFarland's** substantial assistance included, among other things: (1) failing to implement a policy or a system of internal controls to ensure that all non-standard sales terms were properly documented in Riverstone's books, records, and accounts, communicated to order entry personnel in Riverstone's order management group at the time the sale was booked into Oracle and personnel in Riverstone's finance department in charge of booking sales credit reserves in Oracle or collections; and (2) failing to perform any investigation and failing to correct Riverstone's books, records, and accounts when sales contingencies were brought to their attention.

481.    **Pereira**, **Stanton**, and **McFarland** aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Section 13(b)(2)(B)(ii) of the Exchange Act [15 U.S.C. § 78m(b)(2)(B)(ii)].

**SEVENTH CLAIM FOR RELIEF**

**Deceit of Accountants - Exchange Act Rule 13b2-2**
**[17 C.F.R. § 240.13b2-2]**
**(Against All Defendants)**

482.    The SEC realleges paragraphs 1 through 443 above.

483.    By engaging in the acts and conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland**, who were directors or officers of Riverstone when they engaged in the alleged acts and conduct, directly or indirectly, knowingly made or caused to be made materially false or misleading statements, or omitted to state or caused another person to omit to state, material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to an accountant in connection with an audit or examination of the financial statements of Riverstone required to be made or the preparation or filing of reports required to be filed by Riverstone with the SEC.

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

484.     Through the conduct alleged above, **Pereira**, **Stanton**, **Kern**, **Feldman**, and **McFarland** violated, and unless restrained and enjoined will continue to violate, Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

485.     Through the conduct alleged above, **Cornmesser** knowingly provided substantial assistance to **Kern** and **Feldman** in their violations of Rule 13b2-2, and therefore is liable as an aider and abettor pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

486.     **Cornmesser's** substantial assistance included, among other things: (1) encouraging others to remove or misstate sales terms on purchase orders received by Riverstone; (2) entering false information regarding sales terms into Oracle; and (3) removing side agreements from Riverstone's customer sales files at **Kern's** request prior to the field work by Riverstone's outside accountants.

487.     **Cornmesser** aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of Rule 13b2-2 [17 C.F.R. § 240.13b2-2].

**PRAYER FOR RELIEF**

The SEC respectfully requests that this Court:

**I.**

Find that Defendants **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser** committed the violations alleged;

**II.**

Enter an injunction permanently restraining and enjoining Defendants **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser** from violating, directly or indirectly, or aiding and abetting violations of the law and rules alleged in this Complaint;

**III.**

Order defendants **Pereira**, **Stanton**, **Kern**, **Feldman**, and **Cornmesser** to disgorge all ill-gotten gains in the form of any benefits of any kind derived from the illegal conduct alleged in this Complaint, including, but not limited to, bonuses, commissions, and proceeds from stock sales, plus pre-judgment and post-judgment interest;

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384

**IV.**

Order Defendants **Pereira**, **Stanton**, **Kern**, **Feldman**, **McFarland**, and **Cornmesser** to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] in an amount to be determined by the Court, and post-judgment interest;

**V.**

Prohibit Defendants **Pereira**, **Stanton**, and **Kern**, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] from serving as an officer or director of any company having a class of securities registered with the SEC pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

**VI.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

**VII.**

Grant such relief as this Court may determine is just and necessary.

DATED: April 30, 2007.

s/Leslie J. Hughes_____
Leslie J. Hughes Esq. (Colo. 15043)

s/Lee C. Robinson_____
Lee C. Robinson (Colo. 32734)

Attorneys for Plaintiff
Securities and Exchange Commission
1801 California Street, Suite 1500
Denver, CO  80202-2656
Telephone                    (303) 844-1000
Fax                              (303) 844-1068

CERTIFICATE OF SERVICE

I hereby certify that on April 30, 2006, I electronically filed the foregoing PLAINTIFF'S FIRST AMENDED COMPLAINT with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following individuals at their e-mail addresses:

David Banie     david.banie@dlapiper.com, trina.walker@dlapiper.com

Kara L. Erdodi     kara.erdodi@berliner.com, jwillson@berliner.com

William S. Freeman     freemanws@cooley.com, galancr@cooley.com

Rachael E. Meny     rem@kvn.com, efiling@kvn.com; pal@kvn.com

Nicolas Morgan     nicolas.morgan@dlapiper.com, jette.brasher@dlapiper.com

Elliot R. Peters     erp@kvn.com, efiling@kvn.com; aap@kvn.com

David Priebe     david.priebe@dlapiper.com, stacy.murray@dlapiper.com

Lee Conan Robinson     robinsonlc@sec.gov

David J. Schindler     david.schindler@lw.com, terri.lilley@lw.com, and

        kathryn.bowman@lw.com

Shana N. Stanton     sns@kvn.com, efiling@kvn.com; lhl@kvn.com; bdl@kvn.com

Nanci Clarence          nclarence@clarencedyer.com

Quyen Le Ta     qta@kvn.com

Frank R. Ubhaus     fru@berliner.com, cep@berliner.com

DATED:  April 30, 2007

/s/Leslie J. Hughes
  Leslie J. Hughes

FIRST AMENDED COMPLAINT                                    Case No. C 06-6384